**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN THE MATTER OF THE COMPLAINT OF INGRAM BARGE COMPANY AS OWNER OF THE M/V DALE A. HELLER AND THE IB9525, IN025300, IN085089, IN095041, IN096081, IN107057, AND IN117513, PETITIONING FOR EXONERATION FROM OR LIMITATION OF LIABILITY, )))))))) | Civil Action No.: 13 C 3453 Civil Action No.: 13 C 4292 (Consolidated) |
| *Consolidated with,* ) | Judge Amy J. St. Eve |
| IN THE MATTER OF AMERICAN COMMERCIAL LINES, LLC, AS OWNER AND INLAND MARINE SERVICE, INC. AS OWNER *PRO HAC VICE* OF THE M/V LOYD MURPHY FOR EXONERATION FROM OR LIMITATION OF LIABILITY. ))))))) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Inland Marine Service, Inc. ("IMS"), as operator and owner *pro hac vice* of the M/V Loyd Murphy ("Loyd Murphy"), has filed a motion for summary judgment as to all claims against it and the Loyd Murphy pursuant to Federal Rule of Civil Procedure 56(a). (R.637). For the following reasons, the Court denies IMS' motion as to the negligence, public nuisance, and Rivers and Harbors Act claims against it. The Court grants IMS' motion as to the unseaworthiness claims against it.

## BACKGROUND

On June 10, 2013, IMS filed a complaint in admiralty for exoneration from or limitation of liability in connection with an April 18, 2013 incident involving the M/V Loyd Murphy. (R.1,

13-cv-04292).[1]  Specifically, during a high-water situation on the evening of April 18, the M/V

Dale A. Heller ("Dale Heller"), owned by Petitioner Ingram Barge Company ("Ingram"),

attempted to navigate past the Marseilles, Illinois Dam and into the Marseilles Canal.  The Loyd

Murphy, along with two United States Army Corps of Engineers vessels, agreed to assist the

Dale Heller and its tow in navigating past the Marseilles Dam.  While traversing Illinois River

Mile 247.0 near the dam, the Dale Heller's tow broke apart, and seven of its barges either allided

with the dam or sank upriver from it.  (*Id.* ¶ 8).  IMS' complaint anticipates that claimants would

bring various claims against IMS, ACL, and/or the Loyd Murphy as a result of this allision.

On December 16, 2013, the United States filed a claim in IMS' limitation action for

damages to the Marseilles Dam and related structures.  (R.374).[2]  The United States alleges three

counts against IMS:  (1) violations of Sections 403, 408, and 409 of the Rivers and Harbors Act

("RHA");[3] (2) negligence and unseaworthiness under the general maritime law; and (3) creation

of a public nuisance.  (*Id*. at 15-20).  Individual claimants, including the Marseilles Elementary

School District #150 ("MESD"), "have also made claims against IMS for negligence and

unseaworthiness under the general maritime law."  (R.638, IMS Opening Br. at 12).

In support of its motion, IMS argues that the undisputed evidence establishes that the

Loyd Murphy acted "solely in the capacity of an assist boat during the transit of the Heller tow,"

that "nothing the Murphy or her crew did or failed to do caused or contributed to" the April 18

allision, and, thus, IMS and the Loyd Murphy "are not liable to any of the Claimants under  . . .

---

[1]  IMS and American Commercial Lines, LLC ("ACL"), as owner of the Lloyd Murphy, jointly filed the complaint. (*Id.*).  On October 14, 2015, this Court granted ACL's motion for summary judgment without objection, dismissing ACL with prejudice as a party.  (R.674, 13-cv-3453).  The parties do not dispute that, at all times relevant to this litigation, IMS was the bareboat charterer and owner *pro hac vice* of the Lloyd Murphy.  (R.639, IMS Rule 56.1(a)(3) Stmt. Facts ¶ 2).
[2]  Record cites hereinafter refer to *In the Matter of Ingram Barge Company*, No. 13-cv-3453.
[3]  The Court previously dismissed the United States' *in personam* claim under RHA § 408.  (R.620).

any theory of recovery." (R.638, IMS Opening Br. at 2). The United States, Ingram, and MESD

oppose IMS' summary judgment motion. (*See* R.675; R.679; R.680).[4]

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P.

56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In determining summary judgment

motions, "facts must be viewed in the light most favorable to the nonmoving party only if there

is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). The party

seeking summary judgment has the burden of establishing that there is no genuine dispute as to

any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly

supported motion for summary judgment is made, the adverse party must set forth specific facts

showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 255 (quotation omitted).

A court's "job when assessing a summary judgment motion is not to weigh evidence, make

credibility determinations, resolve factual disputes and swearing contests, or decide which

inferences to draw from the facts." *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

## STATEMENT OF FACTS

IMS claims exoneration from liability based, largely, on the "dominant mind" doctrine

applicable in maritime cases involving assist boats. It further claims that the Loyd Murphy and

her crew acted within the standard of care of prudent seamanship, and cannot be liable under the

RHA where IMS neither owned nor operated the Dale Heller barges. In opposing summary

judgment, the United States, MESD, and Ingram point to the Loyd Murphy's relevant conduct

---

[4] The Court previously granted Claimants' motion for joinder in MESD's response to the motion. (R.686).

both before and during the transit into the Marseilles Canal. According to non-movants, this includes the Loyd Murphy's involvement in creating a flotilla of barges at Ballards Island during a high water situation on April 17, 2013, and in planning, directing, and executing the attempted transit on April 18, 2013. The Court looks to the following facts in considering IMS' motion for summary judgment.

## I. The Illinois River Area

The United States Army Corps of Engineers ("Army Corps") operates and maintains the Marseilles Lock and Dam project on the Illinois River at Marseilles, Illinois. (R.676, US Rule 56.1(b)(3)(B) Stmt. Facts ¶ 4). The Marseilles Dam is located near Mile 247.0 on the Illinois River. (R.676-4, Illinois River Charts). The Marseilles Lock is about two miles downriver from the Dam. (R.678, Ingram Rule 56.1(b)(3)(B) Stmt. Facts ¶¶ 12-13). Less than one mile upriver from the Dam is an area known as "Gum Creek." (R.676-4, Illinois River Charts (reflecting "Gum Creek Light & Daymark" at Mile 247.8)). Further upriver, at approximately Mile 248.0, sits an island known as Ballards Island. (*Id.*). Another Illinois River island—Johnson Island—sits upriver from Ballards Island. (R.649, Ice Dep. Tr. at 33-34, 304).

Industry vessels planning to navigate downriver past the Marseilles Dam typically hold at Johnson Island and/or Ballards Island to announce their arrival and to inquire with the Army Corps about the Dam's gate settings. (R.648, Rodriguez Dep. Tr. at 95-96; *see also* R.639, IMS Rule 56.1(a)(3) Stmt. Facts ¶ 17). There are, however, no fixed mooring structures at Ballards Island. (R.646, Henleben Dep. Tr. at 105). Vessels navigating downriver past the Marseilles Dam must enter the Marseilles Canal—the mouth of which is adjacent to the Dam—in order to pass through the Marseilles Lock. (R.639, IMS Rule 56.1(a)(3) Stmt. Facts ¶¶ 12-13).

## II. The Creation of the Ballards Island Flotilla on April 17, 2013

On April 16, 2013, the Dale Heller departed Channahon, Illinois, headed southbound on the Illinois River with fourteen barges in tow. (R.639, IMS Rule 56.1(a)(3) Stmt. Facts ¶ 8). Charlie White ("White") was the captain of the Dale Heller. (*Id.* ¶ 9). It is undisputed that the Illinois River experienced heavy rains and high waters during the Dale Heller's voyage on April 16-18, 2013. (R.639, IMS Rule 56.1(a)(3) Stmt. Facts ¶ 10).

By 5:30 a.m. on April 17, Captain White knew that the Dam gates were opened to at least 20 feet. (R.676, US Rule 56.1(b)(3)(B) Stmt. Facts ¶¶ 18-19; R.681, MESD Rule 56.1(b)(3)(B) Stmt. Facts ¶¶ 18-19 (citing to 4/17 VDR 4, t/s 5:09 a.m. and 5:36 a.m.) ("I'm just going to go down here and back into Ballards Island and stop and wait for the water to go down anyway")).[5] At 7:35 a.m., the Dale Heller arrived at Ballards Island, upriver of the Dam. (R.639, IMS Rule 56.1(a)(3) Stmt. Facts ¶ 17). Captain White informed an Ingram dispatcher that he planned to hold at Ballards Island until the gates were lowered to 17-18 feet total opening. (R.676, US Rule 56.1(b)(3)(B) Stmt. Facts ¶ 20; R.681, MESD Rule 56.1(b)(3)(B) Stmt. Facts ¶ 20 (citing to 4/17 VDR 4, t/s 9:06 a.m.)).[6]

Around 4:00 p.m. on April 17, the Loyd Murphy approached the Marseilles Lock, headed northbound on the Illinois River with a fifteen-barge tow. (R.676, US Rule 56.1(b)(3)(C) Stmt. Additional Facts ¶ 1). Anthony Ice ("Ice") was the captain of the Loyd Murphy. Between 4:00 and 7:10 p.m., the Loyd Murphy and its tow locked through the Lock and transited the Canal.

---

[5] All citations to VDR data ("t/s") correspond to the United States' submission of video and audio files. (R.676-32). Citations to "VDR 2" are to Channel 2, the recorded radio transmissions. Citations to "VDR 4" are to Channel 4, the recorded audio in the wheelhouse of the Dale Heller. The Court understands that the VDR clock ran 11 minutes and 30 seconds ahead of Central Daylight Time. (R.675, US Response Br. at 3 n.3).

[6] It is undisputed that Captain White testified to his "rule of thumb" of not attempting navigation past the Dam with a 14-barge tow where the gates are opened 18 feet or more. (R. R.639, IMS Rule 56.1(a)(3) Stmt. Facts ¶ 16 (citing R.651, White Dep. Tr. at 20-22)). The relationship between higher gate openings and outdraft currents, as well as between outdraft currents and vessel orientation, however, remains disputed. (R.676, US Rule 56.1(b)(3)(B) Stmt. Facts ¶¶ 14-15; R.681, MESD Rule 56.1(b)(3)(B) Stmt. Facts ¶¶ 14-15).

(*Id.* ¶ 5). The Loyd Murphy first attempted to moor below Gum Creek until the water levels reduced, to avoid a problematic upriver transit past Johnson Island. (R.681, MESD Rule 56.1(b)(3)(C) Stmt. Additional Facts ¶¶ 74-75). As Captain Ice testified, "I was trying to hold over there [below Gum Creek] until the flow cut back so I could transit Johnson Island." (R.649, Ice Dep. Tr. at 94; *see also id.* at 305-07 ("I could not transit northbound with my tow upriver due to the fact the Johnson Island cut is shallow, rocky, and swift . . ."); R.701-1, Roach Dep. Tr. at 119-20 ("[Loyd Murphy] just stopped because we weren't going to continue to go through certain areas that . . . could have given us problems"); R.651, White Dep. Tr. at 148 ("That's the reason [the Captain of the Loyd Murphy] was tied off beside of me. We can't get -- we couldn't shove back up through Johnson Island"); R.676, US Rule 56.1(b)(3)(C) Stmt. Additional Facts ¶ 37 (citing 4/18 VDR 2, t/s 9:53-9:54 (Ice to the captain of the M/V City of Joliet: "I couldn't shove the cut, so"))).

The Gum Creek river area was too rocky and shallow for the Loyd Murphy. (R.704, IMS Response to US Rule 56.1(b)(3)(C) Stmt. Additional Facts ¶¶ 5, 12; R.649, Ice Dep. Tr. at 94). Thus, Captain Ice radioed Captain White, and the two discussed the high water situation[7] and whether the Loyd Murphy could also position itself at Ballards Island. (R.676, US Rule 56.1(b)(3)(C) Stmt. Additional Facts ¶¶ 6-12 (citing 4/17 VDR 2, t/s 19:21-20:28)). According to Captain Ice, "I radioed over to the Dale Heller. I said, Hey, you don't mind if I come over there and tie off with you, you know, get me out of here where I don't have to . . . you know, I can help you hold what you got because he's backing pretty strong . . . ." (R.649, Ice Dep. Tr. at 94). The Loyd Murphy thereafter joined the Dale Heller at Ballards Island northbound, tying its tow to the Dale Heller's tow. (R.639, IMS Rule 56.1(a)(3) Stmt. Facts ¶¶ 22, 28; *see also* R.649,

---

[7] With respect to his northbound Canal transit, radio recordings reflect that Ice told White, "damn sure wouldn't have wanted to have 15 loads coming out of there." (R.676, US Rule 56.1(b)(3)(B) Stmt. Facts ¶ 23; R.681, MESD Rule 56.1(b)(3)(B) Stmt. Facts ¶ 23 (citing to 4/17 VDR 2, t/s 20:08:42)).

Ice Dep. Tr. at 97 ("[Q]. Once you were tied up to the Dale Heller's tow at Ballards Island, what was your plan? [A]. To sit there and wait for the water to settle down"). Around 9:00 p.m., Captain White sent an email to Ingram dispatchers, advising that the Dam gates were set to 25 feet. (R.639, IMS Rule 56.1(a)(3) Stmt. Facts ¶ 24).

### III.    The Morning of April 18, 2013

Early on April 18, Captain White reported that the Dam gates had been opened to 35 feet at 2:00 a.m., and that the Illinois River was expected to continue to rise. (R.639, IMS Rule 56.1(a)(3) Stmt. Facts ¶ 25). By 7:00 a.m., the Dale Heller and the Loyd Murphy were having some trouble holding the 29-barge flotilla at Ballards Island. (R.676, US Rule 56.1(b)(3)(B) Stmt. Facts ¶¶ 26-27, 32 (citing 4/18 VDR 4, t/s 7:21-7:22 (White to Ingram Senior Manager of Vessel Operations Ed Henleben ("Henleben"): ("this fella here [Loyd Murphy] . . . he was having problems himself so he's wired in here beside me, he's on the other end of this . . . this is a bad situation here")); *see also* 4/18 VDR 2, t/s 6:58-7:05, 7:08-7:56 (Ice and White discussing the situation); R.649, Ice Dep. Tr. at 120 ("[Q]. And specifically what did you tell Mark Roach? [A]. That we needed to figure out what we were going to do. That, you know, we were having trouble holding what we had . . ."). At 7:34 a.m., IMS Manager Tim Gambrel sent an internal IMS e-mail reflecting that the Loyd Murphy was in distress. According to Gambrel, the "lock is running 55 ft. and [the Loyd Murphy] is stalled out with 10 loads and 5 empties . . . Dale Heller . . . is backing full astern to keep the LM from losing ground." (R.676-23). Captain Ice later denied the characterization of his vessel—as opposed to the Dale Heller—as distressed. (R.649, Ice Dep. Tr. at 259-60 (testifying that he first became "aware of the fact that the Dale Heller was a vessel in need" on the morning of April 18 "when [Loyd Murphy] was full ahead trying to help

[Dale Heller] hold")).  According to Captain Ice, "I could have held my tow where I was at . . .

There was no point where I couldn't hold my own."  (*Id.* at 163-65; *see also id.* at 302).

Around 8:00 a.m., Captain Ice contacted a local tugboat operator, Scott Hardin

("Hardin") of the Nancy S., to request assistance for the combined tow.  (R.676, US Rule

56.1(b)(3)(C) Stmt. Additional Facts ¶¶ 23-24).  Captain Ice radioed, "We may need some help

down here . . . We got about 12,000 horse here, we're barely holding 20 -- 29 barges . . . I don't

know man what we're doing but this ain't right . . . the situation is getting worse.  They're

opening up more and more dam all the time."  4/18 VDR 2, t/s 8:00; *see also* R.649, Ice Dep. Tr.

at 138.  Hardin later testified that it was the Dale Heller—not the Loyd Murphy—that needed

assistance.  (R.701-7, Hardin Dep. Tr. at 70).[8]

Around that time, a crew from the Loyd Murphy and the Dale Heller tied the combined

tow to some trees on Ballards Island, while Captain Ice watched from the Zodiac.  (R.676, US

Rule 56.1(b)(3)(B) Stmt. Facts ¶ 31; *see also* R.649, Ice Dep. Tr. at 133-34 ("I deemed myself to

run the Zodiac up there because I had the most experience in a boat like that than the other

crew"); R.651, White Dep. Tr. at 131).  The Nancy S. arrived around 8:40 a.m. and positioned

itself alongside the Loyd Murphy tow.  (R.676, US Rule 56.1(b)(3)(B) Stmt. Facts ¶ 29 (citing

R.676-5, Nancy S. April 18, 2013 log ("Assist . . . Boat Dale Heller); *see also* R.676-6, Hardin

Dep. Tr. at 90-91 ("[W]hen I got there, they had already completed the shore wire . . . I kind of

just leaned on the outside waiting for them to tell me what to do").  A 9:01 a.m. internal IMS e-

---

[8]  The Dale Heller also attempted to contact assist boats on April 18 to request additional horsepower.  (R.704, IMS
Response to US Rule 56.1(b)(3)(C) Stmt. Additional Facts ¶ 23).  The excerpted testimony of Ingram dispatchers
Adrienne Moore and Carissa Koeller and Ingram Port Captain Ed Henleben, however, is unclear as to the exact
timing of these efforts.  (*See* R.701-9, Moore Dep. Tr. at 147-52; R.701-3, Koeller Dep. Tr. at 56-57; 97-98; R.646,
Henleben Dep. Tr. at 134, 285-86).  It appears that—at some point—Ingram and/or the Dale Heller contacted
Hardin's team for "assistance in mooring the tow."  (R.701-7, Hardin Dep. Tr. at 70:1-16).

mail reflected that the "Loyd Murphy is secure to the bank. They have the Dale Heller alongside . . . All is well from our end."  (R.676-26).

Between 9:00 and 10:00 a.m., Captain Ice contacted the M/V City of Ottawa and the M/V City of Joliet for additional assistance.  (R.676, US Rule 56.1(b)(3)(C) Stmt. Additional Facts ¶¶ 31-37 (citing 4/18 VDR 2, t/s 9:32-10:01); R.676-17, Rosenblad Dep. Tr. at 29:23-30:3 ("[Q]. And did Tony Ice, in fact, call you between 9:00 and 10:00 a.m. on the day of the accident and say that he and other boats and 31 barges were in distress near Ballards Island? [A]. Yes").  The City of Joliet received directions from both Captain Ice and Captain White.  (R.704, IMS Response to US Rule 56.1(b)(3)(C) Stmt. Additional Facts ¶ 38 (citing 4/18, VDR 2, t/s 10:00-10:02)).  Upon arrival, the City of Joliet put its two barges at the head of the Dale Heller tow and wired them into the whole flotilla.  (R.701-14, Deaton Dep. Tr. at 91-92).  When the City of Ottawa arrived, it received directions from the pilot of the Lloyd Murphy, Jackie Daniel ("Daniel").  (R.676, US Rule 56.1(b)(3)(C) Stmt. Additional Facts ¶¶ 41-42 (citing 4/18 VDR 2, t/s 11:53)).  Around 1:15 p.m., the City of Ottawa left its position, replaced by the M/V Cody Boyd.  (*Id.* ¶ 43 (citing 4/18 VDR 2, t/s 13:15)).

Between 2:00 and 3:00 p.m., the last tree securing the flotilla gave way.  (*Id.* ¶ 44 (citing 4/18 VDR 2, t/s 14:25)).  Around that time, Captain Ice asked the City of Ottawa to come back, directed it, searched for other assist boats, ordered his crew to double up the rigging, spoke with IMS and ACL management, and generally "offered ideas to [Captain] White as they occurred to him[.]"  (*Id.* at ¶¶ 45-51 (citing 4/18 VDR 2, t/s 14:39-15:12; R.676-8, Dodd Dep. Tr. at 126-29, 168, 173; R.676-25, Roach Dep. Tr. 138-39)); R.704, IMS Response to US Rule 56.1(b)(3)(C) Stmt. Additional Facts ¶ 46).

## IV.    The Afternoon of April 18, 2013

### A.    The IRCA Conference Call

Meanwhile, at approximately 2:00 p.m. on April 18, a River Industry Action Committee ("RIAC") call convened, followed by an Illinois River Carrier's Association ("IRCA") conference call.  (R.676, US Rule 56.1(b)(3)(B) Stmt. Facts ¶ 34 (citing R.676-7, Hughes Dep. Tr. at 35-36, 59-60)).  The IRCA is a joint association of towage companies and government agencies, formed to disseminate information and to facilitate navigation on the Illinois River. (R.646, Henleben Dep. Tr. at 45-47).  The RIAC is a similar organization, coordinating navigation on the Upper Mississippi River.  (R.676-7, Hughes Dep. Tr. at 31-33).

Representatives of Ingram, the Army Corps, and the United States Coast Guard participated on the April 18 IRCA call.  (R.639, IMS Rule 56.1(a)(3) Stmt. Facts ¶ 34). According to Ingram employee Thomas More, the call participants included, among others, himself, Ingram employee Ed Henleben, ICRA Chairman Terry Wiltz, and Army Corps / Coast Guard employees Mike Cox, Tom Nock, Larry Rodriguez, and Jason Neubauer.  (R.701-4, More Witness Statement).[9]  ACL representatives also listened in—but did not speak—on the call. (R.678, Ingram Rule 56.1(b)(3)(B) Stmt. Facts ¶ 35 (citing testimony of ACL Director of River Operations Harold Dodd ("Dodd")).  Dodd spoke with Captain Ice during the IRCA call. (R.676-8, Dodd Dep. Tr. at 163-80).[10]

After discussing lock closures and river conditions, the IRCA participants discussed the situation at Ballards Island.  RIAC Chairman Shannon Dale Hughes, for example, recalled Ingram representative Ed Henleben joining the call to discuss "get[ting] a plan together to try to

---

[9]  According to Larry Rodriguez, there were "about 40 people on the call."  (R.648, Rodriguez Dep. Tr. at 188).
[10]  Captain Ice also testified to speaking with IMS Vice President Mark Roach around this time.  According to Ice, Roach was "on a conference call."  (R.649, Ice Dep. Tr. at 173:7-23).  Roach, however, could not recall whether he was on the IRCA call.  (R.681, MESD Rule 56.1(b)(3)(B) Stmt. Facts ¶ 35).

help the [Dale Heller] get safely into the Marseilles Canal."  (R.676-7, Hughes Dep. Tr. at 35-36).[11]  Other IRCA participants identified only the Dale Heller—not the Loyd Murphy—as distressed and needing an action plan.  (R.647, More Dep. Tr. at 183-87, 209-10; R.701-5, Heroff Dep. Tr. at 108-09; R.701-6, Harris Dep. Tr. at 40).  When asked who was in charge of "the whole conversation about the Dale Heller," Henleben testified that there "were a lot of people weighing in with ideas and what we can do . . . it was pretty much a joint situation[.]" (R.646, Henleben Dep. Tr. at 197).  It is undisputed that no one from IMS, the Loyd Murphy, or ACL spoke during the IRCA call.  (R.639-2, Hughes Dep. Tr. at 78).

Henleben spoke with the Dale Heller's pilot, Ronald Shrader ("Shrader"), at various points during the IRCA call.  (R.676, US Rule 56.1(b)(3)(B) Stmt. Facts ¶¶ 37-39, 41 (citing 4/18 VDR 4); R.646, Henleben Dep. Tr. at 169-70).  Eventually, the IRCA participants set a general plan to break up the Ballards Island flotilla and to move the Dale Heller and its tow into the Canal.  The parties do not dispute that this plan involved adjusting the Dam gate settings. (R.704, IMS Response to US Rule 56.1(b)(3)(C) Stmt. Additional Facts ¶ 52).  The parties dispute, however, the exact agreement on gate settings -- specifically, whether they had agreed to reduce the gates *by* 16 feet, or *to* 16 feet, and for how long.  (*Compare, e.g.*, R.676, US Rule 56.1(b)(3)(B) Stmt. Facts ¶¶  40, 42, 48, 49, 64 *with* R.678, Ingram Rule 56.1(b)(3)(B) Stmt. Facts ¶¶ 40, 42, 48, 49, 64).[12]  According to Pilot Shrader, the plan "tentatively" involved the Marseilles Lockmaster lowering the gates to 16 feet, the Loyd Murphy and the City of Joliet heading northbound with their tows, and the Cody Boyd standing ready to assist with the Dale Heller's transit into the Canal.  (R.676, US Rule 56.1(b)(3)(C) Stmt. Additional Facts ¶¶ 53-55

---

[11]  Henleben, however, recalled that the Marseilles Lockmaster—not he—originally brought up the Dale Heller and the Loyd Murphy.  (R.646, Henleben Dep. Tr. at 186-87 (testifying that Larry Rodriguez had interrupted the IRCA call to report that "the two boats that were at Ballards Island" had lost mooring to the trees and were slowly sliding downriver)).
[12]  The Court cannot—and need not—resolve this factual dispute at this time.

(citing 4/18 VDR 2, t/s 15:22:28); *see also* R.676-27, Ingram Notes from IRCA Call (confirming plan)).

### B.     The Captains' Meeting

After Pilot Shrader radioed the plan to the vessel crews, Captain Ice asked if Captain White was available for a meeting.  (R.704, IMS Response to US Rule 56.1(b)(3)(C) Stmt. Additional Facts ¶ 57).  Captain Ice radioed, "I'm up here with the Corps of Engineers guys right now, talking to them. We got kind of a game plan . . . Maybe have [White] walk out here or something. We'll all sit here and do a quick pow wow, the wheelmen.  (4/18 VDR 2, t/s 15:23-15:24).[13]  Captain White testified that he attended the meeting to "go over this game plan to see how I felt about it."  (R.651, White Dep. Tr. at 141).

A meeting took place thereafter, around 3:15 p.m.  (4/18 VDR 2, t/s 15:25:14 ("Charlie's heading down your way guys")).  It is undisputed that pilots, captains, and/or deckhands from the Dale Heller, the Loyd Murphy, the City of Ottawa, and the Cody Boyd attended the meeting aboard the City of Ottawa.  (R.676, US Rule 56.1(b)(3)(B) Stmt. Facts ¶¶ 46-47; R.681, MESD Rule 56.1(b)(3)(B) Stmt. Facts ¶¶ 46-47).[14]  According to Captain Ice, the captain of the City of Ottawa—Robert Slack ("Slack")—led the meeting, but no one was "in charge of it" because it was "a put your heads together type meeting."  (R.649, Ice Dep. Tr. at 178-79).  Other witnesses testified that Captain Ice appeared to be in charge of the meeting.  (R.704, IMS Response to US Rule 56.1(b)(3)(C) Stmt. Additional Facts ¶¶ 64, 67-68 (reflecting deposition testimony of Army Corps employees Matthew Brown and Fred Tazelaar, and Cody Boyd Captain Stunkel)).

---

[13]  According to radio recordings, someone aboard the City of Ottawa then invited the captain of the Cody Boyd— Al Stunkel ("Stunkel")—to the meeting.  (4/18 VDR 2, 15:25:38).
[14]  Captain White's testimony indicated that representatives from the "[M/V] Creve Coeur and maybe the City of Joliet" were at the meeting.  (R.651, White Dep. Tr. at 142-45).  The record reflects otherwise.  (R.676-14, Cutler Dep. Tr. at 60-65; R.676-15, Deaton Dep. Tr. at 94-95, 136).

The captains' meeting ended around 3:40 p.m. (R.676, US Rule 56.1(b)(3)(C) Stmt. Additional Facts ¶ 63). The tactical plan following that meeting was for the City of Joliet to transit into the Canal with its two barges, the Loyd Murphy and the Cody Boyd to move the Loyd Murphy's tow across the river—where the Cody Boyd would hold it—and for the Loyd Murphy, the City of Ottawa and the Creve Coeur to then help the Dale Heller transit the Canal with its fourteen barges. (*Id.* ¶ 72; *see also* R.639, IMS Rule 56.1(a)(3) Stmt. Facts ¶ 48). Captain White agreed with this plan. (R.651, White Dep. Tr. at 145).[15] It is undisputed that, among the vessel captains, Captain White "had the ultimate authority to determine whether to go forward with the plan of transiting his tow to the Canal." (R.676, US Rule 56.1(b)(3)(B) Stmt. Facts ¶ 58; R.681, MESD Rule 56.1(b)(3)(B) Stmt. Facts ¶ 58; *see also* R.649, Ice Dep. Tr. at 163 ("[Q]. Whose call was it? [A]. That would have been Captain Charlie's call").[16] Captain White does not dispute this fact. (R.651, White Dep. Tr. at 209-11).

Captain Ice and Captain White conversed about the positioning of the assist boats after the captains' meeting. (R.649, Ice Dep. Tr. at 187-89). In particular, Ice testified that Captain White said, "Well, I want them here and here and that's where I placed them. He asked me to place them because he was busy doing what -- he was focusing on his obligation and maintaining his tow." (*See* R.704, IMS Response to US Rule 56.1(b)(3)(C) Stmt. Additional Facts ¶ 79). Captain White testified that Captain Ice "would be calling the shots" in terms of assist boat positioning because "[Ice]'s got 25 years' experience. He's well versed in this and on this river and he was going to be right on my stern right beside of me." (R.651, White Dep. Tr. at 150-51).

---

[15] The parties dispute whether other options were available to the Dale Heller and its tow. (*See e.g.*, R.676, US Rule 56.1(b)(3)(B) Stmt. Facts ¶¶ 50-55; R.681, MESD Rule 56.1(b)(3)(B) Stmt. Facts ¶¶ 50-55). The Court cannot—and need not—resolve this dispute at this time.

[16] Ingram argues that the government lockmaster, not the vessel captain, "is responsible for directing the movement and mooring of all vessels in or near the lock and dam." (R.678, Ingram Rule 56.1(b)(3)(B) Stmt. Facts ¶ 58) (citing Larry Rodriguez testimony)).

White further testified that the configuration was "between us on the boats . . . my stern was what I was concerned about getting out. So that's why we put the Lloyd Murphy here and the other two boats out toward the head." (*Id.* at 151-53).[17] Captain White asked Captain Ice to assist with communications during the transit. (*Id.* at 155 (testifying that Ice ran the communications check prior to transit); *see also* R.649, Ice Dep. Tr. at 180).

### C. The Attempted Transit to the Canal

After the captains' meeting, the M/V Creve Coeur arrived at Ballards Island, carrying Army Corps supervisor Jeff Griffin ("Griffin"). (R.676, US Rule 56.1(b)(3)(B) Stmt. Facts ¶ 80). Griffin boarded the Loyd Murphy for the transit. (*Id.* ¶ 81).[18] Sometime prior to the transit, the Loyd Murphy moved its barges upriver with the assistance of the Cody Boyd. The Cody Boyd then held the Loyd Murphy tow, while the Creve Coeur "ma[d]e sure the Cody Boyd was going to stay where he needed to stay" before joining the southbound transit to the Canal. (R.639, IMS Rule 56.1(a)(3) Stmt. Facts ¶¶ 56-57; R.649, Ice Dep. Tr. at 176-78, 186-87).[19] It is undisputed that the Cody Boyd—a vessel with less horsepower than the Loyd Murphy— successfully held the tow in position. (R.676-16, Stunkel Dep. Tr. at 82; Ice Dep. Tr. at 283-84).

Around 5:00 p.m., the Dale Heller and its tow began the southbound transit from Ballards Island to the Canal, assisted by the Loyd Murphy, the City of Ottawa, and the Creve Coeur. (R.676, US Rule 56.1(b)(3)(C) Stmt. Additional Facts ¶ 84 (citing 4/18 VDR 2, t/s 17:12:26)). At that time, Griffin called the Marseilles Lockmaster, Larry Rodriguez ("Rodriguez"), to lower

---

[17] Ice recalled asking White—shortly before the proposed transit—if he wanted to position the Loyd Murphy at the head of the tow, moving the two Army Corps boats to the stern. White said no. (R.649, Ice Dep. Tr. at 188; *see also* 4/18 VDR 2, t/s 16:58:58). White did not recall this suggestion. (R.651, White Dep. Tr. at 154).

[18] There is conflicting evidence on why Griffin joined the Loyd Murphy wheelhouse, as opposed to the Dale Heller wheelhouse. (*Compare e.g.,* R.676-20, Griffin Dep. Tr. at 107 (testifying that he boarded the Loyd Murphy because it was closer to the Creve Coeur and "it seemed . . . [Tony Ice] was the one directing" *and* R.676-30, Griffin Answer to Interrogatory No. 2 (same) *with* R.651, White Dep. 150-51, 226 *and* R.649, Ice Dep. 179-80 (testifying that Captain White placed Griffin in the Loyd Murphy wheelhouse to lessen distractions on the Dale Heller)).

[19] According to Ice, "I could have held my tow where I was at . . . There was no point where I couldn't hold my own." (R.649, Ice Dep. Tr. at 163-65; *see also id.* at 302).

the Dam gates.  (*Id.* ¶¶ 85-86 (citing cell phone records and Griffin testimony)).  Captain Ice advised the vessel crews, "They're putting the dam down right now."  (*Id.* ¶ 87 (citing 4/18 VDR 2, t/s 17:13:20)).  Captain White testified that he was "relying on the [Army] Corps, Jeff Griffin, to communicate what needed to be communicated" in terms of gate lowering.  (R.651, White Dep. Tr. at 225:9-14; *see also id.* at 226 (testifying that he [White] could speak directly to the lockmaster on audio Channel 14, but he "wasn't concerned about it")).  Rodriguez testified that "when [the vessels] told me that they were ready to start coming down . . . I went through the computer and clicked [Gates 1, 2, 3, and 4] and they all started down . . . to 4 feet," achieving a total gate setting of 50 feet from an initial 66-foot gate setting.  (R.648, Rodriguez Dep. Tr. at 195-96).  He testified that the gates moved approximately 1 foot per minute.  (*Id.* at 81-82).

It is undisputed that around 5:15 p.m., Griffin called Rodriguez and directed him to raise the Dam gates.  (*Id.* ¶ 62; *see also* R.676, US Rule 56.1(b)(3)(C) Stmt. Additional Facts ¶ 96 (citing cell phone records)).  Conflicting evidence exists, however, on who made—or who should have made—the ultimate decision on whether, why, and when to raise the Dam gates during the transit.  (*See e.g.*, R.704, IMS Response to US Rule 56.1(b)(3)(C) Stmt. Additional Facts ¶¶ 82, 90, 92-95).  Griffin, for example, testified that Captain Ice directed him to raise the gates out of concern for flooding the town.  (R.676-20, Griffin Dep. Tr. at 104-05, 142-45, 253; *see also* 4/18 VDR 2, t/s 17:28:22 (Ice to the vessel crews: "I'm telling him to open up a little bit more gate because they're starting to flood up into those houses already").[20]  Ice, on the other hand, denied telling Griffin to raise the gates.  (R.649, Ice Dep. Tr. at 220-23, 232-33, 276-80, 327).  He testified that he "fumbled with [his] words" on the radio and agreed to the gate-raising idea only after Griffin "was hounding and hounding [him] about it."  (*Id.* at 222).

---

[20]  Griffin further testified, though, that the *lockmaster* made the ultimate decision on whether or not to raise the gates.  (R.701-21, Griffin Dep. Tr. at 127-28).

Meanwhile, during the transit, Captain Ice occasionally gave directions to the Creve Coeur and the City of Ottawa, without explicit prior approval from Captain White.  (R.704, IMS Response to US 56.1(b)(3)(C) Stmt. Additional Facts ¶¶ 98-99 (citing 4/18 VDR 2, t/s 17:12:40 to 17:44:33).  Captain Slack testified to this effect.  (R.681-17, Slack Dep. Tr. at 196 ([Q. And during this particular transit . . . you were also receiving orders from the captain of the Loyd Murphy, weren't you, sir?  [A]. Yes").[21]  Captain White testified that he "agreed" with Captain Ice's orders, and that he had the "right and responsibility" to countermand any order involving his tow with which he disagreed.  (R.651, White Dep. Tr. at 190-91, 194, 199-200, 208-11, 220; *see also* R.703, IMS Response to Ingram 56.1(b)(3)(C) Stmt. Additional Facts ¶ 4; R.705, IMS Response to MESD Rule 56.1(b)(3)(C) Stmt. Additional Facts ¶ 81).  Captain Ice agreed that Captain White remained in charge of the transit.  (R.649, Ice Dep. Tr. at 179:4-8 ("[Q]. In terms of the transit from Ballards Island down to the canal with the Dale Heller and its barges, the Creve Coeur and the City of Ottawa, who was in charge of that?  [A]. Captain Charlie")).

Around 5:30 p.m., after the City of Ottawa stopped pushing on its head, the Dale Heller tow allided with the Canal wall and broke apart.  (R.704, IMS Response to US 56.1(b)(3)(C) Stmt. Additional Facts ¶ 100).  In total, seven barges in the tow allided with the dam or sank upriver from it.  (R.639, IMS Rule 56.1(a)(3) Stmt. Facts ¶ 66).  The United States claims that it experienced subsequent damage to the Dam and its components, damage to the Lock and its components, damage to the earthen dike running along the northern shoreline, and general obstruction of navigation on the Illinois River.  (*See generally* R.374).  Individual claimants further state that, when the river waters topped the earthen dike, they flooded the adjacent town

---

[21]  In at least one instance, Ice merely repeated an order from Captain White, because the Creve Coeur was not monitoring a particular audio channel.  (R.649, Ice Dep. Tr. at 180-81, 260-61).  With respect to his directive to the City of Ottawa to get off the head of the tow, Captain Ice testified that Captain White "was just getting ready to tell [City of Ottawa] the same thing."  (*Id.* at 256).

of Marseilles, causing substantial damage to real and personal property.  (R.639, IMS Rule 56.1(a)(3) Stmt. Facts ¶ 5; *see generally* R.11, 13-cv-04292, individual claim).

## ANALYSIS

### I.        General Maritime Law Claims

"The elements of a maritime negligence cause of action are essentially the same as land-based negligence under the common law," including (i) duty, (ii) breach, (iii) causation, and (iv) damages.  1 Thomas J. Schoenbaum, *Admiralty & Mar. Law* § 5-2 (5th ed. 2011); *see also City of Chicago v. M/V Morgan*, 375 F.3d 563, 572-73 (7th Cir. 2004) (same).  In maritime allision cases, the applicable standard of care "is derived from general concepts of prudent seamanship and reasonable care, statutory and regulatory rules governing the movement and management of vessels and other maritime structures, and recognized maritime customs and usages."  *Folkstone Mar., Ltd. v. CSX Corp.*, 64 F.3d 1037, 1046 (7th Cir. 1995).  The Seventh Circuit has recognized the application of comparative fault principles under the general maritime tort law.  *See, e.g.*, *M/V Morgan*, 375 F.3d at 573.

#### A.        The "Dominant Mind" Doctrine

IMS argues that it fulfilled its duties as an assist boat and is, therefore, exonerated from general maritime liability under the "dominant mind" doctrine.  (R.638, Opening Br. at 13-17).  "When damages involve a tow or an entire flotilla, courts employ the 'dominant mind' doctrine to place liability on the tug and absolve the tow from liability."  *N.M. Paterson & Sons, Ltd. v. M/V Ethel E.*, No. 01 C 7325, 2004 WL 170326, at *3 (N.D. Ill. Jan. 14, 2004) (denying summary judgment where the parties disagreed on who had ultimate responsibility over the maneuvering of the bulk carrier vessel).  In cases involving multiple tug vessels, courts look to "whose people are actually in control of the operation" to determine "dominant mind" status.  *Id.*

"When a helper tug merely furnishes power in obedience to orders from the primary tug without any negligence on its part, it should be exonerated from all liability for damages to the tow." *Compl. of Patton-Tully Transp. Co.*, No. CIV. A. 79-2315, 1982 WL 195694 (E.D. La. Sept. 24, 1982). As *Patton-Tully* makes clear, however, an assist vessel must be free of negligence to be absolved from liability. If the non-dominant party "breached a duty or acted in a negligent manner that contributed to the damages . . . [it] may be held partially or solely liable." *N.M. Paterson & Sons*, 2004 WL 170326, at *3; *see also Moran Towing & Transp. Co. v. Empresa Hondurena de Vapores*, 194 F.2d 629 (5th Cir. 1952) (exonerating from liability a vessel "employed solely . . . to furnish tug power" where the evidence showed "without dispute" an absence of negligence on its part).

The United States, MESD, and Ingram argue that the "dominant mind" doctrine cannot exonerate IMS because the Loyd Murphy did more than give passive assistance. The parties do not dispute that Captain Ice and the Loyd Murphy played a role beyond merely furnishing horsepower. This role included, but was not limited to, joining the Dale Heller at Ballards Island, connecting the two tows, contacting assist boats, overseeing the tree-wiring and other rigging operations, speaking with IMS and ACL management about the situation, offering suggestions to Captain White, facilitating the captains' meeting, and—at Captain White's request—spearheading transit communications, configuring the assist boats for transit, and instructing the assist boats during transit.

This evidence concerning Captain Ice's conduct throughout April 17-18, 2013, however, does not raise a triable issue of fact as to whether the Loyd Murphy—as opposed to the Dale Heller—was the "dominant mind." While the scope of Captain Ice's activities bears on the breadth of negligence claims to which IMS may be subject, *see* discussion *infra*, this evidence

does not create a genuine issue concerning Loyd Murphy's status. Industry custom provides that, when assist vessels are used, navigational command remains with the captain of the vessel being assisted. (R.676, US Rule 56.1(b)(3)(B) Stmt. Facts ¶ 67; R.681, MESD Rule 56.1(b)(3)(B) Stmt. Facts ¶ 67 (admitting the same)).[22]

Non-movants dispute that this custom occurred in practice, however, because the April 18 transit was a "unique," "abnormal," or "non-routine" situation involving several industry and government vessels, as well as divided responsibilities. While that may be true,[23] non-movants fail to identify any evidence that Captain White ceded or transferred ultimate command of the operation. It is undisputed that Ingram had ultimate control over whether or not to move forward with the plan. (R.651, White Dep. Tr. at 209-211, 216-20; R.646, Henleben Dep. Tr. at 197-98 ("[Q]. Ultimately with the decision involving Ingram's barges and Ingram's tow, who was the person who had the veto say on whether or not to move forward with the plan on that call? [A]. Me and the captain of the vessel . . . we wouldn't have done anything without [Captain White's] approval"). In fact, the original plan to assist the Dale Heller's tow into the Canal did not involve the Loyd Murphy at all, and neither Captain Ice nor any other representative of IMS participated in its development. The Court thus finds that testimony from Army Corps employees that Captain Ice "appeared" to be in charge at the captains' meeting—by which time the tentative plan had already been developed by IRCA participants—does not create a genuine issue of material fact as to the status of the Loyd Murphy.

Similarly, evidence that Captain White divided transit duties in order to reduce distractions in the Dale Heller wheelhouse does not create a triable issue as to which vessel was

---

[22] There is no evidence from which a factfinder could reasonably conclude that the Loyd Murphy—as opposed to the Dale Heller—was the vessel being assisted on April 18. To the contrary, the record reflects that the Loyd Murphy could have held its own tow in position.

[23] *See, e.g.*, 647, More Dep. Tr. at 202-03; R.678-1, Brown Dep. Tr. at 82-83; R.678-6, Daniel Dep. Tr. at 190-92; R.646, Henleben Dep. Tr. at 212-16, 334.

the "dominant mind."  Specifically, the fact that Captain White delegated to Captain Ice the dual responsibilities of (1) communicating with Griffin and the other vessels, and (2) positioning the assist boats in accordance with Captain White's concern for the Dale Heller's stern, does not vitiate the Loyd Murphy's status as an assist vessel.  Captain White could have overridden—and indeed, did override—Captain Ice's positioning suggestions.[24]  Similarly, the fact that Captain Ice issued speed, force, and/or orientation instructions does not indicate that Captain Ice had ultimate responsibility over navigational decisions, where Captain White issued some of the instructions himself (Ice merely repeated them), and, in any event, Captain White retained the prerogative to countermand any such instruction.  As both captains recognized, ultimate responsibility remained with Captain White.  (R.651, White Dep. 150-51; R.649, Ice Dep. 179-80).

The United States and MESD liken this case to *Shaver Transportation Co. v. Alaska Freight Lines, Inc.*  In *Shaver*, however, the trial court found the assist boat to be the "dominant mind" where its captain "veto[ed] the course of action suggested by the [assisted vessel's captain], and cho[se] a different course which involved the hazardous element of the current." 315 F.2d 97, 99 (9th Cir. 1963).  In apportioning fault, the appellate court looked to the fact that "each captain operated as if the other one were in charge, and each testified that he was relying on the other to maneuver the barge," finding that the assisted vessel's complete "abdication of responsibility" rendered it negligent.  *Id.* at 100.  Such circumstances of "assumed responsibility" are not present here.  *Id.* at 99.  Even viewing the facts in the light most favorable to the non-movants, the record is devoid of any evidence that Captain Ice overrode a decision by Captain

---

[24] Captain White also could have spoken with the lockmaster directly, but he relied on Griffin—not Captain Ice—to coordinate gate-setting communications.  Captain White and Captain Ice both communicated with the other vessels.

White, that the captains lacked an understanding as to the scope of responsibilities, and/or that Captain White "did nothing," relying instead upon Captain Ice. *Id.* at 100.

The record here reflects that Captain White had ultimate responsibility over the Dale Heller and its tow, and that he delegated certain duties so he could concentrate on steering the Dale Heller into the Canal. *Contra N.M. Paterson*, 2004 WL 170326 at *4 ("Because the parties cannot even agree upon the responsibilities of each party in this action . . . it is impossible to determine who the 'dominant mind' was"). The Court finds that there is no evidence from which a factfinder could reasonably conclude that the Loyd Murphy was the "dominant mind."

### B.       Independent Negligence by IMS

This finding does not, however, compel the conclusion that IMS does not face any liability for the April 18 allision. As the parties recognize, the Loyd Murphy's status as an assist boat does not absolve it of the duty to exercise prudent seamanship.

IMS asks for judgment as a matter of law on all negligence claims because the Loyd Murphy "carried out its duty as an assist boat to the complete satisfaction of Captain White." (R.638, Opening Br. at 16). Captain White agreed that there was nothing Captain Ice "did in navigating the Loyd Murphy that [White was] critical of that [he] believe[d] caused or contributed to [the] incident." (R.651, White Dep. Tr. at 226-27). This testimony as to Captain White's belief, however, does not establish that the Loyd Murphy neither caused nor contributed to the allision. As noted above, the record reflects that the Loyd Murphy did more than merely furnish horsepower in obedience to Captain White's orders. Genuine issues of material fact exist with respect to whether the Loyd Murphy violated the standards of prudent seamanship in the days, hours, and minutes leading up to the allision. Conflicting evidence on Captain Ice's role in the gate setting issue, for example, precludes judgment at this stage.

As the United States correctly notes, none of IMS' cited cases determined an assist boat's liability at the summary judgment stage. *See, e.g*, *Diesel Tanker Ira S. Bushey, Inc. v. Tug Bruce A. McAllister*, No. 92CIV. 5559(SS)(THK), 1994 WL 320328, at *11-12 (S.D.N.Y. June 29, 1994). Contrary to IMS' claim, the evidence is not "so one-sided" that IMS must prevail as a matter of law. (R.701, Reply Br. at 26). In fact, the record reflects evidence which, when viewed in the light most favorable to non-movants, may support a finding of negligence on the part of Captain Ice and/or the Loyd Murphy. The Court thus declines to find, as a matter of law and at this juncture, that IMS is not liable under a general negligence theory.

As to any unseaworthiness claims, however, IMS correctly notes that no party has offered any evidence that the Loyd Murphy "was unseaworthy in any respect." (R.638, Opening Br. at 17). No party responded to this argument or identified any issues of fact to defeat summary judgment on these claims. The Court thus grants summary judgment in favor of IMS on claimants' unseaworthiness claims.

II.     **RHA Claims**

The United States also seeks to impose RHA liability on IMS and/or the Loyd Murphy, including § 403 liability (concerning obstruction to navigable waterways), § 408 *in rem* liability (concerning damage to government works), and § 409 liability (concerning vessels sunk in navigable waterways). IMS requests summary judgment in its favor on each.

A.     **Section 408**

Sections 408 and 412, taken together, impose strict *in rem* liability against "any boat, vessel, scow, raft, or other craft used or employed" in damaging a navigational improvement of

the United States. 33 U.S.C. §§ 408, 412.[25] The Seventh Circuit has recognized that the "combined effect" of these sections "is to provide funds for the replacement and maintenance of improvements built by the United States. This purpose is implemented through an absolute liability standard." *United States v. Ohio Valley Co.*, 510 F.2d 1184, 1188 (7th Cir. 1975).

The United States and IMS do not dispute that negligence principles do not apply to determine § 408 liability. *See, e.g.*, *Ohio Valley Co.*, 510 F.2d at 1186 (holding that "there is no requirement that negligence be shown" and that "a defendant-vessel is liable if it has been the cause of a violation" of § 408). IMS, however, interprets Seventh Circuit precedent as requiring the United States to prove that the Loyd Murphy—as opposed to any other vessel—was "the cause of" the violation before it may be subject to § 408 liability. (R.701, Reply Br. at 3-5 (citing *Ohio Valley,* 510 F.2d at 1186; *United States v. M/V Martin*, 313 F.2d 851, 853 (7th Cir. 1963); *United States v. Central Soya, Inc.*, 697 F.2d 165, 168 (7th Cir. 1982); *United States v. Republic Marine, Inc.*, 829 F.2d 1399, 1405-06 (7th Cir. 1987)). IMS argues that it cannot be held liable under § 408, as a matter of law, because the Loyd Murphy "did not strike or otherwise cause damage to the Dam or any other navigational improvement and did not cause any of the barges in the tow of the M/V Dale Heller to do so." (*Id.* at 5).

IMS' interpretation is too narrow. Section 412 imposes liability on "any vessel . . . used or employed" in violating the law. "[T]he mere fact that [a vessel] was used in violating the statute is sufficient to impose the liability." *United States v. the Terry E. Buchanan*, 138 F. Supp. 754, 755 (S.D.N.Y. 1956). Courts have rejected arguments that "passive" instruments of navigation cannot be held liable to the United States under this statute. *See e.g.*, *id.* at 756 ("The fact that the [passive] barges may be able to implead the tug and make it liable for the penalties

---

[25] There is no dispute in this action over the identity of the Marseilles Lock and Dam as "a work built by the United States . . . for the preservation and improvement of any of its navigable waters or to prevent floods[.]" 33 U.S.C.§ 408.

imposed upon them does not prevent the government from libeling the barges in this manner");

*United States v. TUG SUNDIAL (Vessel ID No. 652357)*, 861 F. Supp. 2d 1208, 1223-26 (D. Or. 2012) (examining statutory text and purpose to hold the same).  Further, the fact that IMS did not own the offending tow does not shield it from liability.  In *Republic Marine*, for example, the Seventh Circuit analyzed § 408 liability in a context involving a tow boat owned by one company, and a barge owned by another company.  As the tow boat pushed the barge into a lock and dam operated by the Army Corps, the barge caught on the lock wall, damaging it.  829 F.2d at 1400.  The Seventh Circuit noted that § 408 liability rested on both "defendant vessels," unless the "damage was caused solely by the government's negligence[.]"  *Id.* at 1406-07.  Here, when viewed in the light most favorable to non-movants, the record reflects that the Loyd Murphy played some role in the ill-fated transit of the Dale Heller tow.  The extent of that role is an issue of fact.  Because the Loyd Murphy was "used or employed" during this mission, the Court cannot grant summary judgment in favor of IMS on § 408 *in rem* liability.[26]

**B.      Section 403 and Section 409**

The Court next addresses § 403 and § 409 liability.

**1.      Availability of Civil Remedies under Sections 403 and 409**

Section 403 prohibits the "creation of any obstruction . . . to the navigable capacity of any of the waters of the United States."  33 U.S.C. § 403.  Under Section 403a, the United States may prosecute "[e]very person and every corporation which shall be guilty of creating or continuing any such unlawful obstruction," as well as bring "proper proceedings in equity to this end."  33

---

[26]  This is true even if one frames the § 408 inquiry in terms of proximate causation, as opposed to the "used or employed" standard.  *See Republic Marine*, 829 F.2d at 1405 n.3 ("The statutory provisions do not use the words 'cause' or 'proximate cause.'  All of the language describing the unlawful behavior in section 408 involves the common element of causation, however, and the courts generally frame the issue that way").  As discussed above, the Court cannot resolve the issue of whether the Loyd Murphy caused or contributed to the April 18 allision on the basis of the record before it.

U.S.C. § 403a.  The statute explicitly authorizes the imposition of a criminal fine "not exceeding five thousand dollars" per week of obstruction.  *Id.*  It also expressly authorizes the injunctive remedy.  *Id.*  ("and such obstruction may be caused to be removed by the injunction of any [appropriate court]. . .").  As such, courts have implied civil remedies for § 403 violations.  *See, e.g.*, *United States v. Alameda Gateway Ltd.*, 213 F.3d 1161, 1167 (9th Cir. 2000) (implying a removal and reimbursement remedy under § 403); *see also United States v. Baycon Indus., Inc.*, 744 F.2d 1505, 1506 n.2 (11th Cir. 1984) (noting, in the context of a criminal prosecution, a parallel civil action seeking removal and reimbursement costs under § 403); *United States v. Republic Steel Corp.*, 362 U.S. 482, 492 (1960) ("Congress has legislated and made its purpose clear; it has provided enough federal law in [§ 403] from which appropriate remedies may be fashioned even though they rest on inferences").

Section 409 (the "Wreck Act") makes it unlawful, among other things, "to sink, or permit or cause to be sunk, vessels or other craft in navigable channels."  33 U.S.C. § 409.  The Wreck Act also charges the "owner, lessee, or operator of such sunken craft" with the duty to mark and to remove the sunken vessel.  *Id.*  Section 411 authorizes criminal penalties ("a fine of up to $25,000 per day") for "[e]very person and every corporation that shall violate, or that shall knowingly aid, abet, authorize, or instigate a violation of the provisions of sections 407, 408, 409, 414 and 415 . . ."  33 U.S.C. § 411.  Section 412 provides for civil *in rem* liability against any vessel "used or employed in violating" any of the aforementioned provisions.  33 U.S.C. § 412.  In addition, courts have construed Section 409 as authorizing *in personam* relief. As this Court previously recognized, "the holding in *Wyandotte* that the government has an implied right to bring an *in personam* claim under Section 409 was based on that section's unique language imposing an affirmative duty on vessel owners to remove a sunken vessel that obstructs a

navigable waterway." *Matter of Complaint of Ingram Barge Co.*, 102 F. Supp. 3d 1008, 1014 (N.D. Ill. 2015).[27]

IMS argues that the United States cannot prevail on its §§ 403 and 409 claims because the government does not request civil relief under these statutes. Instead, IMS asserts, the United States seeks to impose the specified criminal penalties. (R.374, ¶¶ 24-25 ("Per the RHA, 33 U.S.C. § 403a, the creation of an unauthorized obstruction subjects the Loyd Murphy to a penalty of up to $5,000 per week of violation"); *id.* ¶¶ 28-29 ("Per the RHA, 33 U.S.C. § 411, the Loyd Murphy is liable for a penalty of up to $25,000 per day for each day that it violated Sections 408 & 409")). The Court agrees with IMS that the United States cannot recover RHA criminal penalties through this civil action. *See, e.g.*, *United States v. Beatty, Inc.*, 401 F. Supp. 1040, 1045 (W.D. Ky. 1975) ("a defendant under those statutes must be proceeded against by way of information or indictment"). The United States fails to identify any precedent indicating that this Court may award statutory criminal penalties in this limitation proceeding (or in any other civil proceeding).

The inability of the United States to recover the specified criminal penalties, however, does not end the Court's inquiry. The Court acknowledges that the United States' Prayer for Relief requests an award of "all costs and damages available under the RHA, 33 U.S.C. §§ 401-76." (R.374 at 19-20). In light of precedent confirming the availability of civil remedies to the government in RHA cases, the Court is reticent to foreclose the United States' §§ 403 and 409

---

[27] Section 409, 411, and 412, unlike Section 403a, do not expressly authorize the injunctive remedy. The Supreme Court in *Wyandotte* nonetheless inferred the availability of removal and reimbursement remedies based on Section 409's duty-creating language, the inadequacy of its criminal penalties, the United States' interest in protecting national waterways, and the broad construction historically afforded to the RHA. *See Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 199-205 (1967); *see also Alameda Gateway*, 213 F.3d at 1166 ("Despite the absence of an injunctive remedy in the statutory text of [§ 409], the Court went a step further by not only implying an injunctive remedy, but also a self-help removal and reimbursement remedy in favor of the United States").

claims as a matter of law at this stage.[28]  *See e.g.*, *United States v. Nassau Marine Corp.*, 577 F.

Supp. 1475, 1480 (E.D. La. 1984), *aff'd,* 778 F.2d 1111 (5th Cir. 1985) ("Implied remedies of

the [RHA], as determined by the Supreme Court in *Wyandotte* . . . include injunctive relief,

declaratory relief and money damages"); *see also* 33 U.S.C. § 413 ("The Department of Justice

shall conduct the legal proceedings necessary to enforce the provisions of sections 401, 403, 404,

406, 407, 408, 409, 411, and 412 of this title").  The Court will determine any damages,

including appropriate civil fines, in Phase 3 of this admiralty action.

### 2.  IMS' Liability

IMS next argues it did not "create" any obstruction within the meaning of § 403, and did

not "permit or cause to be sunk" any vessel within the meaning of § 409.  The Court examines

each argument in turn.

Courts construe the concept of "obstruction" broadly.  *See Republic Steel*, 362 U.S. 482,

487-88 (1960) ("anything, wherever done or however done, within the limits of the jurisdiction

of the United States, which tends to destroy the navigable capacity of one of the navigable waters

of the United States, is within the terms of the [§ 403] prohibition").  IMS does not dispute that

the sunken Dale Heller barges—as well as the general decline of the navigable capacity of the

Marseilles Dam area following the April 18 allision—constituted an "obstruction" within the

meaning of § 403.  Rather, IMS argues that it did not "create" any such obstruction because "the

barges which struck the Dam or sank upriver . . . were owned and operated by Ingram."  (R.638,

IMS Opening Br. at 18).  Here, again, IMS' interpretation is too narrow.  Civil liability under §

403 does not depend on vessel ownership.  *See* 33 U.S.C. § 403a (authorizing injunctive relief

against "[e]very person and every corporation" that violates § 403); *see also Univ. of Texas Med.*

---

[28]  The Court notes that the United States' §§ 403 and 409 claims against Ingram and the Dale Heller also seek to
impose the specified criminal penalties.  (*See* R.129, ¶¶ 23-28).

*Branch at Galveston v. United States*, 557 F.2d 438, 450 n.18 (5th Cir. 1977) (observing the

same).  Further, relevant precedent "requires the government to allege an affirmative act which

connects the [party] with the creation of an obstruction."  *Baycon Indus., Inc.*, 744 F.2d at 1507

(examining civil case law precedent in the context of a § 403 criminal prosecution).  Here, issues

of fact remain regarding such affirmative action on the part of IMS.  Genuine issues of material

fact exist with respect to whether IMS and/or the Loyd Murphy contributed to the April 18

allision—and the resulting obstruction—in the days, hours, minutes, and seconds leading up to it.

This precludes summary judgment in favor of IMS on § 403 liability.[29]

This evidence also precludes summary judgment in favor of IMS with respect to § 409.

Supreme Court precedent implies that Wreck Act liability can attach to both owners and non-

owners of the sunken vessel.  *See Wyandotte*, 389 U.S. at 199 n.11 (noting that § 409's general

prohibition against sinking, as well as § 411's criminal penalties, "are not limited to owners");

*see also* 33 U.S.C. § 411 (authorizing penalties against "[e]very person and every corporation"

that violates § 411 or knowingly aids such a violation); *Univ. of Texas Med. Branch at

Galveston*, 557 F.2d at 443 (noting that "negligent owners and negligent non-owners have been

treated similarly for purposes of affording the government civil remedies under [§ 403] and [§

409] for wreck removal");[30] *United States v. City of Redwood City*, 640 F.2d 963, 967 (9th Cir.

1981) (applying § 409 to the owner of the port at which the subject barge sank, as well to the

owner of the private company which provided security at the port).

The Court recognizes that the second and third clauses of Section 409 impose duties only

on the "owner, lessee, or operator" of the sunken Dale Heller barges -- which IMS is not.  33

---

[29]  The Court acknowledges the unsettled application of strict liability under § 403.  As the United States notes,
however, the Court need not resolve this issue in denying IMS' motion.  (R.675, US Response Br. at 30 n.11).
[30]  The Court acknowledges that Section 409 no longer employs negligence language.  *In re S. Scrap Material Co.,
LLC*, 541 F.3d 584, 591 (5th Cir. 2008) ("The 1986 amendments . . . took a tack away from negligence theory by
deleting the words 'voluntarily or carelessly' from the first clause of § 409").

U.S.C. § 409.[31]  The first clause, however, "imposes liability on a person whose fault causes a wreck."  *Nunley v. M/V Dauntless Colocotronis*, 727 F.2d 455, 459 (5th Cir. 1984).  Viewing the evidence in the light most favorable to the non-movants, the Court cannot say—as a matter of law at this juncture—that IMS and/or the Loyd Murphy are not at fault in the April 18 allision and the subsequent sinking of the Dale Heller barges.  The Court denies IMS' motion for summary judgment on the United States' § 409 claim.

## III.    Public Nuisance Claim

Lastly, IMS seeks summary judgment on the United States' public nuisance claim, which the United States characterizes as the "federal common law of nuisance."  (R.675, US Response Br. at 42).  The United States asserts that IMS and the Loyd Murphy "have created a danger and menace to navigation, thereby creating a public nuisance, which must be removed, repaired, and abated."  (R.374, ¶ 39).  The United States requests an award of "all costs, damages, and disbursements proximately resulting from the creation of said nuisance."  (*Id.* ¶ 40).

"A public nuisance is defined as a substantial and unreasonable interference with a right common to the general public, usually affecting the public health, safety, peace, comfort, or convenience."  *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 771 (7th Cir. 2011) (citing Restatement (Second) of Torts § 821B)).  The Restatement (Second) of Torts "has been a common reference point for courts considering cases arising under federal common law."  *Id.* at 780.  The Restatement (Second) of Torts distinguishes between actions for damages and actions to enjoin or abate a public nuisance.  *Compare* § 821C(1) *with* § 821C(2).  A party seeking damages arising from a public nuisance "must have suffered harm of a kind different from that suffered by other members of the public."  *Id.* at § 821C(1); *see also* § 821B cmt. (i).  Section

---

[31] Other parts of the Wreck Act similarly address liability for such "owner, lessee, or operator."  33 U.S.C. §§ 414, 415.

821C(2)(b) authorizes "a public official or public agency to represent the state or a political subdivision" seeking to enjoin or abate a public nuisance. *See* § 821C(2)(b).

### A. Substantial and Unreasonable Interference

Here, again, IMS argues that its conduct—including that of Captain Ice—did not "interfere[] in any way with the public use of the waterway or cause[] any substantial or widespread harm." (R.638, IMS Opening Br. at 21). The record, however, does not permit the Court to reach this finding without the benefit of trial, for the reasons explained above.

### B. Statutory Displacement of Federal Common Law

IMS next argues that, "by enacting the RHA, Congress has provided a complete statutory scheme for recovery by the United States for damage to its navigation facilities and obstruction of its waterways, which displaces any common law nuisance claim for said damage and obstruction." (*Id.* at 22). The Supreme Court has clarified that, in cases alleging legislative displacement of federal common law, the test is "simply whether the statute speak[s] directly to [the] question at issue." *Am. Elec. Power Co. v. Connecticut*, 131 S. Ct. 2527, 2537 (2011) (citations omitted). The Supreme Court has invoked the "speaks directly" standard in admiralty cases. *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978) (interpreting the Death on the High Seas Act); *cf. City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 315 (1981) ("*Milwaukee II*") (finding that amendments to the Clean Water Act preempted the federal common law of nuisance in interstate water pollution case).

### 1. The Federal Common Law of Nuisance in Federal Waterway Obstruction or Damage Cases

Before reaching the preemption issue, however, the Court must first determine whether the United States has a federal common law right to bring a public nuisance claim concerning obstructions to navigable waterways and damages to navigational improvements. In particular,

the Court notes that in *Wyandotte*, the Supreme Court examined liability under the Wreck Act

and expressly declined to address whether "non-statutory public nuisance law may form a basis

for the relief here sought by the Government," whether "such a non-statutory right of the

sovereign has ever existed in the United States," or "whether such a right, if it ever did exist,

survived the series of enactments beginning with the Rivers and Harbors Act of 1890."  389 U.S.

at 196 n.5.[32]  The Court finds that the United States does have such a right in equity.

> In 1888, the Supreme Court recognized:

> The power of congress to pass laws for the regulation of the navigation of public rivers, and to prevent any and all obstructions therein, is not questioned. But until it does pass some such law, there is no common law of the United States which prohibits obstructions and nuisances in navigable rivers, unless it be the maritime law, administered by the courts of admiralty and maritime jurisdiction. No precedent, however, exists for the enforcement of any such law; and if such law could be enforced, (a point which we do not undertake to decide,) it would not avail to sustain the bill in equity filed in the original case. There must be a direct statute of the United States in order to bring within the scope of its laws, as administered by the courts of law and equity, obstructions and nuisances in navigable streams within the states. Such obstructions and nuisances are offenses against the laws of the states within which the navigable waters lie, and may be indicted or prohibited as such; but they are not offenses against United States laws which do not exist; and none such exist except what are to be found on the statute book.

*Willamette Iron-Bridge Co. v. Hatch*, 125 U.S. 1, 8 (1888).

> In *Willamette*, plaintiff-wharf and warehouse owners filed a bill in equity to enjoin

defendant-company from constructing a bridge on the Willamette River in Oregon.  *See id*.  The

Supreme Court rejected plaintiff's argument that the Act of Congress admitting Oregon to the

Union—and declaring "that all the navigable waters of the said state shall be common highways,

and forever free, as well to the inhabitants of said state as to all other citizens of the United

States—conferred federal question jurisdiction over the parties' dispute.  *See id*. at 4-6, 17.  The

Court held that this clause "cannot be regarded as establishing the police power of the United

---

[32] Given this uncertainty, the Court requested additional briefing on the United States' public nuisance claim.  IMS, Ingram, and the United States submitted supplemental briefs.  (R.736, R.737, R.738).

States over the rivers of Oregon, or as giving to the federal courts the right to hear and determine, according to federal law, every complaint that may be made of an impediment in, or an encroachment upon, the navigation of those rivers." *Id.* at 12.

After the decision in *Willamette*, "Congress acted promptly, forbidding by [§ 403] of the Rivers and Harbors Act of 1890 . . . 'the creation of any obstruction, not affirmatively authorized by law, to the navigable capacity' of any waters of the United States." *Republic Steel*, 362 U.S. at 486. The Supreme Court later noted, "[a]lthough *Willamette* involved private parties, the clear implication of the Court's opinion was that in the absence of specific legislation no party, including the Federal Government, would be empowered to take any action under federal law with respect to such obstructions." *California v. Sierra Club*, 451 U.S. 287, 295 (1981). *Sierra Club* thus interpreted the RHA's enactment as a reflection that "Congress was concerned . . . with the Federal Government's ability to respond to obstructions on navigable waterways." *Id.* at 296. Prior to the RHA, there was "no federal law which empowered anyone to contest obstructions to navigable rivers." *Id.* at 296 n.7.

The absence of federal law prohibiting obstructions at the time of *Willamette*, however, does not mean that the United States had no pre-existing recourse to abate a public nuisance in navigable waterways. "Beginning at least as early as the sixteenth century the English courts have issued injunctions to abate public nuisances . . . The judicial power to enjoin public nuisance at the instance of the Government has been a commonplace of jurisdiction in American judicial history." *United Steelworkers of Am. v. United States*, 361 U.S. 39, 60-61 (1959) (Frankfurter, J., concurring); *see also Michigan*, 667 F.3d at 770 ("it has been recognized for a much longer period that the equitable power of the courts extends to suits to abate public nuisances . . .").

Pre-*Willamette* cases confirm the availability of a public nuisance remedy in equity. In *Wheeling*, a case concerning an alleged obstruction to the Ohio River, the Supreme Court distinguished between the United States' authority at common law and in equity. *See Com. of Pennsylvania v. Wheeling & Belmont Bridge Co.*, 54 U.S. 518 (1851). Specifically, it noted that an "indictment at common law could not be sustained in the federal courts by the United States, against the bridge as a nuisance, as no such procedure has been authorized by Congress. But a proceeding, on the ground of a private and an irreparable injury, may be sustained . . . If the obstruction be unlawful, and the injury irreparable, by a suit at common law, the injured party may claim the extraordinary protection of a court of chancery." *Id.* at 564. The Court further clarified that a "court of equity will not only interfere upon the information of the attorney-general, but also upon the application of private parties, directly affected by the nuisance." *Id*. at 567.[33]

Pre-*Willamette* cases caution, however, that exercises of this right in equity were "confined and rare," favoring instead the "the ordinary and regular proceeding at law . . . by indictment or information, by which the nuisance may be abated; and the person who caused it may be punished[.]" *City of Georgetown v. Alexandria Canal Co.*, 37 U.S. 91, 98 (1838); *cf. In re Debs*, 158 U.S. 564, 592 (1895) ("because the remedy by indictment is so efficacious, courts of equity entertain jurisdiction in such cases with great reluctance, whether their intervention is invoked at the instance of the attorney general, or of a private individual who suffers some injury therefrom distinct from that of the public, and they will only do so where there appears to be a necessity for their interference").

---

[33] The dissenting opinion in *Wheeling* questioned whether private parties could bring a suit in equity for public nuisance. *Wheeling*, 54 U.S. at 587 ("And it appears to me to be settled law in England, as well as in this country, that chancery will not interfere by injunction where the evidence is conflicting and the injury doubtful. I do not speak of informations in chancery where the attorney-general is a party, for this is not a proceeding of that kind. But I speak of cases between individual parties, like the present one") (Taney, J., dissenting).

The Court thus agrees with the United States that *Willamette* does not foreclose its ability to pursue a public nuisance claim here.  The Court notes, however, that the United States' cited authorities—and the *Willamette* line of cases—authorize equitable relief, not the award of "all costs, damages, and disbursements proximately resulting from the creation of said nuisance," such as the United States seeks here.  (R.374, ¶ 40).  *See, e.g.*, *New Orleans, M. & T.R. Co. v. Mississippi*, 102 U.S. 135, 137 (1880) ("The object of the action was to obtain a peremptory writ of mandamus, requiring the company to remove a stationary bridge which it had erected. . ."); *Michigan*, 667 F.3d at 769 ("The states asked the district court for declaratory and injunctive relief and moved for a preliminary injunction . . ."); *United States v. Duluth*, 25 F. Cas. 923, 925 (C.C.D. Minn. 1871) ("An injunction according to the prayer, will be allowed"); 6 U.S. Op. Atty. Gen. 172, 183 (1853) ("Nothing is better settled in England than the doctrine that a court of chancery has authority in that country to restrain or abate a . . . nuisance in a harbor or other navigable waters, on information by the Attorney General").

The United States appears to recognize that its public nuisance remedy—insofar as it pre-existed and survived the enactment of the RHA—sounds in equity.  (R.738, US Supplemental Br. at 5 ("The [*Willamette*] Court did not mean that there could be no suit in equity for nuisance"); *id.* ("a federal court in equity would have been able to grant relief to remove the obstruction causing the interference")).  The Restatement (Second) of Torts accords with this view.  *See* § 821C(2)(b) (authorizing a public agency to sue to enjoin or abate a public nuisance).[34]  The Court thus disagrees with *United States v. Illinois Terminal Railroad Company*,

---

[34]  The Court recognizes that the United States has a proprietary interest in the Marseilles Lock and Dam.  Its public nuisance claim, however, does not plead a special injury entitling it to damages under non-statutory public nuisance theory.  *See, e.g.*, *New Mexico v. Gen. Elec. Co.*, 335 F. Supp. 2d 1185, 1241 (D.N.M. 2004) ("Absent proof of some discrete 'special injury' to the State's interest apart from the injury to the public's interest in unappropriated groundwater, Plaintiffs may be limited to equitable relief seeking the abatement of the claimed nuisance"); *see also* R.374, ¶¶ 38-40).  The United States refers to "public nuisance under the general maritime law," (R.738, US

insofar as it held that the United States is not limited to equitable relief on a public nuisance theory, where the government also invokes its statutory remedies under the RHA.  501 F. Supp. 18, 21 (E.D. Mo. 1980).[35]  Other courts have dismissed complaints seeking damages under the federal common law of public nuisance.  *See, e.g.*, *Sekco Energy, Inc. v. M/V MARGARET CHOUEST*, 820 F. Supp. 1008, 1013-14 (E.D. La. 1993) (dismissing damages claim and noting its vain search "for case law which recognizes a federal cause of action for public nuisance") (citing S*tate of La. ex rel. Guste v. M/V TESTBANK*, 752 F.2d 1019, 1030 (5th Cir. 1985)).

        The Court thus finds that the United States has a federal right to assert a public nuisance claim, sounding in equity, concerning obstructions to navigable waterways and damages to navigational improvements.  The Court will address further issues regarding relief under this claim during Phase 3 of this action.

## 2.        Statutory Displacement of the United States' Federal Nuisance Right

        Based on the foregoing analysis, the Court finds that the RHA has not displaced the United States' federal nuisance right.  The Court views the enactment of the RHA as consistent with the preservation of the United States' right, in equity, to seek to abate a public nuisance in navigable waterways.

         In *American Electric*, the Supreme Court found that the Clean Air Act "spoke directly" to the question at issue—limitations on carbon dioxide emissions—thus displacing the federal common law right to seek abatement.  131 S. Ct at 2537-40.  In so holding, the Court looked, among other factors, to the reach of the Clean Air Act's remedial provisions, including the

---

Supplemental Br. at 3), but does not address how that public nuisance law differs from other non-statutory public nuisance law.

[35]  The Court does not—and need not—opine on the scope or nature of "equitable relief" available to the United States under the circumstances presented here.  The Court does not address, for example, whether the United States may recover costs associated with abatement under an equitable theory.  The Court will determine appropriate relief in Phase 3 of this admiralty action.

authorization of civil enforcement actions, and to its placement of regulatory authority within one expert agency. *Id.* at 2538-39. The *American Electric* Court noted the same factors present in *Milwaukee II. See id.* at 2534 ("That [Clean Water Act] legislation installed an all-encompassing regulatory program, supervised by an expert administrative agency, to deal comprehensively with interstate water pollution").

As both the United States and IMS acknowledge, "the Rivers and Harbors Act was . . . seen to give the United States broad rights." (R.738, US Supplemental Br. at 8; R.736, IMS Supplemental Br. at 2) (both citing *Wyandotte*, 389 U.S. at 201 ("The Rivers and Harbors Act of 1899, an assertion of the sovereign power of the United States . . . was obviously intended to prevent obstructions in the Nation's waterways. Despite some difficulties in the wording of the Act, we have consistently found its coverage to be broad")). IMS fails, however, to establish the RHA's likeness to the Clean Air Act or the Clean Water Act as an "all-encompassing regulatory program" supervised by one expert agency. 131 S. Ct at 2534. The RHA's prohibitions and remedies, although broad, are not unlimited. This Court already recognized, for example, the United States' inability to impose § 408 *in personam* liability against Ingram and/or IMS for damage to government works. (R.602, R.620).[36] Although the RHA touches on the issue at hand—liability arising from the April 18 allision and subsequent obstruction of and damage to the Marseilles Lock and Dam—laws that "touch[] on the issue at hand [are] not enough" to preclude the United States' public nuisance claim from moving forward. *Michigan*, 667 F.3d at 778; *see also United States v. Dixie Carriers, Inc.*, 462 F. Supp. 1126, 1130 (E.D. La. 1978), *aff'd*, 627 F.2d 736 (5th Cir. 1980) ("Of course, courts must be extremely hesitant to construe statutes in derogation of the common law or the general maritime law").

---

[36] The Court does not imply that the United States may seek such relief under its public nuisance claim, as construed herein. The Court does not remark, at this point, on the scope of relief available to the United States under a public nuisance theory.

For the stated reasons, the Court denies IMS' motion for summary judgment on the United States' public nuisance claim.

## CONCLUSION

For the foregoing reasons, the Court denies in part and grants in part IMS' motion for summary judgment. (R.637). The Court denies IMS' motion as to the negligence, public nuisance, and RHA claims against it. The Court grants IMS' motion as to the unseaworthiness claims against it.


**Dated:** April 13, 2016

ENTERED

_____
AMY J. ST. EVE
United States District Court Judge