**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN THE MATTER OF THE COMPLAINT OF INGRAM BARGE COMPANY AS OWNER OF THE M/V DALE A. HELLER AND THE IB9525, IN025300, IN085089, IN095041, IN096081, IN107057, AND IN117513, PETITIONING FOR EXONERATION FROM OR LIMITATION OF LIABILITY, )<br><br>*Consolidated with,*<br><br>IN THE MATTER OF AMERICAN COMMERCIAL LINES, LLC, AS OWNER AND INLAND MARINE SERVICE, INC. AS OWNER *PRO HAC VICE* OF THE M/V LOYD MURPHY FOR EXONERATION FROM OR LIMITATION OF LIABILITY. | Civil Action No.: 13 C 3453<br>Civil Action No.: 13 C 4292<br>(Consolidated)<br><br>Judge Amy J. St. Eve |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Before the Court are several motions relating to the April 18, 2013 barge allision at the Marseilles Dam located near Marseilles, Illinois. The United States has filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), or, alternatively, for summary judgment pursuant to Federal Rule of Civil Procedure 56(a), as to all claims and counterclaims against it arising from this incident. (R.747). In particular, the United States seeks immunity from liability pursuant to the Flood Control Act, 33 U.S.C. § 702c, or, alternatively, pursuant to the discretionary function exception. Ingram,[1] IMS, MESD, and various individual claimants oppose this motion. (R.800; R.803; R.804; R.807). The United States has separately moved the Court to dismiss Ingram's contract and promissory estoppel claims. (R.750).

---

[1] Capitalized terms not otherwise defined herein shall have the meaning as set forth in the Court's Memorandum Opinion and Order, dated April 13, 2016, on IMS' motion for summary judgment. (R.744).

For the following reasons, the Court denies the United States' motion with respect to the Flood Control Act, but grants the United States' motion with respect to the discretionary function exception. (R.747). The Court finds that the United States cannot be held liable in tort for allegations arising from Lockmaster Rodriguez's operation of the dam gates during the attempted canal transit on April 18, 2013. The Court further grants the United States' motion to dismiss Ingram's promissory estoppel allegations (Count III), but denies the United States' motion with respect to Ingram's breach of contract allegations (Count II). (R.750).

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(1), a court must dismiss a claim if it lacks subject matter jurisdiction over it. *See Aljabri v. Holder*, 745 F.3d 816, 818 (7th Cir. 2014) ("we are required to consider subject-matter jurisdiction as the first question in every case . . . and we must dismiss this suit if such jurisdiction is lacking") (citations omitted); *see also* Fed.R.Civ.P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action"). In reviewing a Rule 12(b)(1) motion to dismiss, courts take all well-pleaded factual allegations in the complaint as true. *Smith v. United States*, 196 F.3d 774, 776 n.1 (7th Cir. 1999). Courts may, however, "properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Calderon v. United States*, 123 F.3d 947, 951 n.2 (7th Cir. 1997).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  In determining summary judgment

motions, "facts must be viewed in the light most favorable to the nonmoving party only if there

is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  The party

seeking summary judgment has the burden of establishing that there is no genuine dispute as to

any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  After "a properly

supported motion for summary judgment is made, the adverse party must set forth specific facts

showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 255 (quotation omitted).

A court's "job when assessing a summary judgment motion is not to weigh evidence, make

credibility determinations, resolve factual disputes and swearing contests, or decide which

inferences to draw from the facts."  *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

## STATEMENT OF FACTS

This admiralty case arises from an unsuccessful attempt by the M/V Dale A. Heller

("Dale Heller"), owned by Petitioner Ingram Barge Company ("Ingram"), to navigate past the

Marseilles Dam during a high-water situation with a fourteen-barge tow.  Other maritime vessels

agreed to assist the Dale Heller in this navigation attempt, including:  (1) the M/V Loyd Murphy

("Loyd Murphy"), operated by Inland Marine Service, Inc.  ("IMS") and owned by American

Commercial Lines, LLC ("ACL"); (2) the M/V City of Ottawa, a United States Army Corps of

Engineers ("Corps") vessel; and (3) the M/V Creve Coeur, another Corps vessel.[2]  While

traversing Illinois River Mile 247.0 near the Dam, the Dale Heller's tow broke apart, and seven

of its barges either allided with the dam or sank upriver from it.  Subsequent to this incident, the

river waters overtopped the surrounding earthen dike and flowed into the town of Marseilles,

causing substantial damage to real and personal property.  The United States now seeks

---

[2]  Other vessels, including the M/V City of Joliet, the M/V Cody Boyd, and the Nancy S. provided additional
assistance to the Dale Heller throughout April 17-18, 2013.

immunity from all resulting damages claims. The Court looks to the following facts in analyzing the United States' immunity arguments.

## I.     The Illinois Waterway

### A.     General Facilities

The Illinois Waterway ("ILWW") is a 327-mile stretch of connected rivers, channels, and canals that run from Lake Michigan to the juncture of the Illinois and Mississippi Rivers in Grafton, Illinois. (R.747-1, US Rule 56.1(a)(3) Stmt. Facts ¶ 9). Since the 1800s, the federal and state governments have authorized the creation of canals within the ILWW to serve various functions, including navigation, sanitation, and flood control. (*Id.* ¶¶ 10-16). Together, the Corps and a state entity—the Metropolitan Water Reclamation District of Greater Chicago ("MWRD")—own, operate, and/or maintain several flood and sewage control and navigation facilities within this system, including the Lockport Lock and Dam, Lockport Controlling Works, the Chicago River Lock and Controlling Works, and the T.J. O'Brien Lock and Controlling Works. (*Id.* ¶¶ 17-30; R.800-1, Ingram Rule 56.1(b)(3)(B) Stmt. Facts ¶¶ 33-39; R.806, Claimants Rule 56.1(b)(3)(B) Stmt. Facts ¶¶ 33-39). The MWRD and the Corps also have constructed specific tunnels and reservoir facilities within the ILWW for flood storage purposes. (R.747-1, US Rule 56.1(a)(3) Stmt. Facts ¶¶ 40-44).

### B.     Marseilles Lock and Dam

The Marseilles Lock and Dam is one of six Corps-owned locks and dams along the ILWW. (*Id.* ¶ 47). The Marseilles Pool, upstream of the Dam, receives all waters drained from upriver of Dresden Island, the nearest Corps facility. (*Id.* ¶¶ 49-51). The Marseilles Dam is designated as a run-of-the-river facility, meaning that the pool is not designed for flood water storage. (*Id.* ¶ 54). Indeed, the project has no upriver flood storage capacity. (R.802, IMS Rule

56.1(b)(3)(C) Stmt. Additional Facts ¶ 9).  The Master Water Control Manual for the Marseilles

Lock and Dam ("Marseilles Water Control Manual") makes this clear, reciting, "[The]

Marseilles Lock and Dam is operated strictly as a run-of-the-river facility with no provision for

storage.  It is operated as a navigation structure to provide the required nine-foot minimum

channel from Marseilles Lock and Dam to Dresden Island Lock and Dam, a distance of

approximately 27 river miles."  (R.747-4, Dep. Ex. 24 at USA-00043024).  Pool volume curve

studies demonstrate that "there is little or no potential for regulation of this project to achieve

flood-control benefits."  (*Id.* at USA-00042994).  The Marseilles Lock and Dam serves no

federally authorized flood control purpose.  (R.800-1, Ingram Rule 56.1(b)(3)(C) Stmt.

Additional Facts ¶ 1; R.806, Claimants Rule 56.1(b)(3)(C) Stmt. Additional Facts ¶ 1).

      The Marseilles Water Control Manual continues, "The Marseilles Lock and Dam project

was authorized, designed, constructed, and is regulated, to maintain navigation on the Illinois

Waterway.  The dam is operated to maintain a normal pool elevation . . . in order to provide a

nine-foot navigation channel[.]"  (R.802-1, Dep. Ex. 24 at USA-00043012).  The Corps

maintains pool elevation by opening and closing the Marseilles Dam's eight tainter gates, each of

which is 60 feet wide and 16 feet high.  (R.747-1, US Rule 56.1(a)(3) Stmt. Facts ¶¶ 53, 55).  As

the river level rises, the Corps opens the gates to allow additional water to flow through.  (*Id.*).[3]

According to the Marseilles Lock and Dam Operations handbook, "this pool shall be carried as

near as possible to 483.25 and should not be permitted to exceed that elevation without

permission from higher authority."  (*Id.* ¶ 142) (citing R.747-4, Dep. Ex. 25 at USA-00001118).

The Marseilles lockhouse uses a one-page grid to determine where to set each of the eight gates

when maintaining the regulated pool elevation.  (*Id.* ¶ 144).   In high water conditions, the

lockhouse procedure (according to the one-page grid) is to open the gates as high as necessary to

---

[3]  The earthen dike running along the northern shoreline also assists in maintaining the navigation pool.  (*Id.* ¶ 56).

discharge incoming waters and to keep the Marseilles Pool at an elevation close to 483.2 feet. (*Id.* ¶ 146).[4]  The Marseilles Water Control Manual, however, permits deviations from normal pool regulation in the event of an emergency.  (*Id.* ¶¶ 154-55).  It also permits "unplanned minor deviations" from normal regulation.  (R.747-4, Dep. Ex. 24 at USA-00043016).  Pertinent federal regulations also permit the lockmaster to depart from regulations, as he deems necessary, in the event of an emergency.  (R.747-1, US Rule 56.1(a)(3) Stmt. Facts ¶ 150) (citing 33 C.F.R. § 207.300(a)).

According to correspondence from private and government engineers, the Marseilles Dam and the earthen dike do provide limited, practical flood damage protection.  (R.747-1,US Rule 56.1(a)(3) Stmt. Facts ¶ 57) (citing R.747-4, US Ex. 7 at USA-00010192 (1932 Corps Letter to the Mayor of Marseilles, "[The earthen dike] has been properly designed to resist the highest anticipated floods . . . The construction of the levee will be a positive relief from the floods"); R.747-4, US Ex. 8 at USA-00032768-79 (1974 Letters from Engineering Firm to the Mayor of Marseilles and to the Federal Insurance Administration, "The dam on the Illinois River at Marseilles acts as an effective Protection structure against the 100 year flood . . ." and "The dam on the Illinois River at Marseilles . . . is used [for flood control] in times of high rains")). The lockmaster's job description further provides, in part, that "[d]uring emergencies and flood periods," he or she "is responsible for [the] implementation of actions to negate or reduce impact on the facility, adjacent area, and communities."  (R.747-5, US Ex. 45 at US-00008222).  In addition, he or she is "responsible for the safety of property, personnel, and public" at the site. (*Id.*).  Lockmaster Larry Rodriguez confirmed, however, that assisting navigation is the "paramount purpose" of the Marseilles Lock and Dam.  (R.648, Rodriguez Dep. Tr. at 57).

---

[4]  At noon on April 18, for example, the lockhouse achieved a pool elevation of 483.3 feet by opening the dam gates to 59 feet.  (*Id.* ¶ 149).

## II.    The Ballards Island Flotilla

### A.    River Conditions Throughout April 16-18, 2013

On April 16, 2013, the Dale Heller departed Channahon, Illinois, headed southbound on the Illinois River with fourteen barges in tow.  At that time, the National Weather Service predicted that the Illinois River would rise to a crest below "action level" and would begin falling thereafter.  (R.800-1, Ingram Rule 56.1(b)(3)(B) Stmt. Facts ¶ 78; R.800-2, Dep. Ex. 391, Recreated NWS Hydrograph).

At 7:35 a.m. on April 17, the Dale Heller arrived at Ballards Island, upriver of the Marseilles Dam.  The Dale Heller's captain—Captain White—informed an Ingram dispatcher that he planned to hold at Ballards Island until the gates were lowered to 17-18 feet total opening.  (4/17 VDR 4, t/s 9:06 a.m.).  Captain White's "rule of thumb" with respect to navigating a fourteen-barge tow past the Marseilles Dam was to attempt such a transit *only* when the dam gates were opened 18 feet or less.  (R.651, White Dep. Tr. at 20-22).  The water levels, however, continued to rise.  The Marseilles lockhouse increasingly opened the dam gates throughout April 17 and 18 in response to these rising water levels.  (R.747-1, US Rule 56.1(a)(3) Stmt. Facts ¶ 81) (citing hydrology records).[5]

In the early evening on April 17, the Loyd Murphy and its fifteen-barge tow locked through the Marseilles Lock, headed northbound.  After an unsuccessful attempt to moor below Gum Creek—less than one mile upriver from the Dam—the Loyd Murphy's captain, Anthony Ice ("Ice"), radioed over to Captain White to discuss whether the Loyd Murphy could also position itself at Ballards Island until the water levels reduced.  The Loyd Murphy subsequently

---

[5] The parties dispute, however, whether these gate adjustments reflect a flooding concern, or whether they merely reflect the lockmaster's efforts to maintain pool elevation at the prescribed level in order to facilitate navigation. (R.802, IMS Rule 56.1(b)(3)(B) Stmt. Facts ¶ 104).

joined the Dale Heller at Ballards Island, connecting the two tows into one 29-barge flotilla. (R.744, Opinion at 5-6).

By early morning on April 18, however, the Dale Heller and the Loyd Murphy were having trouble holding the flotilla at Ballards Island. (R.747-1 US Rule 56.1(a)(3) Stmt. Facts ¶¶ 99-101). As hydrograph evidence shows, the river rose above "action level" by midnight on April 18, hitting minor "flood stage" status in the morning, and continuing to rise into moderate flood stage status by the afternoon. (*Id.* ¶¶ 63-66) (citing R.747-6, US Ex. 54, Recreated Hydrograph).[6] Captain White would not transit past the Marseilles Dam, however, due to his concern about outdraft conditions associated with a total gate opening of more than 17-18 feet. (*Id.* ¶ 79). He acknowledged that he may need to cut his barges free – a move which would have resulted in the barges striking the Marseilles Dam. (*Id.* ¶¶ 102-03).

Throughout that morning, Captain Ice contacted both private and governmental assist boats—including the Nancy S., the City of Ottawa, the City of Joliet, and the Cody Boyd—to request additional horsepower in holding the combined tow upriver of the Dam. Captain Ice also oversaw rigging operations, including the ultimately unsuccessful attempt to tie the combined tow to some trees on Ballards Island. (R.744, Opinion at 8-9). The last tree securing the flotilla gave way between 2:00 and 3:00PM. (4/18 VDR 2, t/s 14:25).

Elsewhere during this time, the MWRD closed all ILWW intake points from Lake Michigan and reversed the flow at several upriver facilities after reaching maximum flood storage capacity. (R.747-1 US Rule 56.1(a)(3) Stmt. Facts ¶¶ 87-90). Between midnight April 18 through midnight April 19, 3 to 5 inches of rain fell in the Illinois River basin upstream of

---

[6] The Claimants deny these facts, but fail to cite to "specific references to the affidavits, parts of the record, and other supporting materials relied upon," as required under Local Rule 56.1. The Court disregards the Claimants' disagreement for failure to comply with Local Rule 56.1. The Seventh Circuit "has consistently upheld district judges' discretion to require strict compliance with Local Rule 56.1." *Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015).

Marseilles.  (*Id.* ¶ 67; R.747-4, Dep. Ex. 420, Hildebrand Analysis at Fig. 14).  Throughout the

morning of April 18, Corps employee and ILWW Acting Project Manager, Michael Zerbonia

("Zerbonia"), "mostly acted as the [Peoria] flood area engineer; coordinating people going out,

answering calls from municipalities, from levee districts, reporting upwards status of our locks

and dams, et cetera."  (R.747-6, US Ex. 51, Zerbonia Dep. Tr. at 29-31, 92).

### B.      The IRCA Call

 At approximately 2:00PM on April 18, a River Industry Action Committee ("RIAC")

call convened, followed by an Illinois River Carrier's Association ("IRCA") conference call.[7]

Representatives of Ingram, ACL, the Corps, and the United States Coast Guard, among others,

participated on the April 18 IRCA call.  After discussing lock closures and river conditions, the

IRCA participants discussed the situation at Ballards Island – in particular, about the Dale

Heller's need for an action plan with respect to its tow.  (R.744, Opinion at 10-11).  According to

Craig Hess—Lockmaster Rodriguez's direct supervisor and IRCA participant—the Corps agreed

to assist the Dale Heller once they understood that the Marseilles Dam was in danger.  (R.747-1

US Rule 56.1(a)(3) Stmt. Facts ¶ 169; *see also* R.747-5, US Ex. 46, Hess Dep. Tr. at 56-58 ("and

that's when we said yes, do what you can do to help them, you know, keep them from . . .

coming down into the dam")).

Eventually, the IRCA participants devised a plan whereby the Corps would lower the

dam gates in order to facilitate the transit of the Dale Heller and its tow into the Marseilles

Canal.  (R.747-1 US Rule 56.1(a)(3) Stmt. Facts ¶109).  The agreement to lower the gates

responded to Ingram's concern for the outdraft impacting the Dale Heller's tow as it neared the

---

[7]  The IRCA is a joint association of towage companies and government agencies, formed to disseminate information and to facilitate navigation on the Illinois River.  The RIAC is a similar organization, coordinating navigation on the Upper Mississippi River.  (R.744, Opinion at 10).

dam. (*Id.* ¶ 111). The Corps was concerned, however, about the potential flooding of Marseilles if the gates were held down for too long. (*Id.* ¶ 112). The Corps shared this concern on the IRCA call, and subsequently with the crews of the Dale Heller and the Loyd Murphy. (*Id.* ¶¶ 112-14).[8] In agreeing to lower the dam gates, Lockmaster Rodriguez effectively agreed to deviate from the standard, one-page gate setting grid, because "this was a different situation[.]" (R.648, Rodriguez Dep. Tr. at 204:2-21).

Rodriguez testified that he made the decision of how much gate to close, although he did not perform any pool calculations in rendering that decision. (*Id.* at 194, 217-18). Rodriguez told the IRCA participants, "I can give you 16 feet." (*Id.* at 192-93). As the Court previously recognized, the parties dispute "the exact agreement on gate settings – specifically, whether they had agreed to reduce the gates *by* 16 feet, or *to* 16 feet, and for how long. (*Compare, e.g.*, R.676, US Rule 56.1(b)(3)(B) Stmt. Facts ¶¶ 40, 42, 48, 49, 64 *with* R.678, Ingram Rule 56.1(b)(3)(B) Stmt. Facts ¶¶ 40, 42, 48, 49, 64)." (R.744, Opinion at 11).

Following the IRCA call, pilots, captains, and/or deckhands from the Dale Heller, the Loyd Murphy, the City of Ottawa, and the Cody Boyd attended a meeting aboard the City of Ottawa to discuss the action plan. (R.744, Opinion and 12-13). The tactical plan following that meeting was for the City of Joliet to transit into the Canal with its two barges, the Loyd Murphy and the Cody Boyd to move the Loyd Murphy's tow across the river—where the Cody Boyd would hold it—and for the Loyd Murphy, the City of Ottawa and the Creve Coeur to then help the Dale Heller transit into the Canal with its fourteen barges. The Creve Coeur subsequently

---

[8] Captain White did not recall hearing this concern expressed, however, until the Dale Heller and the assist vessels started their transit. Specifically, he testified that he did not hear any such concern until "we started down into making this approach, and then I heard something on the radio that they were going to raise the rollers because they didn't want to flood the town . . . What I was aware of was they would drop the gates and give me time to get in the canal and then raise the gates back up. That's all I was aware of. Not – not to a time frame as to how long we're going to leave them down." (R.651, White Dep. Tr. at 110-11).

arrived at Ballards Island, carrying Corps supervisor Jeff Griffin ("Griffin"). (*Id.* at 13-14). Griffin joined Captain Ice in the wheelhouse of the Loyd Murphy prior to the transit.

### III. The Attempted Canal Transit on April 18, 2013

Before the transit started, Captain Ice stated on the radio, "Jeff [Griffin] says he's got the phone ready waiting to shut the dam off when need be . . . once we start easing down, I'll have Jeff make the call. I don't want to keep it shut down for too long." (R.747-1 US Rule 56.1(a)(3) Stmt. Facts ¶ 115) (citing 4/18 VDR 2, t/s 16:59). Around 5:00PM, the Dale Heller and the assist vessels began their southbound transit to the Canal. (*Id.* ¶ 119). At this time, the Morris river gauge registered approximately 71,000 cubic feet per second of water moving downriver. (*Id.* ¶ 66).[9] It is undisputed that the lowering of the dam gates caused the water levels to rise. (*Id.* ¶¶ 120-21).

During the transit, Captain White observed that the water was rising quickly in the vicinity of Snug Harbor, upriver of the Marseilles Dam. (R.651, White Dep. Tr. at 148-52). He testified, "The water [was] coming up quick . . . but the town wasn't flooded." (*Id.* at 150). According to Griffin, around 5:15PM—after seeing the water level rise on the right descending bank of the river—he spoke with Captain Ice, who directed him to call Lockmaster Rodriguez to raise the gates back up by half. (R.747-5, US Ex. 32, Griffin Dep. Tr. at 239; *see also id.* at 264 (testifying that the water was "getting close" to the levee)). In his Coast Guard interview subsequent to the incident, Griffin stated that Captain Ice had shared Griffin's mid-transit concern about the rising water levels. (R.821-2, US Rule 56.1(b)(3)(C) Reply to IMS ¶ 25).

Radio recordings reflect that, around this time, Captain Ice stated, "I'm telling him to open up a little bit more gate because they're starting to flood up into those houses already."

---

[9] The Morris river gauge is used as the reference gauge for determining flood stage in the Marseilles pool. (R.747-1, US Rule 56.1(a)(3) Stmt. Facts ¶ 62).

Captain White responded, "Ok." Captain Ice continued, "If you look, that ladder's already under water over there." (4/18 VDR 2, t/s 17:28:22, 17:28:30). On Ice's direction, Griffin called Rodriguez and relayed the message to open the gates by half. (R.747-5, US Ex. 32, Griffin Dep. Tr. at 142-48, 253). Ice, on the other hand, denied telling Griffin to raise the gates. (R.649, Ice Dep. Tr. at 220-23, 276-80, 327). He testified that he "fumbled with [his] words" on the radio and agreed to the gate-raising idea only after Griffin "was hounding and hounding [him] about it." (*Id.* at 222). Ice testified that he told Griffin, "It's a bad idea, but if you need to open the gates, open up a couple feet on the far side." (*Id.* at 280). Captain Ice denied observing any flooding during the transit. Rather, he repeated statements by Griffin over the radio. (*Id.* at 232-34) (Ice to vessel crews: "We got quite a bit of extra water when they backed that dam up, but he just opened up the dam. They're starting to flood the town").

It is undisputed that Rodriguez opened the dam gates on account of the call from Griffin. (R.747-1 US Rule 56.1(a)(3) Stmt. Facts ¶ 130; R.648, Rodriguez Dep. Tr. at 247:14-16 ("[Q]. And you did that because Jeff Griffin gave you an order to do so? [A]. Yes")).[10] According to Rodriguez, Griffin did not give any reason for this order and, in particular, did not mention flooding. (R.648, Rodriguez Dep. Tr. at 263:7-12, 274:12-17, 281:3-6).[11] Rodriguez, himself, did not observe any flooding during the transit. (*Id.* at 255:2-5). Based on his camera observations, he "had no concerns about Marseilles . . . I was watching the top of the cell. As long as the water didn't hit to the top of the cell, I wasn't concerned about Marseilles flooding . . . It never got to that level." (*Id.* at 280:6-281:2, 281:18-19; *see also* 247:17-248:1 ("[Q]. And

---

[10] Rodriguez thought the head of the tow was inside the Canal when he received the call from Griffin. (R.648, Rodriguez Dep. Tr. at 254, 284).

[11] Griffin testified that he *did* mention "imminent flooding of the town" to Rodriguez. (R.747-5, US Ex. 32, Griffin Dep. Tr. at 148:5-8; *see also* R.802-5, Griffin Dep. Tr. at 181:4-7 ("[Q]. You did tell him . . . it was your impression that the town was flooding and because of that the gates needed to be opened? [A]. Yes")).

at the time Jeff Griffin gave you that order, you know and you knew back then that there was no pool elevation that was even close to the top of the cell, correct? [A]. Yes")).[12]

Rodriguez's second-level supervisor—Michael Zerbonia—testified that Rodriguez had the authority to ignore Griffin's gate-setting instruction or recommendation. (R.747-6, US Ex. 51, Zerbonia Dep. Tr. at 217:14-21; R.747-1, US Rule 56.1(a)(3) Stmt. Facts ¶ 166). Federal regulations and Corps documents, too, reflect that Rodriguez was under no obligation to follow Griffin's instruction relating to the operation of the dam. (R.800-1, Ingram Rule 56.1(b)(3)(C) Stmt. Additional Facts ¶¶ 3-4; R.802, IMS Rule 56.1(b)(3)(C) Stmt. Additional Facts ¶¶ 13-14). In particular, 33 C.F.R. § 207.300(a) provides, in part:

> The lockmaster shall be charged with the immediate control and management of the lock, and of the area set aside as the lock area, including the lock approach channels. He/she shall see that all laws, rules, and regulations for the use of the lock and lock area are duly complied with, to which end he/she is authorized to give all necessary orders and directions in accordance therewith, both to employees of the government and to any and every person within the limits of the lock and lock area, whether navigating the lock or not. No one shall cause any movement of any vessel, boat, or other floating thing in the lock or approaches except by or under the direction of the lockmaster or his/her assistants.

33 C.F.R. § 207.300(a).[13] Griffin, himself, testified that he was "never delegated the duty or the responsibility to determine when [the] gates should be opened or closed" and that, ultimately, it "would be the lockmaster's decision to raise the gates if necessary because of flooding." (R.802-5, Griffin Dep. Tr. at 127-28).

Rodriguez testified that he followed Griffin's order "as per instruction" from Griffin's direct supervisor, Brady Beckman, despite both of them being outside his "chain of command."

---

[12] According to Rodriguez, had Griffin ordered him to raise the gates only if he (Rodriguez) was concerned about flooding the town, Rodriguez "would have left [the gate setting] like it was." (*Id.* at 284:6-14). Had Rodriguez observed flooding, however, he would have opened the gates on his own, without input from Griffin or any vessel operator. (*Id.* at 333).

[13] In addition, Rodriguez's job description provides, in part: "Exercises full regulatory authority in controlling river traffic through the facility." (R.747-5, US Ex. 45 at US-00008221).

(R.648, Rodriguez Dep. Tr. at 127-30; 342-43). Neither Griffin nor Beckman had any expertise in lock and dam operations. (*Id.* at 129). Beckman, for his part, denied telling Rodriguez "to take orders from [Griffin] about gate operation." (R.801-1, US Ex. 12, Beckman Dep. Tr. at 50-51). He did, however, speak with both Rodriguez and Griffin to ensure "that they were going to be talking to one another" to facilitate "clear communication between the tow and the dam and the operator of the dam." (*Id.* at 49-50).

At his deposition, Rodriguez agreed that Griffin—who was aboard the Loyd Murphy during the transit—had a perspective on the tow that he did not have at the lockhouse. (R.648, Rodriguez Dep. Tr. at 341-42). Rodriguez went along with Griffin's instruction because they "were dealing with an emergency" in a high-water situation. (*Id.* at 343-46; *see also id.* at 340, 297). His supervisors—Craig Hess and Mike Zerbonia—agreed that the situation on April 18, 2013 was an "emergency situation." (R.747-5, US Ex. 46, Hess Dep. Tr. at 108-09; R.747-6, US Ex. 51, Zerbonia Dep. Tr. at 218). Other Corps and Coast Guard personnel agreed. (R.821, US Reply Br. at 23 n.20 (citing deposition testimony)). Captain White, Port Captain Henleben, and Pilot Shrader also agreed. (R.651, White Dep. Tr. at 351; R.646, Henleben Dep. Tr. at 178; R.821-1, Shrader Dep. Tr. at 72).[14]

After Rodriguez raised the dam gates around 5:20PM, the water level began to fall. (R.747-1 US Rule 56.1(a)(3) Stmt. Facts ¶ 131). The Dale Heller and the assist vessels continued their southbound transit to the Canal. (*Id.* ¶ 133).

---

[14] The Claimants "specifically den[y] that there was an emergency situation on April 18, 2013, prior to the allision." (R.806, Claimants Rule 56.1(b)(3)(B) Stmt. Facts ¶¶ 150, 167, 171-72). Here again, however, the Claimants fail to cite to "specific references to the affidavits, parts of the record, and other supporting materials relied upon," as required under Local Rule 56.1.

## IV.    The Allision and Resulting Damages

Around 5:30PM, as the City of Ottawa and the first row of barges crossed into the Canal, the head of the Dale Heller tow turned towards the dam.  (R.747-1 US Rule 56.1(a)(3) Stmt. Facts ¶ 134).  The right side of the barges hit a concrete wall running alongside the Canal entrance, breaking the rigging that connected the first five barges.  (*Id.* ¶ 135).  Several of those barges struck the dam.  (*Id.* ¶ 136).  Eventually, the wires connecting the Dale Heller to the remaining barges broke, resulting in several more barges alliding with the dam.  (*Id.* ¶ 137).  The allision rendered one dam gate inoperable, and four of the barges sank just upriver of the dam.  (*Id.* ¶¶ 138-39).  By the morning of April 19, the river water overtopped the earthen dike and flowed into the town of Marseilles.  (*Id.* ¶ 140).

The United States claims that it experienced subsequent damage to the Dam and its components, damage to the Lock and its components, damage to the earthen dike running along the northern shoreline, and general obstruction of navigation on the Illinois River, seeking recovery from Ingram and/or IMS.  (*See generally* R.374).  Individual claimants, meanwhile, seek to recover from the United States, Ingram, and/or IMS for their resulting property damage. (*See, e.g.*, R.474, MESD Am. Claim).  Ingram, on the other hand, seeks indemnity, cargo loss, and salvage expenses from the United States as a result of this incident.  (*See, e.g.*, R.165).  The United States now moves to dismiss these claims and counterclaims, arguing that the Flood Control Act shields it from liability relating to its April 18, 2013 flood-control efforts.  In the alternative, the United States argues that Lockmaster Rodriguez's conduct in operating the dam gates was discretionary and policy-based and, therefore, the United States is immunized from tort liability pursuant to the discretionary function exception.  The Court addresses each argument, in turn.

**ANALYSIS**

I.      **Immunity under the Flood Control Act**

The Flood Control Act of 1928 provides, in part, that "[n]o liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place[.]"  *See* 33 U.S.C. § 702c.[15]  This provision bars recovery where the federal government "would otherwise be liable under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*"  *Cent. Green Co. v. United States*, 531 U.S. 425, 428-29 (2001) (quoting *United States v. James*, 478 U.S. 597, 599 (1986)).

A.      **Applicable Legal Principles**

In *Central Green*, the Supreme Court examined the meaning of the term "floods or flood waters," in particular, "whether those words encompass all the water that flows through a federal facility that was designed and is operated, at least in part, for flood control purposes."  531 U.S. at 427.  The Ninth Circuit in *Central Green* had held that immunity attached because the facility at issue—the Madera Canal—was part of the Central Valley Project, and flood control was one of the purposes served by that project.  *Id.* at 431.  In so holding, the Ninth Circuit had looked to language from the Supreme Court's decision in *James* – specifically, that "the terms 'flood' and 'flood waters' apply to all waters contained in or carried through a federal flood control project for purposes of or related to flood control[.]"  *See James*, 478 U.S. at 605.  In *Central Green*, the Supreme Court disavowed this broad "related to" dictum from *James*, which had supported a judicial focus on "whether the damage relates in some, often tenuous, way to a flood control project, rather than whether it relates to floods or flood waters."  531 U.S. at 430, 436-37 (quotations omitted); *see also Fryman v. United States*, 901 F.2d 79, 81 (7th Cir. 1990) ("*James*

---

[15]  Section 702c is entitled: "Expenditures for construction work; conditions precedent; liability for damage from flood waters; condemnation proceedings; floodage rights."  *See id.*

was so broadly written that it cannot be applied literally").  The *Central Green* Court reversed and remanded the Ninth Circuit decision, concluding that "courts should consider the character of the waters that cause the relevant damage rather than the relation between that damage and a flood control project."  531 U.S. at 437.

After *Central Green*, courts must consider "the character of the waters that cause the relevant damage and the purposes behind their release" in analyzing Section 702c immunity.  *Id.* at 434.  The Fifth Circuit interpreted this *Central Green* holding in *In re Katrina Canal Breaches Litigation*, 696 F.3d 436 (5th Cir. 2012).  In particular, the Fifth Circuit characterized the immune "character" of the relevant waters as "the heart of the Section 702c inquiry."  *Id.* at 445-46 ("[A]fter *Central Green,* waters have the immune character of 'flood waters' if the government's link to the waters is through flood-control activity.  That is to say, the government's acting upon waters for the purpose of flood control is flood-control activity, and flood-control activity is what gives waters an immune 'character'").  The Fifth Circuit also examined the purpose of the water's release.  *See id.* at 444-45 (citing *Graci v. United States*, 456 F.2d 20, 26 (5th Cir. 1971)).[16]  Other courts have shared this "purpose" focus – that is, "whether the water was released for a purpose related to flood control."  *Judy Kroshus v. United States*, No. 3:08-CV-0246-LDG-RAM, 2011 WL 4501121, at *6 (D. Nev. Sept. 26, 2011) ("The *Central Green* Court did not reject a nexus between immunity and a congressionally authorized purpose of flood control.  Rather, it redirected the inquiry from whether a flood control project was related to the cause of the damage, to whether the damaging water was related to flood control").

---

[16]  In *Graci*, the Fifth Circuit agreed with the district court that it was unreasonable "to suppose that in exchange for its entry into flood control projects the United States demanded complete immunity from liability for the negligent and wrongful acts of its employees *unconnected with flood control projects*."  456 F.2d at 26 (emphasis in original).

Ultimately, the Court must decide whether the United States was engaged in a "flood-control activity" resulting in damage by flood waters. *See Central Green*, 531 U.S. at 434. The United States argues that the "waters of the Illinois River were undeniably at flood levels and the action of the Corps in changing the gates before, during, and after the transit were taken upon such flood waters." (R.747-3, US Opening Br. at 39). The claimed damages, therefore, are "directly tied to the flood waters the Corps was attempting to pass through the dam." (*Id.* at 32). Viewing the broader evidence in the light most favorable to the non-movants, however, the Court cannot draw this conclusion at the summary judgment stage. The Court addresses each of the arguments made by the non-movants and the United States, in turn.

### B.     Nature of the Marseilles Lock and Dam

Non-movants urge the Court to examine Section 702c immunity by reference to the nature of the Marseilles Lock and Dam project. In particular, they argue that flood immunity is not applicable here because the Marseilles Lock and Dam project is a navigation project, not a federal flood control project. Indeed, the record reflects—and the United States does not dispute—that the Marseilles Lock and Dam is a run-of-the-river facility, with no upriver flood storage capacity, no federally-authorized flood control purpose, and no potential to achieve flood-control benefits. (*See* R.802-1, Dep. Ex. 24 at USA-00043012 (The Marseilles Lock and Dam project was authorized, designed, constructed, and is regulated, to maintain navigation on the Illinois Waterway. The dam is operated to maintain a normal pool elevation . . . in order to provide a nine-foot navigation channel")).[17]

---

[17] The United States offers hearsay statements from private and city engineers to argue that the Marseilles Dam and its levee *do* provide practical flood damage protection. The United States does not identify any exceptions to the hearsay rules to support the admissibility of such statements for the truth of the matter asserted. Accordingly, the Court does not consider such evidence in its disposition of the United States' summary judgment motion. *See C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 838 (7th Cir. 2015) ("Summary judgment is appropriate where the admissible evidence reveals no genuine issue of any material fact").

The nature of the Marseilles Lock and Dam as a navigation project, however, is not dispositive on the immunity inquiry. Under *Central Green*, courts must "consider the character of the waters that cause the relevant damage rather than the relation between that damage and a flood control project." 531 U.S. at 437. Contrary to the United States' suggestion, though, the Court does not read this language as precluding all consideration of the project's navigational nature within the Court's Section 702c analysis. In *Central Green* itself, the Supreme Court rejected the concept that all water flowing through the Central Valley Project was "flood water" simply "because flood control is among the purposes served by the project." *See* 531 U.S. at 434; *see also California v. United States*, 271 F.3d 1377, 1384-85 (Fed. Cir. 2001) (interpreting *Central Green* and recognizing that the government was not immune from suit "solely because the Madera Canal was part of the Central Valley Project, and therefore tenuously related to flood control" when "the true purpose of the facility that caused the damage was irrigation").

The Court therefore looks to the authorized purpose of the Marseilles Lock and Dam as one aspect informing its Section 702c determination of the character of the waters that caused the damage at issue and the purpose behind their release. *See Central Green*, 531 U.S. at 434. Indeed, as non-movants observe, other courts continue to confirm a nexus "between immunity and a congressionally authorized purpose of flood control." *Judy Kroshus*, 2011 WL 4501121 at *6; *see also In re Katrina*, 696 F.3d at 444-45 (recognizing the principle that Section 702c immunity does not attach where the alleged flood water damage is "caused by the negligence of the United States unconnected with any flood control project") (citing *Graci*, 456 F.2d at 26 ("the immunity from liability for floodwater damage arising in connection with flood control works was the condition upon which the government decided to enter into the area of nationwide flood control programs")).

### C.    Flood Control Efforts on the Illinois River

The United States, in turn, urges the Court to examine Section 702c immunity by reference to the general flood conditions on the Illinois River throughout April 17-18, 2013.  As the record establishes, Northern Illinois had experienced heavy rainfall and the MWRD had reached maximum flood storage capacity at key ILWW facilities by early morning on April 18. The United States does not, however, specifically connect these upriver facilities to the Marseilles Lock and Dam with respect to the flood waters as they existed prior to the allision. Without more, neither the fact that the Marseilles Pool "receives" all waters drained from upriver of Dresden Island, nor that the Marseilles Lock and Dam is "on the ILWW," establishes that Section 702c immunity attaches to its waters.[18]  *See generally Central Green*, 531 U.S. at 428 (rejecting the concept that immunity attached "solely because [the Madera Canal] is a branch of the Central Valley Project"); *see also Morton v. United States*, No. CV 09-877-PHX-FJM, 2010 WL 3981129, at *1 (D. Ariz. Oct. 8, 2010) ("Simply because waters are in some way related to a flood control project is insufficient" to warrant immunity).  Here, as in *Katrina*, the government has failed to demonstrate that the Marseilles Lock and Dam is "so interconnected" with the upriver flood control effort "as to make it part" of that effort.  *In re Katrina*, 696 F.3d at 448 (analyzing claims related to the dredging of the Mississippi River Gulf Outlet ("MRGO"), a shipping channel).  To the contrary, as noted above, the record reflects that the Marseilles Lock and Dam serves no flood control function.

The United States likens the Marseilles Lock and Dam, instead, to the "17th Street Canals" at issue in *Katrina*, which were a part of the Corps' Lake Pontchartrain and Vicinity Hurricane Protection Plan ("LPV").  In affirming immunity, the Fifth Circuit specifically recognized that these canals were "designed to prevent flooding either by creating drainage or by

---

[18]  *See* R.747-1, US Rule 56.1(a)(3) Stmt. Facts ¶¶ 47, 50; R.747-3, Opening Br. at 42-44.

preventing storm surge with levees, and were fully incorporated [by Congress] in the LPV plan." *Id.* at 448. None of these considerations—congressional approval and incorporation into a flood control plan, and/or specific designation as a flood prevention facility—apply to the Marseilles Lock and Dam. *See Kibler v. United States*, 46 F. Supp. 3d 844, 860 (C.D. Ill. 2014) (interpreting *In re Katrina*). The Court is not convinced, therefore, that the Corps' activities on the Marseilles Lock and Dam entitle it to immunity as a matter of law based on a tenuous connection to a "greater flood control project."

### D. Character of the Damaging Waters

The record contains, however, some recreated hydrograph evidence indicating that the Marseilles Pool had reached "flood stage" status by the morning of April 18. (R.747-1, US Rule 56.1(a)(3) Stmt. Facts ¶¶ 62-66; R.747-6, US Ex. 54, Recreated Hydrograph). The waters remained above "flood stage" until after the allision. (*Id.* ¶ 64). This demonstration favors the attachment of immunity. *See Central Green*, 531 U.S. at 436 ("It is relatively easy to determine that a particular release of water that has reached flood stage is 'flood water'" within the meaning of Section 702c) (analyzing *James*).

A "flood stage" label alone, however, does not trigger automatic immunity under Section 702c. Rather, as the Seventh Circuit instructs, there must be some causal nexus between these "flood waters," the alleged governmental negligence,[19] and the resulting damages. *See Fryman*, 901 F.2d at 81 ("If § 702c has limits, they have to do with causation"). In *James*, for example, the Supreme Court clarified that the Corps had released the "flood stage" reservoir waters as "*part of the flood control function of the Millwood facility*," and that such release "created a

---

[19] The Claimants' tort claims do not focus on the Corps' failure to prevent or control the flooding. Rather, they center on the Corps' failure to ensure the safe navigation of the Dale Heller and its tow into the Canal, focusing specifically on Lockmaster Rodriguez's operation of the dam gates. (*E.g.*, R.474, MESD Am. Claim ¶¶ 31-38). Ingram's tort claims share this focus. (R.165, Ingram Counterclaim ¶¶ 14-22).

swift, strong current toward the underwater discharge" which pulled the three respondents through the tainter gates. *James*, 478 U.S. at 599-600 (emphasis added).[20] The Court, thus, does not read Section 702c as shielding the government from all liability for acts *causing* damage by flood waters, where those acts are untied to a flood-control activity.

In *Katrina*, for example, the Fifth Circuit reasoned that the "the government's acting upon waters for the purpose of flood control is flood-control activity, and flood-control activity is what gives waters an immune 'character.'" *Id*. The *Katrina* court thus recognized immunity for any "flood-control activity engaged in by the government, even in the context of a project that was not primarily or substantially related to flood control." *Id.* at 447. With respect to claims arising from the dredging of the MRGO, for example, the Fifth Circuit held that immunity did not apply because "the flood waters that destroyed the plaintiffs' property were not released by any flood-control activity or negligence therein." *Id.* at 448. *Katrina* thus instructs that a "flood waters" label, alone, does not confer Section 702c immunity.

Here, as in *Katrina*, if the government was engaged in a "flood-control activity" at the Marseilles Lock and Dam at the time of the allision—even despite the facility's undisputed nature as a federal navigation project—the government is immune from liability arising from the damaging waters. *See id.* at 447-48; *Central Green*, 531 U.S. at 434 (Section 702c "directs us to determine the scope of the immunity conferred, not by the character of the federal project or the purposes it serves, but by the character of the waters that cause the relevant damage and the purposes behind their release"). As the United States' own authorities make clear, however, a governmental "flood control function"—and the nexus of that function to the waters and to the injury—is critical to the Section 702c inquiry. *See Kibler*, 46 F. Supp. 3d at 863.

---

[20] This aspect of *James* remains good law. *See Central Green*, 531 U.S. at 436 (remarking on the "particular release" of water at issue in *James*).

### E.    Purpose of the Water's Release

The Court must thus decide whether the Corps was engaged in a "flood-control activity" at the time of the allision – that is, whether the Corps was "acting upon [the] waters for the purpose of flood control[.]"  *In re Katrina*, 696 F.3d at 446.  After reviewing the record, material factual disputes exist with respect to this issue, precluding the Court from granting summary judgment based on Section 702c immunity in favor of the United States.  *See Scott*, 550 U.S. at 380.

The United States argues that the "now-criticized actions of the Corps were taken to facilitate the passage of flood waters and to mitigate the risk of flood damage."  (R.747-3, US Opening Br. at 38).  In particular, the United States points to record evidence indicating that:  (1) during flood periods, the lockmaster is responsible for implementing "actions to negate or reduce [the] impact on the facility, adjacent area, and communities;" (2)  the Marseilles lockhouse increasingly opened the dam gates throughout April 17 and 18 in response to rising water levels; (3) near the start of the transit, the closing of the dam gates caused the water level to rise; (4) during the transit, Griffin observed the rising waters and discussed a potential flooding concern with Captain Ice; (5) Rodriguez raised the dam gates on account of the call from Griffin; (6) the raising of the dam gates during the transit caused the water level to fall; (7) the allision resulted in one inoperable dam gate, and four sunken barges upriver of the dam; and (8) by April 19, the river waters overtopped the earthen dike and flowed into Marseilles.

Non-movants disagree with the characterization of these activities as "flood control" activities.  Rather, non-movants contend that the Corps undertook the complained-of actions in order to facilitate navigation generally and, in particular, to facilitate the passage of the Dale Heller tow into the Canal.  In particular, non-movants point to record evidence indicating that:

(1) the lockmaster exercises "full regulatory authority in controlling river traffic through the facility;" (2) the Marseilles Lock and Dam is a navigational project, operated to maintain a normal pool elevation of 483.25 in order to provide a navigation channel; (3) throughout April 17 and 18, Lockmaster Rodriguez "manipulate[d] the gates so that the pool was at 483.00" (R.648, Rodriguez Dep. Tr. at 229-32); (4) on the afternoon of April 18, the IRCA participants devised a plan whereby the Corps would lower the dam gates to facilitate the transit of the Dale Heller and its tow into the Canal; (5) Rodriguez closed the dam gates in response to Ingram's navigational concern for outdraft conditions; (6) Captain Ice did not share any flooding concern with Griffin during the transit; and (7) Rodriguez raised the gates per Griffin's instruction, not because Griffin mentioned flooding or because Rodriguez, himself, observed any flooding.

Ultimately—when viewing the record in the light most favorable to the non-movants—an issue of fact exists with respect to whether the Corps "acted upon" the Marseilles waters for the purpose of flood control. The Court recognizes that, in this particular case, navigation and flood control are not "wholly unrelated" activities, especially with respect to the mid-transit gate-raising issue. *See In re Katrina*, 696 F.3d at 447 (holding that "a negligent government activity . . . wholly unrelated to flood control [and which] causes a flood" does not merit Section 702c immunity). As the Court previously recognized, conflicting evidence exists "on who made—or who should have made—the ultimate decision on whether, *why*, and when to raise the Dam gates during the transit." (R.744, Opinion at 15) (emphasis added). Ultimately, the Court agrees with IMS that Lockmaster Rodriguez's "actions, observations, and understandings" are uniquely relevant to whether he raised the dam gates—"act[ing] upon the waters"—for flood control purposes. His deposition testimony indicates that he did not. (R.648, Rodriguez Dep. Tr. at 247, 263, 274, 281, 255, 280-81).

According to Rodriguez, the Corps agreed to provide assist vessels and to lower the dam gates in order "to assist the Dale Heller[.]" (*Id.* at 329). He later testified that "other than that boat coming in, my priority – my top priority, was not flooding Marseilles." (*Id.* at 333). Even construing flood prevention as a "top priority," however, the fact remains that—in his mid-transit gate operations—Rodriguez "wasn't concerned about Marseilles flooding . . . It never got to that level." (*Id.* at 280:6-281:2). Material factual disputes surrounding the gate-raising issue preclude the Court from granting summary judgment in favor of the United States based on Section 702c immunity. The Court cannot say, as a matter of law, that the damaging floodwaters were released "on account of flood-control activity or negligence therein," as opposed to a failed navigation operation or negligence therein. *See In re Katrina*, 696 F.3d at 444.

The United States' cited authorities are distinguishable. In *Bierer-Carter v. United States*, for example, the plaintiff "fail[ed] to provide any other explanation as to why the gate lifts were opened," aside from flood control purposes. 806 F. Supp. 2d 1245, 1252-53 (S.D. Fla. 2011). Here, non-movants specifically contest the United States' evidence and point to an additional explanation for the gate movements: facilitating navigation.[21] The Court likewise finds unavailing the United States' reliance on *A.O. Smith Corporation v. United States*. In *A.O. Smith*, although the federal dam at issue was not a "flood control project," other factors— including the use of a "surcharge pool" to reservoir flood waters, and the prioritization of flood control over "all other operating objectives" during flood periods—led the court to find that the Corps had engaged in "flood control activity involving flood waters." *A.O. Smith Corp. v.*

---

[21] The United States asks the Court to reject as "factually incorrect" the "argument that [the] re-opening of the gates was related to assistance of navigation, as opposed to flood control" because "there was good reason to believe that opening the gates might not be helpful to the tow." (R.821, Reply Br. at 5). Rodriguez testified, however, that Griffin had a mid-transit perspective on the tow that he (Rodriguez) did not have, thus calling into question *why* Rodriguez obeyed Griffin's instruction – whether for a tactical navigation purpose, or out of concern for potential flooding. (R.648, Rodriguez Dep. Tr. at 341-42). The Court will not decide which inference to draw from the facts at the summary judgment stage. *See Miller*, 761 F.3d at 827.

*United States*, No. 3:12-0429, 2013 WL 771919, at *3 (M.D. Tenn. Feb. 28, 2013), *aff'd*, 774

F.3d 359 (6th Cir. 2014). By contrast, here, the Marseilles Lock and Dam does not have any

flood storage capacity, the relevant manuals do not prioritize flood control over navigation (or

any other objective), and—perhaps most importantly—the claims against the United States do

not allege negligence in responding to heavy rains on the Illinois River, or in operating the dam

for a flood control purpose. *Contra id.* at *3-4 (The conduct challenged in this case is the

Defendant's operation of Old Hickory Dam in the days leading up to and during the May 2010

floods[,]" including the government's failure to implement its own "'Flood Regulation'

instructions"). Given these distinctions, *A.O. Smith* is not instructive on the application of

Section 702c immunity here.

Based on the foregoing analysis, the Court finds that the United States is not entitled to

Section 702c immunity under *Central Green* as a matter of law.

## II.     Immunity under the Discretionary Function Exception

The United States also moves for immunity under the discretionary function exception.

This doctrine shields the United States from tort liability with respect to "[a]ny claim . . . based

upon the exercise or performance or the failure to exercise or perform a discretionary function or

duty on the part of a federal agency or an employee of the Government, whether or not the

discretion involved be abused." 28 U.S.C. § 2680(a); *see also United States v. Gaubert*, 499

U.S. 315 (1991). "The discretionary function exception is an exception to the waiver of

sovereign immunity granted in the Federal Tort Claims Act, 28 U.S.C. § 2680. Though not a

part of the [Suits in Admiralty Act], the discretionary function exception is impliedly contained

in that waiver of sovereign immunity as well." *Cassens v. St. Louis River Cruise Lines, Inc.*, 44

F.3d 508, 510-11 (7th Cir. 1995). The United States now seeks dismissal of any claims based on

Lockmaster Rodriguez's operation of the dam gates during the attempted Canal transit. After reviewing applicable legal principles and the record evidence, the Court finds that Rodriguez's conduct—even if negligent—was discretionary and policy-based, and, therefore, subject to immunity from tort liability.

### A. Applicable Legal Principles

#### 1. Waiver of the Affirmative Defense

The discretionary function exception is an affirmative defense to liability that the government must plead and prove. *Keller v. United States*, 771 F.3d 1021, 1023 (7th Cir. 2014). "To support summary judgment under the exception, the government must offer evidence that shows beyond reasonable dispute that its conduct was shielded by the exception." *Id.*

As an initial matter, Ingram argues that the government has waived this defense by failing to raise it in an answer or other pleading, citing *Stewart v. United States*, 199 F.2d 517 (7th Cir. 1952). In *Stewart*, the Seventh Circuit rejected as untimely the government's attempt to invoke this defense after reaching a liability judgment in the action. In response, the United States observes that it pled affirmative defenses of lack of waiver of sovereign immunity and lack of subject matter jurisdiction in numerous answers, and has filed the present pre-trial motion relating to one doctrine under those umbrellas. This posture and timing, the United States argues, distinguishes this case from *Stewart*.[22]

_____

[22] Other courts have declined to follow *Stewart* because the *Stewart* court viewed "the discretionary function exception as a waivable affirmative defense rather than an impairment of its power to adjudicate." *Richardson v. United States*, 943 F.2d 1107, 1113 (9th Cir. 1991). As the Ninth Circuit observed in *Richardson*, "this view of the Federal Tort Claims Act and its exceptions . . . is not followed in this circuit, or any other circuit including the Seventh." *Id.* (citing *Cisco v. United States*, 768 F.2d 788 (7th Cir. 1985) (affirming Rule 12(b)(1) dismissal pursuant to the discretionary function exception)). The Seventh Circuit has acknowledged its own "wavering" on the issue of whether "defenses to the government's liability under the Tort Claims Act are jurisdictional" in nature, appropriate for disposition on a Rule 12(b)(1) motion for lack of subject matter jurisdiction. *See Collins v. United States*, 564 F.3d 833, 837 (7th Cir. 2009).

The Court need not decide whether the United States erred in failing to plead the discretionary function exception as a *specific* affirmative defense under the doctrine of sovereign immunity. The Court permits the affirmative defense here, where Ingram has failed to demonstrate that it has been prejudiced by the government's timing in asserting this defense and where extensive discovery has occurred on the issue. *See Glob. Tech. & Trading, Inc. v. Tech Mahindra Ltd.*, 789 F.3d 730, 732-33 (7th Cir. 2015) (district courts may "authorize a litigant to assert an affirmative defense despite its omission from the answer" where there is no "reduction in the plaintiff's ability to meet the defense on the merits"); *Carter v. United States*, 333 F.3d 791, 796 (7th Cir. 2003) ("The failure to plead an affirmative defense in the answer works a forfeiture only if the plaintiff is harmed by the defendant's delay in asserting it").

Ingram asks the Court to "assume" harm because fact discovery has already closed. (R.800, Ingram Response Br. at 20, citing *Bd. of Trustees of Plumbers' Local Union No. 93 U.A. v. Encotech Const. Servs., Inc.*, No. 07 C 1901, 2010 WL 1994472, at *4 (N.D. Ill. May 14, 2010)). Unlike in *Encotech*, however, the discovery conducted in this action covered the scope and nature of the Corps' authority and discretion in operating the dam gates on April 18, 2013. *Contra* 2010 WL 1994472 at *4 ("To allow Defendants to raise this contractual defense now, after discovery has closed, would deprive Plaintiffs of the opportunity to conduct discovery as to consideration issue"). Indeed, Ingram's 2014 discovery requests demanded the production of documents "that describe the authority and duties of the Lockmaster at Marseilles Lock & Dam on April 18, 2013." (R.821-1, Ex. 1, US Response to Ingram RFP at ¶ 7). In response, the United States produced relevant Corps manuals and documents. (*Id.*). In addition, Ingram deposed several government witnesses about the existence and scope of Rodriguez's discretion,

including Rodriguez himself, Griffin, and their respective supervisors.[23] Ingram's brief recites this evidence in opposing the United States' motion for immunity based on the discretionary function exception. IMS and the Claimants similarly recite this evidence.[24]

Given the discovery conducted with respect to the scope and nature of Lockmaster Rodriguez's authority and discretion—and Ingram's failure to substantiate its naked prejudice claim—the Court permits the affirmative defense. *See Williams v. Lampe*, 399 F.3d 867, 871 (7th Cir. 2005) (a party "cannot establish prejudice merely by showing that the case has progressed significantly since the defendants answered his complaint").

### 2. The *Gaubert* Two-Part Test

The Supreme Court has set forth a two-part test to determine whether challenged governmental conduct falls within the purview of the discretionary function exception.

First, the exception "covers only acts that are discretionary in nature, acts that involve an element of judgment or choice[.]" *Gaubert*, 499 U.S. at 322 (citing *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). "The requirement of judgment or choice is not satisfied if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow, because the employee has no rightful option but to adhere to the directive." (*Id.*) (quotations omitted). On the other hand, "if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." *Id.* at 324.

Second, even if the challenged conduct involves an element of judgment or choice, courts must inquire "whether that judgment is of the kind that the discretionary function exception was

---

[23] The United States dedicates five pages of its reply brief to recite the extensive discovery conducted with respect to the discretionary function exception. (R.821, US Reply Br. at 13-18).
[24] Neither IMS nor the Claimants contend that the United States has waived this defense.

designed to shield." *Id.* at 322-23. Because the exception's purpose is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort," the exception "protects only governmental actions and decisions based on considerations of public policy." *Id.* (citations and quotations omitted). "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion," however, "it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Id.* at 324.

### B. The *Gaubert* Analysis

#### 1. The Challenged Conduct Was Discretionary in Nature

The Court first inquires "whether the challenged actions were discretionary, or whether they were instead controlled by mandatory statutes or regulations," *Gaubert*, 499 U.S. at 328, and examines each proffered source of applicable policy.

First, a federal statute vests in the Secretary of the Army[25] the duty "to prescribe such regulations for the use, administration, and navigation of the navigable waters of the United States as in his judgment the public necessity may require for the protection of life and property, or of operations of the United States in channel improvement[.]" *See* 33 U.S.C. § 1. As the Supreme Court noted in *Gaubert*, "it will most often be true that the general aims and policies of the controlling statute will be evident from its text." 499 U.S at 324. Here, the statute affords discretion to the Secretary of the Army to determine *which* regulations to prescribe in implementing its dual aims. *See* 33 U.S.C. § 1 ("as in his judgment the public necessity may require").

---

[25] The Corps falls under the Department of the Army. *See generally, e.g.*, Title 33 United States Code.

Second, the relevant regulation promulgated pursuant to 33 U.S.C. § 1 provides:

> (a) Authority of lockmasters—
>
> > (1) Locks staffed with Government personnel. The provisions of this paragraph apply to all waterways in this section except for Cordell Hull Lock located at Mile 313.5 on the Cumberland River in Tennessee. The lockmaster shall be charged with the immediate control and management of the lock, and of the area set aside as the lock area, including the lock approach channels. He/she shall see that all laws, rules, and regulations for the use of the lock and lock area are duly complied with, to which end he/she is authorized to give all necessary orders and directions in accordance therewith, both to employees of the government and to any and every person within the limits of the lock and lock area, whether navigating the lock or not. No one shall cause any movement of any vessel, boat, or other floating thing in the lock or approaches except by or under the direction of the lockmaster or his/her assistants. In the event of an emergency, the lockmaster may depart from these regulations as he deems necessary. The lockmasters shall also be charged with the control and management of federally constructed mooring facilities.

33 C.F.R. § 207.300(a)(1). Ingram reads this provision as setting forth mandatory duties on the part of the lockmaster – specifically, a non-discretionary duty to communicate "clearly and accurately" about dam conditions. Some courts have read this text—charging the lockmaster with control and management of the lock and lock area—as imposing an affirmative duty "to advise river pilots accurately and completely of conditions at a lock" and requiring such pilots "to defer to the orders and directions of the lockman." *Complaint of Walker's Midstream Fuel & Serv. Co.*, 636 F. Supp. 339, 350 (W.D. Ky. 1986). Even assuming that courts may imply lockmaster duties under this provision,[26] the text of 33 C.F.R. § 207.300(a)(1) does not, itself, prescribe a *specific* course of conduct as contemplated under step one of *Gaubert*. *See* 499 U.S. at 322 ("The requirement of judgment or choice is not satisfied if a federal statute, regulation, or

---

[26] Ingram's other cited authority—*Alter Co. v. United States*, 412 F. Supp. 73 (S.D. Iowa 1976) —refused to read this provision in isolation, without reference to other regulations pertaining to prudent seamanship in navigation. *See id.* at 79-81 ("Thus, even if a lock operator gave an erroneous order for a tow to back down from a forebay, the pilot cannot escape liability when he knows that such an order would be dangerous to his tow . . . the pilot is given responsibility for navigation, and the lock operator is given responsibility for locking. Alter's attempt to shift that responsibility must fail"). *Alter*, in any event, does not examine the discretionary function exception.

policy specifically prescribes a course of action for an employee to follow") (citation omitted); *see also Freeman v. United States*, 556 F.3d 326, 339 (5th Cir. 2009) ("We conclude that these (and similar) responsibilities were so general that they too fail to prescribe a nondiscretionary course of action"); *Rosebush v. United States*, 119 F.3d 438, 442 (6th Cir. 1997) ("The relevant inquiry is whether the controlling statutes, regulations and administrative policies mandated that the Forest Service maintain its campsites and fire pits in any *specific* manner"); *cf. Ochran v. United States*, 117 F.3d 495, 500 (11th Cir. 1997) ("the use of the word 'shall' in describing the responsibilities of the AUSA does not necessarily mean that the Guidelines left no room for the AUSA to exercise judgment or choice"). In fact, the regulation makes clear that the lockmaster "may depart" from the regulations of § 207.300 "as he deems necessary" in "the event of an emergency." *See* 33 C.F.R. § 207.300(a)(1). This regulation does not mandate a specific action by Lockmaster Rodriguez in operating the dam gates.[27] Non-movants fail to identify any other federal regulation—or specific provision of § 207.300—applicable to the Court's analysis.

Third, Claimants point to a specific provision of the Marseilles Water Control Manual permitting "unplanned minor deviations from the normal regulation of the pool, although they are not considered emergencies." (R.747-4, Dep. Ex. 24 at USA-00043016). According to Claimants, Rodriguez's supervisors—Hess and Zerbonia—approved one such minor deviation (lowering the gates for the transit). Instead of following "the specific, mandated procedure approved by those above him in the chain-of-command," Rodriguez "abandoned the operation and violated the directives and procedures" by following Griffin's gate-raising instruction.

---

[27] Ingram relies on other pre-*Gaubert* cases to support its "non-discretionary duty" argument. The Court does not find these cases persuasive. In *Chotin*, the Sixth Circuit focused on whether the lockmaster's conduct involved decisions "anchored in social, economic, and political policies of the kind that Congress intended to safeguard from judicial second-guessing." *Chotin Transp., Inc. v. United States*, 819 F.2d 1342, 1346-47 (6th Cir. 1987). This standard speaks to the second prong under *Gaubert*, not the first prong. Similarly, *Alter* is not instructive because it does not address the discretionary function exception. *See* 412 F. Supp. 73.

(R.803, Claimants Response Br. at 6-11). This argument is flawed for several reasons. Even assuming that the Marseilles Water Control Manual sets out "established government policy" under *Gaubert*,[28] the "unplanned minor deviation" provision is plainly discretionary. (R.747-4, Dep. Ex. 24 at USA-00043016 ("Each request is analyzed on its merits. Consideration is given to upstream watershed conditions, potential flood threat, and possible alternative measures")). Furthermore, even construing the supervisor-approved plan as a "specific, mandated procedure," Claimants fail to liken this oral procedure to an institutional policy position properly considered in a *Gaubert* analysis. *See Irving v. United States*, 162 F.3d 154, 166 (1st Cir. 1998) (interpreting *Gaubert* and noting, "[t]o determine what is agency policy, courts customarily defer to the statements of the official policymaker, not others, even though the others may occupy important agency positions"). Claimants relatedly fail to identify the Corps' policies prohibiting Rodriguez from following Griffin's gate-raising instruction with respect to the situation he faced on April 18, 2013. In addition, Claimants fail to set forth any record evidence supporting their contention that April 18 did not constitute an "emergency" situation. (R.806, Claimants Rule 56.1(b)(3)(B) Stmt. Facts ¶¶ 150, 167, 171-72 (unsupported by record citations)). To the contrary, both government and industry witnesses testified to this effect – specifically, that April 18 was an unprecedented, non-routine, emergency situation.[29] Claimants thus fail to adduce

---

[28] The Marseilles Water Control Manual is "intended to provide guidance and instructions for project personnel[.]" (R.747-4, Dep. Ex. 24 at USA-00042967).

[29] In contrast to the Claimants, IMS argues that this *was* an emergency situation. According to IMS, "the decision to act was not discretionary, as the situation left the Corps with no choice." (R.804, IMS Response Br. at 17). The Ninth Circuit recently considered—and rejected—a similar argument. *See Chadd v. United States*, 794 F.3d 1104, 1111-12 (9th Cir. 2015) ("But whether there was only one reasonable course of action is not the relevant question for determining subject matter jurisdiction under § 2680(a)"). Furthermore, the Marseilles Water Control Manual—assuming that it constitutes agency policy under *Gaubert*—states that "[n]ecessary action under emergency conditions is taken immediately unless such action would create equal or worse conditions." (R.747-4, Dep. Ex. 24 at USA-00043016). This "unless" language contemplates Corps discretion on whether, or not, to act. Federal regulations contemplate lockmaster discretion, as well. *See* 33 C.F.R. § 207.300(a)(1) ("In the event of an emergency, the lockmaster may depart from these regulations as he deems necessary"). IMS cites no precedent divesting the government of its otherwise-conferred discretion in an emergency situation, instead arguing that the

"specific facts showing that there is a genuine issue for trial," *see Anderson*, 477 U.S. at 255, and fail to convince the Court that the April 18 situation constituted a "minor deviation" within the meaning of the Marseilles Water Control Manual.[30]

Finally, Claimants argue that, "under the black letter policy of the Illinois Waterway, navigation assistance is always to take precedence over water control." (R.803, Claimants Response Br. at 15). This provision of the Marseilles Control Water Manual, however, speaks only to Gates 10 and 11, which "control the flow in the North Channel Headrace." (R.803-6 at USA-00043014). This case does not involve the operation of Gates 10 and 11. Accordingly, this provision has no bearing on the Court's *Gaubert* analysis.

Here, non-movants have failed "to identify any specific, nondiscretionary function or duty that does not involve an element of judgment or choice." *Freeman*, 556 F.3d at 338. The absence of a specific, mandatory directive distinguishes this case from *Berkovitz v. United States*, 486 U.S. 531 (1988). In *Berkovitz*, the Supreme Court examined a federal statute (42 U.S.C. § 262(d)) and a federal regulation (21 C.F.R § 601.2) to hold that the government "has no discretion to issue a license without first receiving the required test data; to do so would violate a specific statutory and regulatory directive." *Id.* at 542-43; *see also Wilburn v. United States*, 616

_____

Corps' policies favored the safety of property, personnel, and the public. These aspirational policies, however, are not germane to step one of the *Gaubert* analysis. *Cf. Tippett v. United States*, 108 F.3d 1194, 1197 (10th Cir. 1997) ("[T]he general goal of protecting human life in the nation's national parks is not the kind of specific mandatory directive that operated to divest [the federal agent] of discretion in the situation he faced"); *Valdez v. United States*, 56 F.3d 1177, 1180 (9th Cir. 1995) ("While the said policy guidelines certainly outline general policy goals regarding visitor safety, the means by which [agency] employees meet these goals necessarily involves an exercise of discretion").

[30] Claimants argue that there was no "emergency" within the meaning of the manual because "[t]here was no drowning or accident" and the "operational facilities were operating normally, albeit under high water conditions." (R.803, Claimants Response Br. at 7). The language from the Marseilles Water Control Manual is not so limited. Rather, the manual provides those scenarios as examples of "[s]ome emergencies that can be expected[.]" (R.747-4, Dep. Ex. 24 at USA-00043016). Here, the record reflects that the April 18, 2013 flotilla predicament was an emergency situation. According to Rodriguez, throughout his 28-year tenure, he had only lowered the gates twice before upon industry request, and, even then, it was only by "2 or 3 feet." (R.648, Rodriguez Dep. Tr. at 333:12-335:4). This testimony belies the characterization of the April 18 gate operation as a "minor deviation" within the meaning of the Marseilles Water Control Manual.

F. App'x 848, 860 (6th Cir. 2015) (reciting a state statute and an Army regulation and holding that "neither affords those implementing the rules any choice but to follow them"). No party has identified any directive similar to those at issue in *Berkovitz* and *Wilburn*. To the contrary, the United States has identified a federal statute (33 U.S.C. § 1) and a federal regulation (33 C.F.R. § 207.300(a)(1)) contemplating agency discretion with respect to lockhouse operations, particularly during emergency situations. The Court therefore finds that the challenged conduct was discretionary. *See Gaubert*, 499 U.S. at 328.

## 2. The Challenged Conduct Was Policy-Based

According to the United States, the Corps used the discretion conferred under 33 C.F.R. § 207.300(a)(1) to deviate from its normal regulation of the Marseilles Pool in order to assist the Dale Heller in its emergency transit. The government offers several policy-based rationales behind this conduct, including "balancing the risk to government property and employees, the risk to public safety on account of potentially loose barges, the risk of flooding the town by reducing the dam discharge temporarily to aid navigation, the salutary goal of attempting to assist vessels in distress, and the Corps' need to return the pool to the regulated elevation." (R.747-3, US Opening Br. at 56-57). Other courts have held the Corps' decisions regarding dam operations to be susceptible to policy analysis. *See A.O. Smith Corp. v. United States*, 774 F.3d 359, 366 (6th Cir. 2014) ("The Corps was required to exercise its discretion in balancing competing and conflicting directives and policy goals, decisions at the very heart of the discretionary function exception"); *In re Ohio River Disaster Litig.*, 862 F.2d 1237, 1248 (6th Cir. 1988) ("The decision to maintain navigation at the expense of passing ice, however, is a decision the Corps is uniquely qualified to make, and is protected by the discretionary function exception"). Courts have also deemed governmental decisions to assist in emergency situations

as susceptible to policy analysis. *See In re Katrina Canal Breaches Consol. Litig.*, No. 06-6099, 2008 WL 2186400, at *5 (E.D. La. May 27, 2008), *aff'd sub nom. In re Katrina Canal Breaches Litig.*, 351 F. App'x 938 (5th Cir. 2009) (collecting cases). Non-movants do not dispute these general principles. Instead, non-movants raise related—but ultimately unconvincing—issues to preclude the characterization of the challenged conduct as "policy-based." The Court addresses each one.

First, non-movants argue that, in operating the dam gates, Rodriguez was not concerned about flooding and did not engage in any sort of policy balancing. Rodriguez's subjective intent, however, is not relevant to a *Gaubert* analysis. *See Gaubert*, 499 U.S. at 325 ("The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis"); *Chadd v. United States*, 794 F.3d 1104, 1113 (9th Cir. 2015) ("Whether Park officials actually took into consideration the policy objectives listed in the Service's guidelines is irrelevant because the challenged decision need not be *actually* grounded in policy considerations, but must be, by its nature, *susceptible* to a policy analysis) (citation and quotation omitted).

IMS similarly argues that the government may not "create after-the-fact justifications for the purpose of liability protection," citing *Marlys Bear Medicine v. United States*, 241 F.3d 1208 (9th Cir. 2001). But the *Marlys* court specifically noted that the discretionary function exception applies where there is "reasonable support in the record for a court to find, without imposing its own conjecture, that a decision was policy-based or susceptible to policy analysis." *Id.* at 1216. Here, the undisputed record reflects that the Corps had articulated its concern about potential flooding prior to the attempted transit. In addition, the Corps was concerned about property

damage, personnel safety, and public safety if the Dale Heller could not hold its barges in position throughout the high-water situation. (*See, e.g.*, R.747-6, Ex. 51, Zerbonia Dep. Tr. at 15-18, 227-29). Non-movants fail to set forth "specific facts showing that there is a genuine issue for trial" against this summary judgment record. *See Anderson*, 477 U.S. at 255. Here, the undisputed record—not conjecture—establishes that the Corps' conduct in lowering and raising the dam gates on April 18, 2013 was susceptible to policy analysis, including considerations of public safety, property protection, navigation, and flood mitigation in an emergency situation. *Contra Marlys*, 241 F.3d at 1216.

Second, non-movants suggest that Rodriguez's conduct "cannot be said to be based on the purposes that the regulatory regime seeks to accomplish," thus falling outside of the discretionary function exception's immunity shield. *Gaubert*, 499 U.S. at 325 n.7. Claimants, for example, argue that the "decision to place water control efforts over navigation assistance is contrary to public policy and falls outside the exception." (R.803, Claimants Response Br. at 15). Claimants recite no authority for this proposition, and ignore the text of the controlling federal statute. *See* 33 U.S.C. § 1 (recognizing the dual aims of protection of life and property, and protection of operations in navigable channels). Non-movants also criticize Rodriguez's specific conduct—his failure to clarify what he meant by "16 feet," his mid-transit action in raising the gates, his unquestioning compliance to Griffin's instruction, and his failure to inform vessel operators of gate movements and outdraft conditions as they approached the dam—as contrary to regulatory policy. These criticisms, however, focus on Rodriguez's alleged negligence, not on the "nature of the actions taken and on whether they are susceptible to policy analysis." *Gaubert*, 499 U.S. at 325. Whether Rodriguez was, in fact, negligent is irrelevant to the discretionary function analysis. *See* 28 U.S.C. § 2680(a) (clarifying that the exception

applies "whether or not the discretion involved be abused"); *Gaubert*, 499 U.S. at 323; *Hylin v. United States*, 755 F.2d 551, 553 (7th Cir. 1985); *Freeman*, 556 F.3d at 341.

Third, IMS urges the Court to "distinguish between design and implementation," seeking to hold Rodriguez liable for the negligent implementation of an otherwise immunized policy plan. In support, IMS relies on *Whisnant v. United States*, 400 F.3d 1177 (9th Cir. 2005). In *Whisnant*, the Ninth Circuit acknowledged that *Gaubert* disposed of the dichotomy between "operational" decisions and "planning" decisions in the context of the discretionary function exception. *See id.* at 1181 ("the applicability of the exception does not depend on whether the relevant decision was made by an individual at the 'operational' or 'planning' level"); *see also Gaubert*, 499 U.S. at 326, 334. The *Whisnant* court, however, drew a distinction between the "design-implementation distinction" and the "operational-planning distinction rejected in *Gaubert*" insofar as "the former concerns the nature of the decision, while the latter concerns the identity of the decisionmaker." 400 F.3d at 1181 n1.[31] Under this reasoning, the Ninth Circuit held that "the decision to adopt safety precautions may be based in policy considerations, but the implementation of those precautions is not . . . Safety measures, once undertaken, cannot be shortchanged in the name of policy." *Id.* at 1182. IMS interprets this language to mean that "once the government has undertaken responsibility for the safety of an event, the execution of that responsibility is not subject to the discretionary function exception." (R.804, IMS Response Br. at 16). The Court disagrees with this broad interpretation. *Whisnant*, moreover, is not binding on this Court, and—even if it were—subsequent decisions have limited its application.

In *Whisnant*, plaintiff claimed that the government "negligently ignored health hazards that were called to its attention" at a government-operated commissary. 400 F.3d at 1179-80,

---

[31] Non-movants do not challenge the application of the discretionary function exception on the basis of Rodriguez's status.

1185.  The Ninth Circuit held that "because removing an obvious health hazard is a matter of safety and not policy, the government's alleged failure to control the accumulation of toxic mold in the Bangor commissary cannot be protected under the discretionary function exception."  *Id.* at 1183.  Contrary to IMS' suggestion, however, *Whisnant* does not speak in terms of a duty to ensure a safe "event."  Rather, it speaks in terms of ongoing maintenance and monitoring duties which, once undertaken by the government, must be carried out with due care.  *See id.* at 1183 (analyzing cases and observing, "Like the government's duties to maintain its roads in safe condition, to ensure the use of suitable materials in its building projects, and to monitor the safety of its logging sites, the government's duty to maintain its grocery store as a safe and healthy environment for employees and customers is not a policy choice of the type the discretionary function exception shields").  Indeed, as the Ninth Circuit recently recognized, "we have cautiously applied this doctrine and we have applied it largely in cases involving public health and safety[.]"  *Gonzalez v. United States*, 814 F.3d 1022, 1035 (9th Cir. 2016).

Gonzalez, along with other post-*Whisnant* precedent, makes clear that the "design-implementation" doctrine "does not permit liability where . . . the implementation itself implicates policy concerns.  To conclude otherwise would simply swallow the two-step, discretionary act and policy judgment analysis the Supreme Court [has] set forth[."  *Id.* (citing *Whisnant*, 400 F.3d at 1182 n.3 (the "implementation of a government policy *is* shielded where the implementation itself implicates policy concerns, such as where government officials must consider competing fire-fighter safety and public safety considerations in deciding how to fight a forest fire[.]")).  Indeed, "so long as a decision involves *even two competing policy interests*, it is 'susceptible' to policy analysis and is thus protected by the discretionary function exception."  *Chadd*, 794 F.3d at 1112 (citing *Bailey v. United States*, 623 F.3d 855, 862-63 (9th Cir. 2010)

("our law that establishes that balancing *competing* safety considerations *is* a protected policy judgment")).

The Seventh Circuit has neither adopted nor rejected this "design-implementation" doctrine. Even assuming its adoption, however, this case is more akin to *Gonzalez* than to *Whisnant*. In *Gonzalez*, the Ninth Circuit deemed the FBI's decision not to disclose information regarding a threatened home invasion to be discretionary and policy-based. In so holding, the Ninth Circuit explicitly rejected a focus on the government's alleged failure "to carry out its own plan" in favor of a focus "on the discretionary and policy-based nature" of the agency determination. *See* 814 F.3d at 1035-36. As the *Gonzalez* court observed, "[f]undamentally, the decision whether or not to disclose information under the Guidelines . . . requires considerations of public safety, allocation of scarce resources, and the likelihood of success." *Id.* at 1036. Similarly here, the Corps had to balance competing policy interests—public safety, property protection, navigation, and flood mitigation—in deciding whether and when to lower and raise the dam gates during the Canal transit. The regulatory discretion afforded to the Corps in this activity, alone, "creates a strong presumption" in favor of immunity. *See Gaubert*, 499 U.S. at 324; *Gonzalez*, 814 F.3d at 1036 (cautioning that the "design-implementation" doctrine should not contravene the Supreme Court's "clear command" regarding this presumption).

Ultimately, even viewing the evidence in the light most favorable to the non-movants, the record supports the conclusion that Rodriguez's conduct was susceptible to policy analysis. Because the Corps had to balance competing policy interests in operating the dam gates on April 18, immunity shields its decisions. *See Bailey*, 623 F.3d at 863.

## C.     The Application of *Indian Towing*

Non-movants' final argument concerns the application of *Indian Towing Co. v. United States*, 350 U.S. 61 (1955), which they submit is the leading case on the "Good Samaritan" doctrine.  In *Indian Towing*, the Supreme Court held that:

> The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning.  If the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States is liable under the Tort Claims Act.

*Id.* at 69.

According to non-movants, once the Corps exercised its discretion to assist the Dale Heller by lowering the dam gates—and engendered reliance on that assistance—the Corps had an obligation to use due care in carrying out that assumed duty.  Having failed to use due care, non-movants argue, the United States cannot now avail itself of the discretionary function exception.  The Court first addresses the differing post-*Gaubert* treatment of *Indian Towing* before addressing the merits of this argument.

### 1.     Post-*Gaubert* Landscape

The application of *Indian Towing* to a post-*Gaubert* discretionary function analysis is unsettled.  In particular, some courts view *Indian Towing* as setting forth an inquiry separate and apart from the discretionary function analysis, while others view it as instructive on the scope of the exception.  Ultimately, either approach results in a finding that the United States is immune from claims based on Rodriguez's operation of the dam gates during the attempted transit.

### a. Independent Duty Determination

In the context of the waiver of sovereign immunity arising under the Suits in Admiralty Act ("SAA"), the Seventh Circuit has indicated that a determination on the United States' substantive tort liability is an independent, threshold inquiry to the discretionary function exception inquiry. Specifically, in *Cassens v. St. Louis River Cruise Lines*, the Seventh Circuit observed that "[t]here would appear to be a threshold question whether this suit falls within the SAA's waiver of sovereign immunity" – that is, whether the "Coast Guard is liable to the Cassens for a recognized private tort" under Good Samaritan principles. *See* 44 F.3d 508, 510 n.2 (7th Cir. 1995). The Sixth Circuit has likewise ruled in the FTCA context that "focusing solely on the applicability of the discretionary function exception" is akin to "putting the cart before the horse." *Myers v. United States*, 17 F.3d 890, 898 (6th Cir. 1994). Other courts follow this approach. *See Dorking Genetics v. United States*, 76 F.3d 1261, 1264 (2d Cir. 1996) (addressing, first, the creation a cognizable duty under the FTCA, and declining to reach the discretionary function inquiry); *Irving v. United States*, No. CIV. 81-501-SD, 1994 WL 287750, at *1 (D.N.H. June 23, 1994) (addressing the "merits of the litigation" is the proper approach).[32]

In *Myers*, the Sixth Circuit observed that the "FTCA does not *create* liability, it merely waives sovereign immunity to the extent that state-law would impose liability on a 'private

---

[32] The Fourth and Eleventh Circuits, by contrast, have presented the two inquiries as parallel—yet independent— bases depriving courts of subject matter jurisdiction. *See Suter v. United States*, 441 F.3d 306, 310 (4th Cir. 2006) (declining to consider the merits dismissal and electing a "more straightforward basis for affirmance" under the discretionary function exception); *Zelaya v. United States*, 781 F.3d 1315, 1326 (11th Cir. 2015) (remand on merits question unnecessary where the discretionary function exception applied to "negate the waiver of sovereign immunity that might otherwise arise from the FTCA"). In *Cassens*, the Seventh Circuit ultimately declined to address the threshold "state-law" inquiry, in favor of resolution on discretionary function grounds. *See Cassens*, 44 F.3d at 510 n.2.

individual in similar circumstances.'"  *Id.* at 899 (citing 28 U.S.C. § 2674).[33]  The *Myers* court further observed that:

> The greatest limitation upon the government's liability under the FTCA is not, and was not intended to be, the discretionary function exception.  Rather, the principle limitation is that, for the government to be liable, state law must provide for private liability under similar circumstances. Where no similar circumstances exist or can even be imagined, or where private individuals would not be held liable even under similar circumstances, the government is not liable under the FTCA.

*Id.* at 905.[34]

The Court pauses here to examine *Indian Towing*.  There, the Supreme Court rejected the government's contention that the FTCA "must be read as excluding liability in the performance of activities which private persons do not perform," such as lighthouse operations.  350 U.S. at 64.  The Supreme Court analogized the situation to a private setting, noting that "one who undertakes to warn the public of danger and thereby induces reliance must perform his 'good Samaritan' task in a careful manner."  *Id.* at 64-65.  Other courts have interpreted *Indian Towing* along these lines.  *See Berkovitz*, 486 U.S. at 539 (reading *Indian Towing* as "disapproving [the] argument that FTCA precludes liability for the performance of 'uniquely governmental functions'"); *Zelaya*, 781 F.3d at 1324-25 ("the Supreme Court long ago made clear that there is no exception from FTCA liability solely because the particular tort arose from the performance of uniquely governmental functions.  So, the question arises, how should the FTCA be applied when uniquely governmental functions are at issue? We have recognized that normally, the most analogous approach in determining whether the government is liable in the regulator-enforcer

---

[33]  The SAA likewise does not create liability.  *See Trautman v. Buck Steber, Inc.*, 693 F.2d 440, 443-44 (5th Cir. 1982).  Rather, it waives "the government's sovereign immunity with respect to any claims that could be maintained in admiralty if brought against a private person."  *Hillier v. S. Towing Co.*, 714 F.2d 714, 722 (7th Cir. 1983).

[34]  Other courts disagree with the Sixth Circuit's "greatest limitation" analysis.  *See Cazales v. Lecon, Inc.*, 994 F. Supp. 765, 770 (S.D. Tex. 1997) ("The discretionary function exception operates as the foremost limitation on a court's jurisdiction under the FTCA").

context under state law is the Good Samaritan doctrine") (citation and quotation omitted); *Dorking*, 76 F.3d at 1266; *Bergquist v. U.S. Nat. Weather Serv.*, 849 F. Supp. 1221, 1229 (N.D. Ill. 1994).

Interpreting *Indian Towing*, the Sixth Circuit has reasoned that, "[w]hile private individuals do not routinely provide these [lighthouse] services, such similar situations are readily imaginable and liability surely would be imposed were private individuals to engage in providing these services." *Myers*, 17 F.3d at 904. Because the *Myers* plaintiff failed to allege facts sufficient to support state-law liability for a similarly-situated private individual under the Good Samaritan doctrine, however, dismissal was proper without resort to the discretionary function exception. *Id.* at 904-05. The *Myers* court noted, in particular, the insufficiency of allegations concerning "justifiable, detrimental reliance." *Id.* at 903; *see also id.* at 905 (the Good Samaritan doctrine "will only apply against the government in the presence of reasonable, justifiable reliance").[35]

Following *Myers*, some courts have held that, "even if the Coast Guard failed to satisfy the Good Samaritan Doctrine's due care requirements, such facts are only sufficient to invoke the Government's initial waiver of sovereign immunity. Such facts are not sufficient, however, to obviate the effects of the discretionary function exception." *In re Steinle*, 835 F. Supp. 2d 437, 447 (N.D. Ohio 2011); *see also Ochran*, 117 F.3d at 505 (agreeing that the creation of a state-law duty satisfies only "one of the two FTCA requirements; if the discharge of this state-law duty involves judgments grounded in considerations of public policy, the discretionary

---

[35] Federal maritime law recognizes the Good Samaritan doctrine. *See In re All Maine Asbestos Litig.*, 581 F. Supp. 963, 978 (D. Me. 1984). To impose liability against the government under this doctrine, however, the challenged conduct must "affirmatively worsen[] the situation." *Myers*, 17 F.3d at 904; *see also Thames Shipyard & Repair Co. v. United States*, 350 F.3d 247, 265 (1st Cir. 2003) (the Coast Guard "would not be civilly liable unless its negligence worsened the situation over what it would have been had the Coast Guard not come to the aid of the NORTHERN VOYAGER").

function exception bars suit against the United States"). This view accords with the principle that 28 U.S.C. § 2680(a) "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. Varig Airlines*, 467 U.S. 797, 808 (1984). Construing the Good Samaritan doctrine as an inquiry wholly independent of the discretionary function inquiry, the record supports immunity under *Gaubert*. The Court must address other caselaw, however, before rendering this determination.

### b.      Informing the *Gaubert* Analysis

As the Ninth Circuit has recognized, "[a]lthough the analysis in *Indian Towing* is not addressed to the discretionary function exception, subsequent Supreme Court precedent has treated *Indian Towing* as relevant authority in this area." *Whisnant*, 400 F.3d at 1182 n.2. In *Berkovitz*, for example, the Supreme Court cited *Indian Towing* as supporting the principle that if a government act "simply does not involve the exercise of such [policy] judgment, the discretionary function exception does not bar a claim that the act was negligent or wrongful." 486 U.S. at 546-47. The Supreme Court in *Gaubert*, however, clarified that *Berkovitz*'s reference to *Indian Towing* did not endorse a "nonexistent dichotomy between discretionary functions and operational activities." *See* 499 U.S. at 326.

Based on this *Gaubert* holding and the posture of *Indian Towing*,[36] several circuit courts have held that *Indian Towing* does not apply to the discretionary function analysis. *See Harrell v. United States*, 443 F.3d 1231, 1237 (10th Cir. 2006) (collecting cases from the First, Eleventh, Tenth, Fourth, and Ninth Circuits). The Seventh Circuit has not squarely addressed this issue.

---

[36] The government in *Indian Towing* conceded the inapplicability of the discretionary function exception. *See Harrell v. United States*, 443 F.3d 1231, 1237 (10th Cir. 2006) ("the government conceded that the discretionary function exception did not apply and relied instead on the unsuccessful argument that the maintenance of a lighthouse was not the proper basis for liability in tort because it was a 'uniquely government function'").

As noted above, *Cassens* only analyzed *Indian Towing* in the context of the "threshold" inquiry regarding the Coast Guard's substantive liability under the SAA, not in the context of the discretionary function analysis. *See Cassens*, 44 F.3d at 510 n.2.[37] The Seventh Circuit did, however, look to *Varig Airlines* to inform its understanding of the discretionary function exception. In particular, *Cassens* highlighted language suggesting that the exception protects not only the decision *whether* to implement a federal program, but also *how* to implement that program, even shielding the government where its agents take "calculated risks." *Id.* at 513 (citing *Varig*, 467 U.S. at 820).[38]

Other courts have recognized this "whether / how" distinction in the context of the discretionary function exception – specifically with respect to the government's voluntary assumption of a state-law duty. In *Ochran*, for example, the Eleventh Circuit held that, although a government attorney "may have voluntarily assumed the duty" of protecting plaintiff, "her negligence in discharging that duty is not actionable under the FTCA" because "deciding both *whether* and *how* to protect a victim" was grounded in policy considerations. *Ochran*, 117 F.3d at 506. The *Ochran* court specifically noted, however, that "[their] dealings did not involve a promise to perform specific actions on [plaintiff's] behalf." *Id.* at 506 n.7.

---

[37] With respect to *Indian Towing*, the Seventh Circuit noted that "[i]t seems quite unlikely that Mr. Cassens saw, much less relied on, the Coast Guard certification when he boarded the Belle or used its stairways. Any detrimental reliance, then, must have been on the part of SLRCLI [the vessel's operator]. The claim would have to be that the existence of the Coast Guard inspection process induced SLRCLI to forgo its own safety inspection. This claim of reliance is a far cry from that of the navigators on the lighthouse in *Indian Towing* . . . and it is difficult to see how such reliance would be either justified or legal." *Id.* Ultimately, the Seventh Circuit did not make this justifiable reliance determination, resolving the immunity issue on discretionary function grounds.

[38] Other courts have interpreted *Varig Airlines* to support the notion that the discretionary function exception applies even where the government is negligent "in performing its voluntarily assumed duty[.]" *See Cazales v. Lecon, Inc.*, 994 F. Supp. 765, 774 (S.D. Tex. 1997). In *Varig Airlines*, the Supreme Court noted that "the duty to ensure that an aircraft conforms to FAA safety regulations lies with the manufacturer and operator, while the FAA retains responsibility for policing compliance." 467 U.S. at 797. Interpreting *Varig Airlines*, the *Cazales* court noted that "the government's assignment of the duty to ensure airplane safety to the manufacturer and the operator, despite the government's voluntary assumption of inspection and certification procedures, was a decision protected under the discretionary function exception. Furthermore, this protection extended to the government's decision to ensure safety only through the use of 'spot checks.'" *See* 994 F. Supp. at 774.

Other courts, by contrast, have deemed alleged breaches of *specific* protection promises as falling outside of the discretionary function exception's protection. *See Chang-Williams v. Dep't of the Navy*, 766 F. Supp. 2d 604, 618 (D. Md. 2011) ("Thus, the real issue in this case is not whether the decision to protect is discretionary, but whether the agents of the United States performed a discretionary function when they disregarded their own specific assurances to Chang–Williams and her family"); *Wilburn*, 616 F. App'x at 861 ("But a direct representation by the government to a domestic violence victim that it will take certain action, followed by a failure to take that action, is not subject to the same policy analysis"). In addition, as noted above, courts have deemed governmental failures to perform safety functions—once undertaken—as outside the discretionary function exception. *See, e.g.*, *Callas' Estate v. United States*, 682 F.2d 613, 624 (7th Cir. 1982); *Whisnant*, 400 F.3d at 1182. Furthermore, courts have held that, once the Coast Guard makes the decision to render emergency aid, the implementation of that decision is not subject to policy analysis. *See Hurd v. United States*, 134 F. Supp. 2d 745, 768-69 (D.S.C. 2001), *aff'd*, 34 F. App'x 77 (4th Cir. 2002). These cases suggest that a key principle in *Indian Towing*—the engendering of detrimental reliance—limits the scope of the discretionary function exception. *See Marbulk Shipping, Inc. v. Martin-Marietta Materials, Inc.*, 271 F. Supp. 2d 1374, 1381 (S.D. Ala. 2003) ("Because the same policy considerations that underlie the decision *whether* to mark a hazard also underlie the decision *how* to do so, it is doubtful that *Eklof*, to the extent not based on mariners' detrimental reliance as in *Indian Towing*, could survive scrutiny under *Gaubert*").

## 2. *Indian Towing* Applied

Ultimately, the Court agrees with the United States that, properly construed, *Indian Towing* speaks not to the application of the discretionary function exception, but rather to the

government's state-law liability under the SAA. Even assuming that Ingram justifiably and detrimentally relied on Rodriguez's offer to lower the dam gates to 16 feet until its tow had safely transited into the Canal, this fact does not preclude the Court from reaching an "alternative basis" for dismissal – namely, the discretionary function exception. *See Cassens*, 44 F.3d at 510 n.2.[39] Because the challenged conduct was discretionary and policy-based as addressed above, immunity applies under 28 U.S.C. § 2680(a). *See Gaubert*, 499 U.S. at 315.

Even viewing *Indian Towing* as relevant to the discretionary function analysis, moreover, it is unclear whether the alleged presence of detrimental reliance, alone, can bar the application of this exception. In *Chang-Williams* and *Wilburn*, for example, the government assumed a duty "to take certain particular actions" and then "wholly failed to do so." *Chang-Williams*, 766 F. Supp. 2d at 619; *Wilburn*, 616 F. App'x at 861 (noting that the government failed to "follow through" on a promise to "take certain action"). Similarly, in *Hurd*, the agent's rescue conduct was not discretionary because "Coast Guard policy specifically prescribe[d] a course of action for him to follow" under "objective criteria." *See Hurd*, 134 F. Supp. 2d at 769.

Here, by contrast, the record reflects that the Corps' decisions—both *whether* to assist the Dale Heller and *how* to assist the Dale Heller—were subject to policy analysis. *See Ochran*, 117 F.3d at 506. Even viewing the facts in the light most favorable to the non-movants, Rodriguez's alleged offer to lower the gates to 16 feet, followed by his mid-transit raising of the gates, does not amount to an abject failure to follow through on a certain promise. *Contra Chang-Williams*, 766 F. Supp. 2d at 619; *Wilburn*, 616 F. App'x at 861. To the contrary, the record reflects that

---

[39] *Cassens* viewed the discretionary function inquiry as jurisdictional in nature. *See* 44 F.3d at 510 n.2. The Seventh Circuit has continued to apply this "alternative basis" treatment, however, even where it construes the discretionary function inquiry as non-jurisdictional. *See Reynolds v. United States*, 549 F.3d 1108, 1111-12 (7th Cir. 2008) (analyzing the discretionary function exception against a Rule 12(b)(6) standard, versus the district court's Rule 12(b)(1) standard, and noting, "[t]he FTCA to one side, we still must evaluate whether Reynolds has stated a claim for relief under Indiana tort law").

there was no specific agreement on how long the gates would stay down, given the Corps'

acknowledged concern regarding potential flooding.  Unlike in *Hurd*, moreover, non-movants

offer no evidence that Corps policy specifically prescribed a course of action for Rodriguez to

follow in his mid-transit gate operations.  Finally, this case does not concern routine safety

decisions, triggering jurisdictional concerns that "[e]very slip and fall, every failure to warn,

every inspection and maintenance decision can be couched in terms of policy choices based on

allocation of limited resources."  *Whisnant*, 400 F.3d at 1183.  Rather, this case concerns an

emergency situation, wherein the United States made the discretionary decision to assist a

stranded flotilla of barges by operating dam gates, while also weighing safety and property

considerations.  Even assuming the presence of detrimental reliance, the discretionary function

exception nonetheless protects the Corps' decisions.  *See Limar Shipping Ltd. v. United States*,

324 F.3d 1, 11-12 (1st Cir. 2003) (where the government "does not create a danger but rather

only fails to render adequate performance, liability does not attach") (citation and quotation

omitted).

     Based on the foregoing analysis, the Court grants the United States' motion with respect

to immunity under the discretionary function exception.

## III.    Dismissal of Ingram's Contract Allegations

     As the United States acknowledges, the discretionary function doctrine does not shield it

from contractual liability.  (R.821, US Reply Br. at 18 n.16).  Ingram has alleged two contract

claims against the United States – one for breach of contract (Count II), and one for promissory

estoppel (Count III).  The United States now moves to dismiss these claims on sovereign

immunity grounds.  *See United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("It is axiomatic that

the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction").

In Count II of its Amended Counterclaim, Ingram alleges that the Corps "offered to lower the gates of the Marseilles Dam to a total opening of or about 16 feet to allow the flotilla to safely navigate into the Marseilles Canal, in exchange for Ingram's agreement to navigate the flotilla into the Marseilles Canal, where the flotilla would not pose a threat to the Marseilles Dam." (R.373, Am. Counterclaim ¶ 32). Ingram accepted this offer. (*Id.* ¶ 33). The Corps breached this agreement, Ingram argues, by failing to lower the gates to 16 feet, by opening the dam gates as the head of the flotilla neared the Canal entrance, and by failing to permit the flotilla adequate time to transit into the Canal. (*Id.* ¶ 35). Ingram's promissory estoppel claim (Count III) echoes these allegations. (*Id.* ¶¶ 39-48) ("Rodriguez expected, or reasonably should have expected, that his promise would induce and cause the Captain of the Dale A. Heller to attempt to navigate the flotilla past the Marseilles Dam and into the Marseilles Canal"). The Court examines each claim, in turn.

## A. Promissory Estoppel (Count III)

Promissory estoppel "is another name for an implied-in-law contract claim." *XP Vehicles, Inc. v. United States*, 121 Fed. Cl. 770, 782 (2015) (citation omitted). A contract implied in law is a "fiction of law," essentially, "an equitable cause of action whereby one who reasonably relies on another's promise can subsequently require [him] to make good on his promise." *Id.* (citations omitted). The parties do not dispute that implied-in-law contracts are "claims for which the United States has not waived its sovereign immunity" under the Tucker Act. *See id.* at 780-783 (collecting cases).[40] Indeed, the Supreme Court has long made clear

---

[40] The Tucker Act governs the jurisdiction of the Court of Federal Claims and "waives sovereign immunity for claims against the United States not sounding in tort that are founded upon the Constitution, a federal statute or

that, while the Tucker Act expressly waives immunity for contract claims—either "express or implied in fact"—it "does not give a right of action against the United States in those cases where, if the transaction were between private parties, recovery could be had upon a contract implied in law." *Merritt v. United States*, 267 U.S. 338, 341 (1925). Ingram does not dispute this principle.

Instead, Ingram argues that the Suits in Admiralty Act—not the Tucker Act— governs its contract claims against the government. *See* 46 U.S.C. §§ 30901-30918. Even applying the SAA, however, the Court finds no convincing precedent supporting the imposition of implied-in-law contractual liability on the United States. The Court declines, therefore, to impose it here. *See Hillier*, 714 F.2d at 722-23 ("to interpret the Suits in Admiralty Act as a waiver of the government's sovereign immunity . . . in a suit based on a radically new theory of liability . . . would violate the principle that the United States' consent to be sued is not lightly inferred") (quoting *Mitchell*, 463 U.S. at 218); *see also Cesaroni v. United States*, 624 F. Supp. 613, 619 (S.D. Ga.), *aff'd*, 780 F.2d 1031 (11th Cir. 1985) (noting that, under either the Tucker Act or the SAA, "the contract that plaintiff is relying upon must be recognized specifically as a contract enforceable against the Government").

The SAA is a jurisdictional statute which brings maritime claims against the United States within the admiralty jurisdiction of federal district courts. *See Trautman*, 693 F.2d at 443-44 (noting that the SAA "does not itself provide a cause of action against the United States. Instead, it only acts as a waiver of the sovereign immunity of the United States in admiralty suits. Thus, the act merely provides a jurisdictional hook upon which to hang a traditional admiralty claim"). The SAA "originally waived sovereign immunity only with respect to damage caused

---

regulation, or an express or implied contract with the United States." *XP Vehicles*, 121 Fed. Cl. at 780 (citing 28 U.S.C. § 1491 (2012)).

by government vessels and cargoes, but it was amended in 1960 . . . to waive the government's sovereign immunity with respect to any claims that could be maintained in admiralty if brought against a private person." *Hillier*, 714 F.2d at 722. Specifically, the amended waiver provision reads:

> In a case in which, if a vessel were privately owned or operated, or if cargo were privately owned or possessed, or if a private person or property were involved, a civil action in admiralty could be maintained, a civil action in admiralty in personam may be brought against the United States or a federally-owned corporation. In a civil action in admiralty brought by the United States or a federally-owned corporation, an admiralty claim in personam may be filed or a setoff claimed against the United States or corporation.

46 U.S.C. § 30903(a).

The 1960 amendment "attempted to eliminate the confusion between [the SAA and the Tucker Act] by expanding the scope of the Suits in Admiralty Act at the expense of the Tucker Act thereby virtually eliminating the quasi-admiralty jurisdiction of the Court of Claims under the Tucker Act." *United States v. United Cont'l Tuna Corp.*, 425 U.S. 164, 179 (1976); *see also Bearce v. United States*, 614 F.2d 556, 558 (7th Cir. 1980) ("In 1960 the statute was amended to eliminate a variety of jurisdictional problems by bringing all maritime claims against the United States under the admiralty jurisdiction of the federal courts"). As the United States recognizes, however, neither *United Continental Tuna Corporation* nor the legislative history recited therein supports the conclusion that the 1960 amendment altered the longstanding prohibition on "implied-in-law" contractual liability against the United States with respect to maritime contracts. Indeed, Ingram identifies no authority confirming (or discussing) the availability of such a claim against the United States under the SAA.

Ingram, instead, asks the Court (1) to treat its SAA implied-in-law contract claim against the government "just like [one] between private parties," and (2) to apply Illinois contract law, which recognizes promissory estoppel claims between private parties. The Court recognizes that

SAA claims are governed by the "principles of law and the rules of practice applicable in like cases between private parties." 46 U.S.C. § 30907(a). The Court does not, however, read this provision as requiring the Court to ignore the unique character of suits against the United States. Federal courts, for example, have implied exceptions to the United States' waiver of sovereign immunity under the SAA, despite a lack of exemption language in § 30903(a) and despite the "applicable in like cases between private parties" language of § 30907(a). *See, e.g.*, *Cassens*, 44 F.3d at 510-11 ("The discretionary function exception is an exception to the waiver of sovereign immunity granted in the Federal Tort Claims Act, 28 U.S.C. § 2680. Though not a part of the SAA, the discretionary function exception is impliedly contained in that waiver of sovereign immunity as well").[41]

In light of this precedent, and in the absence of any authority upholding implied-in-law contractual liability under the SAA, the Court construes the SAA's waiver provision strictly and in favor of the United States. *See United States v. Nordic Vill. Inc.*, 503 U.S. 30, 34 (1992) (recognizing the "traditional principle that the Government's consent to be sued must be construed strictly in favor of the sovereign, and not enlarged . . . beyond what the language requires") (citations and quotations omitted); *Stewart Sand & Material Co. v. Se. State Bank*, 318 F. Supp. 870, 874 (W.D. Mo. 1970) ("Express contracts and implied-in-fact contracts are agreements of a type wherein the assent of the Government to be sued is indirectly manifested. But a contract implied in law is not the same, and imports a contractual obligation in the absence of intention to be bound. To permit suit on such contracts detracts from the principles that the United States cannot be sued without its consent and that the consent must be express and not

---

[41] The United States identifies other implied limitations on its SAA liability that are not applicable to private parties in a civil admiralty action. (R.798, US Reply Br. at 5-6). None, however, touch upon the issue of implied-in-law contractual liability.

implied").  The Court therefore grants the United States' motion to dismiss Count III for want of subject matter jurisdiction.

### B.        Breach of Contract (Count II)

The Court next examines Ingram's breach of contract claim (Count II).  "An implied-in-fact contract is founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred . . . from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding."  *XP Vehicles*, 121 Fed. Cl. at 781 (citation omitted).  "[W]hen alleging that the federal government entered into an implied-in-fact contract, a plaintiff must establish the same elements as an express contract, namely: mutuality of intent to contract, an unambiguous offer and acceptance, consideration, and actual authority on the part of the government's representative to bind the government."  *Id.* at 785.

As a threshold matter, the government has waived sovereign immunity for implied-in-fact contract claims under the Tucker Act and the SAA.  *See id.* at 784; 46 U.S.C. § 30903(a).  Ingram's allegation that a contract exists between itself and the United States, moreover, "is enough to confer subject matter jurisdiction" as to Count II.  *See XP Vehicles*, 121 Fed. Cl. at 784.  Ingram's Amended Counterclaim (R.373) alleges an offer (¶ 32), authority (¶¶ 31-32), acceptance (¶ 33), mutuality of intent to contract (¶¶ 29-30, 32-33), and consideration (¶ 32), each of which the Court must accept as true on a Rule 12(b)(1) challenge.  *See Smith*, 196 F.3d at 776 n.1.  This pleading is distinguishable, therefore, from the "bald assertions" of governmental promises held insufficient to invoke subject matter jurisdiction in the Court of Federal Claims. *See, e.g.*, *Twp. of Saddle Brook v. United States*, 104 Fed. Cl. 101, 109-10 (2012) (deeming allegations concerning the existence of an implied-in-fact contract "patently insubstantial" where plaintiff failed to allege mutual intent to contract and an exchange of consideration); *Vane*

*Minerals (US), LLC v. United States*, 116 Fed. Cl. 48, 67 (2014) (same); *see also Shapiro v. McManus*, 136 S. Ct. 450, 456, 193 L. Ed. 2d 279 (2015) (absent "wholly insubstantial and frivolous" allegations, "the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction").  In light of Ingram's breach of contract allegations—whether ultimately viable or not—the Court does not view the United States' challenge as a Rule 12(b)(1) or 12(h)(3) challenge to jurisdiction.

"[A] claim does not fail for lack of jurisdiction merely because its success is doubtful." *XP Vehicles*, 121 Fed. Cl. at 784-85 (citing *Bell v. Hood,* 327 U.S. 678, 682 (1946)).  Here, the United States did not timely move to dismiss Count II for failure to state a claim under Rule 12(b)(6).  The Court denies the United States' present request for Rule 12(b)(1) dismissal, and further denies its request for leave to re-file its motion as one for summary judgment at this late stage.  (R.798, Reply Br. at 14).[42]  As the United States acknowledges, its motion "is not being presented at the start of litigation, but rather after three years of discovery."  (*Id.*).  The deadline to file dispositive motions has passed (R.674), and—with trial beginning in approximately two months—the United States has not justified its failure to challenge the merits of Ingram's breach of contract allegations before now.

---

[42]  The United States relies upon summary judgment decisions to urge the Court to find, for example, that Lockmaster Rodriguez lacked actual authority to bind the government to the contract at issue, or to find that the contract lacked valid consideration.  *See, e.g.*, *H. Landau & Co. v. United States*, 886 F.2d 322 (Fed. Cir. 1989); *SGS-92-X003 v. United States*, 74 Fed. Cl. 637 (2007); *Hammond Grp., Ltd. v. Spalding & Evenflo Companies, Inc.*, 69 F.3d 845 (7th Cir. 1995).  The Court declines, however, to rule on these issues.

**CONCLUSION**

For the foregoing reasons, the Court denies the United States' motion with respect to the Flood Control Act, but grants the United States' motion with respect to the discretionary function exception. (R.747). The Court finds that the United States cannot be held liable in tort for allegations arising from Lockmaster Rodriguez's operation of the dam gates during the attempted Canal transit. The Court further grants the United States' motion to dismiss Ingram's promissory estoppel allegations (Count III), but denies the United States' motion with respect to Ingram's breach of contract allegations (Count II). (R.750).


**Dated:** July 13, 2016

ENTERED

_____
AMY J. ST. EVE
United States District Court Judge