# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE COMPLAINT OF ) <br> INGRAM BARGE COMPANY AS OWNER ) <br> OF THE M/V DALE A. HELLER AND THE ) <br> IB9525, IN025300, IN085089, IN095041, ) <br> IN096081, IN107057, AND IN117513, ) <br> PETITIONING FOR EXONERATION FROM ) <br> OR LIMITATION OF LIABILITY, ) <br>  ) <br> *Consolidated with,* ) <br>  ) <br> IN THE MATTER OF AMERICAN ) <br> COMMERCIAL LINES, LLC, AS OWNER ) <br> AND INLAND MARINE SERVICE, INC. AS ) <br> OWNER *PRO HAC VICE* OF THE M/V LOYD ) <br> MURPHY FOR EXONERATION FROM OR ) <br> LIMITATION OF LIABILITY. ) | Civil Action No.: 13 C 3453 <br> Civil Action No.: 13 C 4292 <br> (Consolidated) <br>  <br> Judge Amy J. St. Eve |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On May 6, 2016, Petitioner Ingram Barge Company ("Ingram"), as owner of the M/V Dale A. Heller ("Dale Heller"), moved to limit the testimony of the United States' expert, Captain Donald Kinsey, pursuant to the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). (R.764). After the parties briefed the present motion, the Court held a *Daubert* hearing on June 30, 2016, at which Captain Kinsey testified. For the following reasons, the Court, in its discretion, grants in part and denies in part Ingram's motion.

**BACKGROUND**

I. **Factual Background**

This admiralty case arises from the Dale Heller's unsuccessful attempt to navigate its fourteen-barge tow past a federal dam located near the town of Marseilles, Illinois during a high-water situation on April 18, 2013. Other maritime vessels agreed to assist the Dale Heller in this navigation attempt, including: (1) the M/V Loyd Murphy ("Loyd Murphy"), operated by Inland Marine Service, Inc. ("IMS") and owned by American Commercial Lines, LLC; (2) the M/V City of Ottawa, a United States Army of Engineers ("Corps") vessel; and (3) the M/V Creve Coeur, another Corps vessel.[1] While traversing Illinois River Mile 247.0 near the Marseilles Dam, the Dale Heller's tow broke apart, and seven of its barges either allided with the dam or sank upriver from it. Subsequent to this incident, the river waters overtopped the surrounding earthen dike and flowed into the town of Marseilles, causing substantial damage to real and personal property.

Ingram and IMS both filed a complaint in admiralty for exoneration from or limitation of liability in connection with this April 18, 2013 incident. (R.1; R.1, 13-cv-04292). The United States filed a claim in both limitation actions for damages to the Marseilles Dam and related structures. (R.129, R.374). Individual claimants also filed general maritime claims against Ingram, IMS, and the United States for their resulting property damage.

II. **Captain Kinsey's Qualifications**

Captain Kinsey has a Bachelor's Degree in Marine Transportation from the State University of New York Maritime College at Fort Schuyler. He also holds several Coast Guard licenses, including a Master of Towing Vessels Oceans license, a Master Any Gross Tons Upon Inland Waters license, and a First Class Pilot Any Gross Tons license, as endorsed. The Master

---

[1] Other vessels, including the M/V City of Joliet, the M/V Cody Boyd, and the Nancy S. provided additional assistance to the Dale Heller throughout April 17-18, 2013.

Any Gross Tons Upon Inland Waters license, in particular, entitles him to captain any vessel of any gross tons upon any inland waters, except for the western rivers of the United States. The National Maritime Center, furthermore, certified Captain Kinsey as a navigation instructor for candidates seeking Coast Guard licenses. He is also a Coast Guard-designated Examiner for Towing Vessels, an accredited marine surveyor, and a lead auditor for the national Responsible Carrier Program run by the American Waterways Operators. (R.790-1, Kinsey CV at 1-2).

In addition to education and professional accreditation, Captain Kinsey has four decades of experience navigating vessels—including towboats pushing a single-unit barge—on inland rivers, including the rivers along the eastern seaboard of the United States and the Gulf of Mexico. Although Captain Kinsey has never navigated a vessel on the Illinois River past the Marseilles Lock and Dam, he has navigated vessels within the New York State canal system, which contains lock and dam facilities.

### III. Captain Kinsey's Expert Opinions

In his report dated December 22, 2015, Captain Kinsey offers several opinions about the events of April 17-18, 2013, leading up to the dam allision. (R.764-2, Kinsey Rep.). In particular, Captain Kinsey examines the Inland Navigation Rules to render opinions about the prudence of the attempted transit to the Marseilles Canal and about the insufficiency of planning surrounding that decision. (*Id.* at 5-9). He also opines on Ingram's purported failure to adhere to its own safety management policies and procedures. (*Id.* at 9-20).[2] Captain Kinsey then uses these sources and his own experience to criticize, among other things, (i) the purported lack of communication between the Dale Heller Captain (Captain White) and Ingram's Port Captain (Ed Henleben); (ii) Ingram's failure to appreciate weather conditions throughout April 16-17; (iii) Captain White's decision to back in and hold at Ballards Island with a fourteen-barge tow on

---

[2] Ingram does not challenge this opinion relating to safety management practices.

April 17; (iv) Ingram's failure to use available vessel technology to ensure both (a) accurate data reception, and (b) clear communication with the Marseilles Lockhouse during the attempted transit; and (v), ultimately, Ingram's decision to proceed with an unprecedented transit plan without sufficient planning. (*Id.* at 20-38).[3] Captain Kinsey closes his report with an "error chain" study throughout April 16-18, 2013, ultimately concluding that the "root cause of the incident is attempting to navigate a 14 barge tow past the Marseilles Dam in high water conditions without sufficient planning." (*Id.* at 39-44).

## DAUBERT STANDARD

"A district court's decision to exclude expert testimony is governed by Federal Rules of Evidence 702 and 703, as construed by the Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993)." *Brown v. Burlington No. Santa Fe Ry. Co.*, 765 F.3d 765, 771 (7th Cir. 2014). "The rubric for evaluating the admissibility of expert evidence considers whether the expert was qualified, whether his methodology was scientifically reliable, and whether the testimony would have assisted the trier of fact in understanding the evidence or in determining the fact in issue." *Hartman v. EBSCO Indus., Inc.*, 758 F.3d 810, 817 (7th Cir. 2014); *see also Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 704 (7th Cir. 2015) ("Rule 702 and *Daubert* require the district court to determine whether proposed expert testimony is both relevant and reliable"). Although the Seventh Circuit reviews "the district court's application of *Daubert* [] de novo," if "the court adhered to the *Daubert* framework, then its decision on admissibility is reviewed for abuse of discretion." *Estate of Stuller v. United States*, 811 F.3d 890, 895 (7th Cir. 2016).

---

[3] Captain Kinsey also criticizes the conduct of the Loyd Murphy and its Captain, Anthony Ice ("Ice"), in locking through the Marseilles facility during a high-water situation, wiring its tow alongside the Dale Heller, and playing an unwarranted role at the "captains' meeting," during which the various captains, pilots, and/or deckhands discussed the transit plan. (*Id.* at 38, 40).

4

A district court's evaluation of expert testimony under *Daubert* does not "take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012); *see also Ortiz v. City of Chicago*, 656 F.3d 523, 536 (7th Cir. 2011) ("The admissibility determination is not intended to supplant the adversarial process, and so even 'shaky' testimony may be admissible"). Once it is determined that "the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Lapsley*, 689 F.3d at 805 (quoting *Daubert*, 509 U.S. at 596). A district court's inquiry under *Daubert* is a flexible one and district courts have wide latitude in performing this gate-keeping function. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Hartman*, 758 F.3d at 818. "'[T]he key to the gate is not the ultimate correctness of the expert's conclusions,'" rather, "'it is the soundness and care with which the expert arrived at her opinion[.]'" *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015) (citation omitted). The "proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard" by a preponderance of the evidence. *Lewis v. Citgo Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

The Seventh Circuit has clarified that *Daubert*'s reliability and relevancy requirements "continue to apply in a bench trial." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010). "However, the usual concerns of the rule—keeping unreliable expert testimony from the jury—are not present in such a setting[.]" *Id.* As such, the Court may defer making reliability determinations until after the evidence is presented. *Id.*; *see also Estate of Stuller*, 811 F.3d at 895 n.3 ("Where the factfinder and the gatekeeper are the same, the court does not err in

admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702"); *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006) ("the court can hear the evidence and make its reliability determination during, rather than in advance of, trial"). A district court conducting a bench trial must nevertheless provide more than "conclusory statements of admissibility or inadmissibility to show that it adequately performed its gatekeeping function." *Metavante*, 619 F.3d at 760.

## ANALYSIS

In this *Daubert* motion, Ingram asks the Court to limit Captain Kinsey's opinions to those regarding "safety management systems for vessel operators" and to strike his opinions regarding "navigational decision-making." (R.764). In support of this request, Ingram argues that (1) Captain Kinsey is not qualified to render navigation opinions in this case; (2) Captain Kinsey's navigation opinions do not result from any discernable methodology; and (3) Captain Kinsey's navigation opinions are duplicative of another United States' expert's opinions, Captain Pat Jamison ("Jamison"). The Court examines each argument, in turn.

**I.     Captain Kinsey Is Qualified to Render Navigation Opinions in This Case**

"For a witness to be considered an 'expert,' Rule 702 requires that person to be qualified as such by knowledge, skill, experience, training, or education." *Lewis*, 561 F.3d at 705 (quotations omitted). Ingram challenges Captain Kinsey's navigation qualifications because he has no experience piloting a vessel on the Illinois River. Ingram points, in particular, to Captain Kinsey's own admission that upper river mariners (such as Captains White and Ice) are the "elite of the inland mariners." (R.764-2, Kinsey Rep. at 4; R.764-3, Kinsey Dep. Tr. at 89-90). According to Ingram, this admission, coupled with Captain Kinsey's lack of experience on the Illinois River, precludes the Court from admitting his navigation-oriented opinions in their

entirety. After reviewing the parties' submissions and hearing Captain Kinsey's live testimony, the Court disagrees.

At the *Daubert* hearing, Captain Kinsey testified to his forty-year experience as a marine navigator, including twenty-five years as a captain onboard various tugs and motor vessels. In particular, he testified to his experience navigating inland waters, including, among others, the St. Lawrence River, the Chelsea River, the Narragansett River, the Connecticut River, the Chesapeake Bay, the James River, the Charleston River, the St. John's River, and the Houston Shipping Channel. From 1978 to the mid 1990's, Captain Kinsey served as a captain and mate with Mobil Oil Corporation's Northeast Fleet. In that role, he navigated New York State's canal system, including the eleven lock and dam mechanisms located throughout Lake Champlain. Captain Kinsey testified that, while these locks and dams are not identical to the Marseilles Lock and Dam, the same navigational principles apply with respect to (i) approaching the lock area, (ii) minding any cross-currents created by the dam, and (iii) maintaining clear communication with external parties, such as port captains, lockmasters, and/or draw bridge operators.

Apart from a brief stint at the beginning of his career, Captain Kinsey has no navigation experience on the Illinois River. Furthermore, as Captain Kinsey testified, he does not hold—and has never held—a license to captain or pilot a vessel on the Illinois River. According to his hearing testimony, the waters of the Illinois River are "pilotage waters" – that is, narrow waters with many "bends and turns." Captain Kinsey agreed that Captain White and Captain Ice—who, unlike him, *do* hold licenses to operate on the Illinois River—used their "professional judgment" in terms of their "underway boat handling," or "pilotage," decision-making. Ingram looks to this evidence to limit the scope of Captain Kinsey's expert testimony.

7

Given Captain Kinsey's extensive experience in marine navigation, however, the Court declines to find that Captain Kinsey is not qualified to render navigation opinions in this case. *See Mike Hooks Dredging Co. v. Marquette Transp. Gulf-Inland, L.L.C.*, 716 F.3d 886, 894 (5th Cir. 2013) (district court did not abuse discretion in admitting expert witness who lacked "practical experience" with the Gulf Intracoastal Waterway where the witness had "extensive experience with maritime navigation" in other countries). Hyper-specialization—in this case, professional experience piloting a towboat pushing a multi-unit tow through the Marseilles Lock and Dam—is not a prerequisite for admitting expert testimony in admiralty cases. Furthermore, the majority of Captain Kinsey's proffered navigation opinions concern Ingram's conduct (and, to a lesser extent, IMS' conduct) *before* the attempted canal transit – in particular, regarding poor planning and inadequate communications leading up to the allision. In other words, the proffered opinions do not touch upon the physical pilotage of the Dale Heller past the Marseilles Dam, a topic on which Captain Kinsey admits he is not qualified to testify.[4]

The Court is not persuaded, therefore, by Ingram's analogy to *Lewis*, where the excluded expert was an "allergist and had no training or experience in toxicology or epidemiology." 561 F.3d at 706. Here, Captain Kinsey's educational and experiential background bears on his navigation opinions. Unlike in *Lewis*, moreover, where the proponents "failed to advance any arguments in support of their experts," here, the United States has offered evidence—including CV credentials and hearing testimony—establishing that Captain Kinsey is qualified to render navigation opinions. *Id.* at 705-06. In view of this evidence, the Court declines to bar Captain Kinsey's navigation opinions on qualification grounds. *See Fed. Ins. Co. v. Arthur Andersen,*

---

[4] At his deposition, for example, Captain Kinsey testified that his report does not address "the movement of the tow from Ballards Island down into the navigation lock" because his expertise "is not operating a 14-barge tow on the Illinois River." (R.764-3, Kinsey Dep. Tr. at 32; *see also id.* at 42). To the extent Captain Kinsey's trial testimony discusses the physical pilotage of the Dale Heller and/or the assist vessels during the attempted transit, the Court will consider proper objections at that time.

*LLP*, No. 1:03CV01174, 2006 WL 6555232, at *2 (N.D. Ill. Jan. 18, 2006) (concluding that the proposed expert possessed the "knowledge, skill, and experience necessary to satisfy the threshold of admissibility under Rule 702").

## II. Reliability and Relevance of Captain Kinsey's Navigation Opinions

### A. Captain Kinsey's Opinions Result from a Discernable Methodology

Ingram next challenges Captain Kinsey's navigation opinions as a subjective "take" on selected facts, without citation to the record. This challenge speaks to the reliability requirement under *Daubert* and Rule 703. *See Stuhlmacher v. Home Depot U.S.A., Inc.*, 774 F.3d 405, 409 (7th Cir. 2014) ("Expert testimony is admissible at trial if the testimony is relevant to a fact in issue, is based on sufficient facts or data, and is the product of reliable scientific or other expert methods that are properly applied"); *see also Brown*, 765 F.3d at 772 ("Rule 703 requires the expert to rely on 'facts or data,' as opposed to subjective impressions"). Although an expert's opinion must be founded on sufficient facts or data, *see Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011), "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Manpower, Inc. v. Ins. Co. of Penn.*, 732 F.3d 796, 806 (7th Cir. 2013) (citation omitted). A "district court enjoys broad latitude both in deciding how to determine reliability and in making the ultimate reliability determination." *Higgins,* 794 F.3d at 704 (citation omitted).

In particular, Ingram argues that Captain Kinsey's expert report is replete with 65 "in my opinion" judgments that "are nothing more than *ipse dixit* declarations" unmoored to the record. In addition, Ingram argues, Captain Kinsey "cherry-picked" supporting data while ignoring all

9

other data, acting as a "partisan advocate" rather than a neutral expert. The Court examines these arguments, in turn.

### 1. Factual Support

As an initial matter, the Court disagrees with Ingram's broad characterization of the 65 challenged opinions as untied to the record. As his hearing testimony made clear, in order to render his expert opinions, Captain Kinsey (1) conducted an on-site visit to the Marseilles Lock and Dam; (2) examined the evidentiary record, including Ingram's safety, weather, and navigation manuals and audit information, waterway charts, chart-plotter data, deposition transcripts, witness interview statements, and 60 hours of audio and visual recordings from the Dale Heller wheelhouse; and (3) applied his own education, extensive professional experience, and training as a marine auditor. Ingram's argument regarding a lack of citation to the record, moreover, is not borne out by the expert report itself, which includes footnote citations and other references to documents and data. Given this sound methodological approach—and given Ingram's own failure to reason why each of the 65 "in my opinion" statements do not meet the *Daubert* standard—the Court declines to analyze each one for admissibility at this time. *See Metavante*, 619 F.3d at 760.[5]

The Court does, however, examine the specific examples set forth by Ingram. In particular, Ingram points to ten examples of Captain Kinsey's alleged *ipse dixit* declarations, arguing that "[n]o methodology provides a foundation" for such statements. (R.764-1, Opening Br. at 6-7). The challenged ten opinions are:

1. In my opinion it would be a precaution to not attempt to enter the extremely narrow navigation canal above [the] Marseilles Lock.

---

[5] Captain Kinsey's explanation of his methodology satisfies the Court that his opinions concerning the Loyd Murphy pass the *Daubert* test. (R.764-2, Kinsey Rep at 38, 40). The Court reserves the right to disregard such testimony if, at trial, it "turns out not to meet the standard of reliability established by Rule 702." *Estate of Stuller*, 811 F.3d at 895 n.3.

2. In my opinion attempting this transit at a time when the dam gate settings were at over 60 feet, a type of transit that none of the vessel operators had ever attempted was not prudent.

3. It was also negligent for Pilot Shrader to not notify Captain White and Operations Manager Ed Henleben that all of the vessels holding the combined tow of 31 barges were "fully engaged" and not holding position after the trees fell at 1312.

4. In my opinion, effective communication never got past Mr. Henleben.

5. In my opinion it was negligent to not discuss the plan details with Captain White or at least get an email confirmation from the Captain that all of the plan details were understood and accepted.

6. Ingram managers, in my opinion, failed to appreciate the weather conditions.

7. In my opinion, there were alternatives; there is a history of tows lying at Ballards Island during high waters with the rollers wide open. In my opinion it would be necessary to get the "Dale Heller" off the stern of the tow and push on or into the island.

8. In my opinion it was negligent to not enter waypoints for the transit from Ballards Island to the Marseilles Navigation Canal.

9. Captain White was responsible for the safe navigation of his tow and was negligent in not verifying that the navigation dam would be properly set before he made his approach to the Marseilles Canal.

10. Failing to test the possible duration of the dam setting is negligent in my opinion.

After reviewing each statement, the Court finds sufficient factual underpinning for Opinion Nos. 1-5 and 8-9. *See Brown*, 765 F.3d at 771-72. In particular, Captain Kinsey derives Opinion Nos. 1 and 2 by reviewing deposition testimony and audio recordings, and using his maritime experience to apply Inland Navigation Rule No. 2, relating to prudence and risk management in inland navigation. He uses the same methodology with respect to Opinion No. 3, instead applying Inland Navigation Rule No. 5, relating to lookout practices and effective communications. The principle of effective communications also underlies Opinion Nos. 4, 5, and 9, wherein Captain Kinsey criticizes—based on his review of the wheelhouse audio and

Ingram's safety management system—Captain White and Ed Henleben's failure to communicate with each other, and Captain White's failure to communicate with the Marseilles lockhouse, with respect to the transit plan. Captain Kinsey's (i) safety auditor training, (ii) experience as an instructor of bridge resource management, and (iii) personal experience as a vessel captain and a relief port captain, each bear on these opinions. Relatedly, to render Opinion No. 8, Captain Kinsey relies upon his training as an instructor in electronic chart-plotting to criticize Ingram's failure to program waypoints into its electronic chart display to determine the precise location of the tow during the attempted transit. The Court finds that sufficient facts or data support these statements. *See Bielskis*, 663 F.3d at 894.

Captain Kinsey's Opinion Nos. 7 and 10, however, lack support in the record. In Opinion No. 7, Captain Kinsey opines that there were "alternatives" available to Ingram on April 18, including moving the Dale Heller off the stern and pushing the tow into Ballards Island. In Opinion No. 10, Captain Kinsey faults Ingram for failing to test the gate settings using the M/V City of Joliet as a "trial run." Captain Kinsey fails, however, to identify any factual underpinning (or provide any expert analysis) to support these opinions. As to Opinion No. 7, Captain Kinsey recalled "four individuals" testifying to the topic of breaking the Dale Heller off the tow's stern, but his expert report provides no citation to the record, and he did not identify any specifics at the hearing. His past experience "pushing up on vessels to hold them in position," meanwhile, does not enable him to render an opinion regarding an "alternative option" available to the Dale Heller on April 18.[6] The Court therefore strikes Captain Kinsey's expert opinion regarding "alternatives" or "possibilities." (R.764-2, Kinsey Rep. at 26-28, "No

---

[6] Captain Kinsey, for example, provides no calculations to support this opinion.

12

Alternative").⁷ The Court also strikes Captain Kinsey's unsupported opinion that Ingram should have tested the gate settings on a "trial basis" using the City of Joliet. (*Id.* at 36-37). There is no evidence that Ingram had any authority or ability to direct that the Joliet—and/or the Marseilles lockhouse—conduct this "trial run." To the extent consistent with this Opinion, Captain Kinsey may testify regarding pre-transit planning and transit communications, but he sets forth no underlying facts or data regarding the feasibility of using the Joliet as a "trial run." The Court therefore strikes this opinion. *See Brown*, 765 F.3d at 772 ("Rule 703 requires the expert to rely on 'facts or data,' as opposed to subjective impressions").

In Opinion No. 6, Captain Kinsey opines that "Ingram managers . . . failed to appreciate the weather conditions." At the hearing, Captain Kinsey explained that, based on his review of the record, Ed Henleben did not support Captain White's decision to stop navigation at Ballards Island and, in that respect, failed to consider all weather-related information. As Captain Kinsey testified, "I expect my managers to stay informed of weather conditions the same way I would keep myself informed of weather conditions." This "best practice" opinion, however, does not appear to "involve the application of scientific, technical, or other specialized knowledge as required under Federal Rule of Evidence 702." *Alcala*, 2006 WL 5112759 at *1. In other words, the Court does not see how Captain Kinsey's proffered expertise assists the trier of fact in this observation. The Court therefore strikes this opinion. *See Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001) (affirming the exclusion of expert testimony where it was "based

---

⁷ Alternatively, the Court views this opinion as gratuitous and not useful to the trier of fact. As the Court has previously observed, expert opinion must be based on the application of experience or knowledge, not merely drawn from facts in the record. *See Alcala v. Emhart*, No. 04 C 205, 2006 WL 5112759, at *1 (N.D. Ill. Apr. 25, 2006). "Unless the expertise adds something, the expert is at best offering a gratuitous opinion[.]" *United States v. Hall,* 93 F.3d 1337, 1343 (7th Cir. 1996). Captain Kinsey's opinion purportedly draws from the deposition testimony of four unnamed individuals. The Court does not need an expert to repackage factual testimony.

on common sense" and thus "obvious to the layperson") (citation omitted).[8] The Court also strikes another weather-related opinion—"there was never a time from 2000 on April 16th when the gate setting was 19 feet onward that the Navigation Dam at Marseilles was open less than 18 feet"—for lack of factual underpinning.[9] *See Bielskis*, 663 F.3d at 894. The Court therefore grants Ingram's motion with respect to Captain Kinsey's opinions under the heading, "Weather Forecasts and Predictions." (R.764-2, Kinsey Rep. at 22).

### 2. Conflicting Evidence

Ingram next argues that Captain Kinsey's selective use of record facts renders his opinions unreliable under *Daubert*. During the hearing, for example, Ingram questioned Captain Kinsey on his failure to consider "key" evidence concerning (i) the communication of a 16-foot (versus 60-foot) gate-setting agreement, as well as (ii) the responsibility of Corps employee Jeff Griffin to coordinate lockhouse communications. In addition, Ingram faulted Captain Kinsey for mistakenly referring to the Dale Heller's chart-plotting system (CEACT) as an "Ingram product."

As the Court previously recognized, however, there are sufficient factual underpinnings—as opposed to mere subjective impressions—to support Captain Kinsey's Opinion Nos. 1-5 and 8-9. *See Brown*, 765 F.3d at 771-72. Here, the presence of conflicting underlying evidence speaks to the weight of the proffered opinion, not its admissibility. *See NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 789-90 (7th Cir. 2000); *Nolan v. United States*, No. 12 C 0247, 2015 WL 5159888, at *7 (N.D. Ill. Sept. 1, 2015). At trial, Ingram can challenge

---

[8] Ingram further argues that Captain Kinsey's failure to consider "key" record evidence—including hydrographs of the Illinois River, one Corps manual, and two Rule 30(b)(6) depositions of the National Weather Service—necessarily renders his weather-related opinion unreliable under *Daubert*. The presence of conflicting underlying evidence, however, speaks to the weight of the proffered opinion, not its admissibility. In any event, the Court has already excluded this opinion on relevance grounds.

[9] Captain Kinsey cites to "LPMS" here, but that shorthand does not refer to any readily-identifiable piece of record evidence. Ingram refers to this citation as "cryptic."

the accuracy of the underlying evidence by using vigorous cross-examination and presenting contrary evidence. *See Lapsley*, 689 F.3d at 805; *see also Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 768 (7th Cir. 2013) ("The fact that an expert's testimony contains some vulnerable assumptions does not make the testimony irrelevant or inadmissible").[10]

Furthermore, if the Court later determines that any opinion testimony is not properly based on facts in the record, the Court will strike the testimony at such time. *See Metavante*, 619 F.3d at 760; *see also Armament Sys. & Procedures, Inc. v. IQ Hong Kong Ltd.*, No. 00-C-1257, 2007 WL 4747940, at *2 (E.D. Wis. Apr. 27, 2007) (reserving the right to "entertain objections and disregard testimony" should the proffered expert testimony "cross the line" into irrelevancy or unreliability during bench trial). *Daubert* concerns—including "the trier of fact being fooled by evidence of dubious merit"—are not as significant here, where the Court acts as factfinder and gatekeeper. *See Taubensee Steel & Wire Co. v. Macsteel Int'l USA Corp.*, No. 9 C 1505, 2011 WL 1651239, at *4 (N.D. Ill. May 2, 2011); *The Medicines Co. v. Mylan Inc.*, No. 11-CV-1285, 2014 WL 1979360, at *5 (N.D. Ill. May 15, 2014); *Loeffel Steel*, 372 F. Supp. 2d 1104, 1122-23 (N.D. Ill. 2005).

For these reasons, the Court, in its discretion, denies Ingram's motion as to Opinion Nos. 1-5 and 8-9. The Court grants Ingram's motion as to Opinion Nos. 6, 7, and 10 and as otherwise discussed in this Opinion.

### B.    Legal Conclusions

Ingram also contends that Captain Kinsey has offered impermissible "legal conclusions." As a general rule, an expert may not offer legal opinions. *See Jiminez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013). "Where the proffered expert offers nothing more than a 'bottom

---

[10] During the hearing, Ingram also faulted Captain Kinsey for characterizing the transit plan as the "Ed Henleben Plan." Evidence bearing on the Coast Guard's involvement in the transit plan's development, however, likewise speaks to weight – not admissibility.

15

line' conclusion, he does not assist the trier of fact." *U.S. Gypsum Co. v. Lafarge North America Inc.*, 670 F. Supp. 2d. 748, 765 (N.D. Ill. 2010) (quoting *Clark v. Tanaka Corp.,* 192 F.3d 750, 759 (7th Cir. 1999)). As the Seventh Circuit teaches, "[e]xpert testimony as to legal conclusions that will determine the outcome of the case is inadmissible." *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003). There is a difference, nevertheless, "between stating a legal conclusion and providing concrete information against which to measure abstract legal concepts." *United States v. Blount*, 502 F.3d 674, 680 (7th Cir. 2007).

Here, Ingram challenges Captain Kinsey's use of the word "negligent" throughout his expert report. As Captain Kinsey testified at the hearing, however, this word choice is merely descriptive. Captain Kinsey's use of the word "negligent" to describe his view of the evidence, as informed (in most instances) by his own expertise, does not transform his opinion into a "legal conclusion." *See Good Shepherd*, 323 F.3d at 564. The Court notes, moreover, that there is no risk of jury confusion here, given that this is a bench trial. The Court will not accept Captain Kinsey's negligence opinions as legal conclusions. *See Metavante*, 619 F.3d at 760; *Medicines Co.*, 2014 WL 1979360 at *5 (noting that the "risk of confusion or prejudice" is lessened in a bench trial). Because Captain Kinsey has not offered a "bottom line" conclusion on purely legal matters, and because this is a bench trial at which *Daubert* concerns are not as significant, the Court denies that aspect of Ingram's motion.

## III. The Court Will Decide FRE 403 Issues, As Necessary, at Trial

Finally, Ingram asks the Court to exclude Captain Kinsey's navigation opinions as duplicative of Captain Jamison's expert opinions. Federal Rule of Evidence 403 permits the Court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . needlessly presenting cumulative evidence." Fed. R. Evid. 403. The Seventh Circuit has

instructed that, while a district court "retains considerable latitude even with admittedly relevant evidence in rejecting that which is cumulative," the court must not "so limit[] the evidence that the litigant is effectively prevented from presenting his or her case." *Thompson v. City of Chicago*, 722 F.3d 963, 971 (7th Cir. 2013) (citations and quotations omitted).

According to Captain Jamison, "Captain Charles White made a series of bad decisions and all these did contribute to this [April 18, 2013] accident." (R.764-4, Jamison Rep. at Item 20).[11] This opinion is based on his experience "piloting boats on the Illinois River starting in 1961." (*Id.*). While Captain Kinsey likewise opines on Ingram's "bad decisions" throughout April 16-18, 2013, the Court declines to find—at this stage of the proceedings—that such overlap substantially outweighs the probative value of the proffered expert evidence. *See Thompson*, 722 F.3d at 971 (recognizing "the importance of flexibility to accommodate adjustment" with respect to Rule 403 rulings) (citing *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1171 (7th Cir. 1983)). This decision is subject to change if events at the trial satisfy the Court that the United States is "needlessly presenting cumulative evidence" in the form of two maritime navigation experts. *See id.* The Court denies this aspect of Ingram's motion as premature.

---

[11] Captain Jamison also criticizes the conduct of Captain Ice. *See id.*

## CONCLUSION

For these reasons, the Court, in its discretion, grants in part and denies in part Ingram's *Daubert* motion.


**Dated:** July 14, 2016                    ENTERED

_____
AMY J. ST. EVE
United States District Court Judge